**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| STARNET INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. FILED: MARCH 31, 2008 |
| | ) | 08 CV 1828          JH |
| SOUTH WEST INDUSTRIES, INC. d/b/a | ) | JUDGE GOTTSCHALL |
| ANDERSON ELEVATOR COMPANY; and | ) | MAGISTRATE JUDGE ASHMAN |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, StarNet Insurance Company ("StarNet"), by and through its counsel of record,

Bollinger, Ruberry & Garvey, and for its Complaint against Defendants South West Industries,

Inc. d/b/a Anderson Elevator Company ("SWI") and Chicago Transit Authority ("CTA"),

alleges, states and avers:

### JURISDICTION

1.    Plaintiff StarNet is a Connecticut insurance company, with its principal place of

business at 475 Steamboat Road, Greenwich, CT 06830, issuing insurance policies in Illinois

pursuant to the Illinois Insurance Code.

2.    Defendant SWI is an Illinois corporation, with its principal place of business at

2801 19th Ave., Broadview, IL 60155.

3.    Defendant CTA is an Illinois governmental agency, with its principal place of

business at 567 W. Lake St., Chicago, IL 60661.

4.      This Court has jurisdiction over this matter under 28 U.S.C. § 1332 based on diversity of citizenship of the parties and the matter in controversy exceeds $75,000.

## LEWANDOWSKI LAWSUIT

5.      On October 24, 2006, a lawsuit was filed in the Circuit Court of Cook County, Illinois under the caption, *Lawrence Lewandowski v. South West Industries Inc., et al.*, Case No. 2006 L 011181 (the "Lewandowski Lawsuit").  A true and correct copy of the First Amended Complaint filed in the Lewandowski Lawsuit is attached hereto as Exhibit "A".

6.      SWI was served in the Lewandowski Lawsuit on or about November 9, 2006.

7.      Count I of the Lewandowski Lawsuit includes the following allegations:

a.      On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit Authority (CTA).

b.      On and prior to July 5, 2006, SOUTH WEST had a contract with the CTA to inspect, maintain and/or repair elevators, including an elevator located at the Pulaski station of the CTA's Orange Line ("the elevator"), at or near 5106 S. Pulaski Road, Chicago, Illinois.

c.      On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

d.      On or about July 5, 2006, the elevator's cables snapped, separated or otherwise failed, causing the elevator to fall.

e.      On or about July 5, 2006, no brake, governor or other device prevented the elevator from free falling.

f.      As a proximate result of the elevator's fall, LAWRENCE was injured.

g.      At the time and place alleged, SOUTH WEST was negligent in one or more of the following respects:

1.  Installing unsafe, inadequate or otherwise defective cables; or

2.  Failing to adequately inspect or maintain the cables; or

3.  Failing to repair the elevator or cables though they knew, or should have known, they were unsafe; or

4.  Failing to install properly working brakes, a governor or other safety device to prevent the elevator's free fall; or

5.  Failing to adequately inspect or maintain the brakes, governor or other safety device; or

6.  Failing to repair the brakes, governor or other safety device though they knew, or should have known, that they were malfunctioning or were otherwise unsafe; or

7.  Was otherwise negligent in its installation, inspection and/or maintenance of the elevator.

h.  As a proximate result of one or more of the foregoing negligent acts and/or omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

8.  Count II of the Lewandowski Lawsuit includes the following allegations:

a.  On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit Authority (CTA).

b.     On and prior to July 5, 2006, SOUTH WEST assembled and installed elevators and their components

c.     Prior to July 5, 2006, SOUTH WEST installed an elevator at the CTA's Pulaski Station of the Orange Line located at or near 5106 Pulaski Road, Chicago, Illinois.

d.     On and prior to July 5, 2006, SOUTH WEST assembled the components of the elevator.

e.     On and prior to July 5, 2006, SOUTH WEST procured the cables for the elevator.

f.     On and prior to July 5, 2006, SOUTH WEST installed the cables for the elevator.

g.     On and prior to July 5, 2006, SOUTH WEST was responsible for the installation of brakes or governors for the elevator.

h.     On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

i.     On or about July 5, 2006, the elevator's cables snapped, separated or otherwise failed, causing the elevator to fall.

j.     On or about July 5, 2006, no brake, governor or other device prevented the elevator from free falling.

k.     As a proximate result of the elevator's fall, LAWRENCE was injured.

l.     At the time and place alleged, the elevator was unreasonably dangerous in one or more of the following respects:

   1.  It had inadequate cables; or

   2.  Its cables were inadequately maintained and/or repaired; or

3.   It lacked adequate brakes; or

4.   Its brakes were inadequately maintained and/or repaired; or

5.   It lacked a governor or similar safety device; or

6.   Its governor or otherwise similar safety device was inadequately maintained and/or repaired.

m.   The aforesaid defective and unreasonably dangerous conditions were present at the time the elevator left the control of SOUTH WEST.

n.   As a proximate result of . . . one or more of the foregoing unreasonably dangerous conditions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will incur expenses for future medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

9.   Counts V & VI of the Lewandowski Lawsuit include the following additional allegations:

a.   At all times alleged BERNICE was the wife of LAWRENCE.

b.   As a proximate result of one or more of the foregoing negligent acts and/or omissions, BERNICE has suffered a loss of the society, companionship and support of her husband, LAWRENCE.

## SOUTH WEST'S THIRD-PARTY COMPLAINT

10.   On October 24, 2007, SWI filed a Third-Party Complaint in the Lewandowski Lawsuit against the CTA ("SWI Complaint").  A true and correct copy of the SWI Complaint is attached hereto as Exhibit "B".

11.     The CTA was served with the SWI Complaint on October 30, 2007.

12.     Count I of the SWI Complaint includes the following allegations:

a.      At the date, time and place of the aforesaid incident, CTA was charged with the management, operation, and control of the aforementioned property, and as such was a common carrier with respect to the elevator located therein, and had the duty to use the highest degree of care consistent with the management, operation, and control of said property to avoid injury to those on the premises.

b.      Notwithstanding said duty, CTA acted or failed to act in one or more of the following ways that amounted to negligent or careless conduct:

1.      failed to maintain the elevator in good and proper condition when it knew or should have known in the exercise of the highest degree of care and caution that the elevator created a situation of imminent danger for persons, such as the plaintiff;

2.      allowed said elevator to fall into a state of disrepair for an unreasonable length of time when it knew or should have known in the exercise of the highest degree of care and caution that such condition created a situation of imminent danger for persons, such as plaintiff;

3.      failed to notify SOUTH WEST of the alleged defective condition of the elevator prior to the date of the alleged incident so that SOUTH WEST could come to the premises and repair the alleged condition, when it knew or should have known in the exercise of

the highest degree of care and caution that such condition created a situation of imminent danger for persons, such as the plaintiff;

4. failed to warn passengers and other intended users of the subject elevator of the alleged defective condition of the elevator when it knew or should have known in the exercise of the highest degree of care and caution that such condition created a situation of imminent danger for persons, such as the plaintiff;

5. failed to have a Type A safety installed in the elevator when the station was built, which is the proper safety for an elevator that is under 100 feet;

6. failed to keep the hoistway/pit of the elevator free from chemicals such as those used to remove graffiti, and free from water vapor, salt, ice, water and rain, which caused the cables to deteriorate.

c. SOUTH WEST denies all liability as alleged by the plaintiff and if it is found that SOUTH WEST is liable to the plaintiffs, one or more of the foregoing acts or omissions on the part of third-party defendant contributed in whole or in part to proximately cause the injuries alleged to have been sustained by the plaintiffs.

d. In the event that the plaintiffs recover a judgment from SOUTH WEST, then pursuant to 740 ILCS 100/2, SOUTH WEST is entitled to judgment by way of contribution against third-party defendant for that portion of said judgment in excess of SOUTH WEST'S pro rata share of liability to the full extent allowed by law.

13.    Count II of the SWI Complaint includes the following allegations:

    a.    That on or about July 6, 2006, the third-party defendant, CTA, and its duly authorized agents or servants had exclusive actual physical possession of the elevator and all of its component parts.

    b.    That third-party defendant, CTA, was charged with the management, operation, and control of the aforementioned elevator and all of its component parts.

    c.    That after the plaintiff, LAWRENCE LEWANDOWSKI, was involved in the incident of July 6, 2006, third-party defendant, CTA, knew or should have known that the elevator and its component parts had to be maintained for inspection and preservation.

    d.    That third-party defendant, CTA, had a duty to maintain, preserve and secure the elevator and its component parts and keep them free from water, ice, salt, chemicals and debris.

    e.    That, notwithstanding said duties, third-party defendant, CTA, allowed water, ice, salt, chemicals and debris to build up and sit in the pit/hoist way causing the hoist ropes and other component parts to rust and further deteriorate.

    f.    That third-party defendant, CTA, allowed the elevator and its component parts to sit in ice, water, chemicals and debris for a significant and unreasonable length of time which caused further deterioration to the evidence which has impaired defendant SOUTH WEST's ability to defend

itself by an examination of the allegedly defective product, hoist ropes, elevator and its component parts.

g.    SOUTH WEST denies all liability as alleged by the plaintiff and if it is found that SOUTH WEST is liable to the plaintiffs, one or more of the foregoing acts or omissions on the part of third-party defendant, CTA, contributed in whole or in part to proximately cause the injuries alleged to have been sustained by the plaintiffs.

h.    In the event that the plaintiffs recover a judgment from SOUTH WEST, then pursuant to 740 ILCS 100/2, SOUTH WEST is entitled to judgment by way of contribution against third-party defendant, CTA, for that portion of said judgment in excess of SOUTH WEST'S pro rata share of liability to the full extent allowed by law.

## STARNET POLICY

14.    StarNet issued Policy No. JMS0000171-00 (the "StarNet Policy") to SWI.  A true and correct copy of the StarNet Policy is attached hereto as Exhibit "C".

15.    The StarNet Policy is effective from March 31, 2006 to March 31, 2007.

16.    The Each Occurrence Limit of the StarNet Policy is $1,000,000, and the General Aggregate Limit is $3,000,000.

17.    The StarNet Policy contains the following insuring agreement:

1. Insuring Agreement

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance

does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. . . .

b.    This insurance applies to "bodily injury" and "property damage" only if:

(1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2)    The "bodily injury" or "property damage" occurs during the policy period;

18.    The StarNet Policy contains the following exclusion:

e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a)  Employment by the insured; or

(b)  Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1)  Whether the insured may be liable as an employer or in any other capacity; and

(2)  To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

## GROUNDS FOR DECLARATORY JUDGMENT

19.    SWI and CTA entered into an agreement on or around February 8, 2005, in which SWI agreed to inspect, service, maintain and repair elevators for the CTA.  A true and correct copy of the agreement is attached hereto as Exhibit "D".

20.    At the time of the injury to Lewandowski alleged in the Lewandowski Lawsuit, Lewandowski was riding an elevator at the Pulaski station of the CTA's Orange Line.

21.    Upon information and belief, Lewandowski was an employee of the CTA acting within the course and scope of his employment with the CTA on the day and time he was allegedly injured.

22.    The "Employer's Liability" exclusion applies to exclude any coverage or potential coverage for the CTA in the Lewandowski Lawsuit.

23.    As a result of the application of the "Employer's Liability" exclusion, StarNet has no duty to defend the CTA in connection with the Lewandowski Lawsuit.

WHEREFORE, Plaintiff, StarNet prays:

A.    That this Court determine and adjudicate the rights and liabilities of the parties hereto with respect to the StarNet Policy.

B.    That this Court find and declare that the StarNet Policy does not potentially or actually cover any portion of the claims against CTA in the Lewandowski Lawsuit.

C.    That this Court find and declare that StarNet has no duty to defend CTA in connection with the Lewandowski Lawsuit.

D.    That this Court grant such other and further relied as it deems proper under the evidence and circumstances.

Respectfully submitted,

STARNET INSURANCE COMPANY


_____/s/ Perry M. Shorris_____
One of StarNet's Attorneys

Perry M. Shorris, Esq.
Bollinger, Ruberry & Garvey
500 West Madison Street, Suite 2300
Chicago, IL  60661-2511
(312) 466-8000
(312) 466-8001 – Fax

```
08 CV 1828        JH
JUDGE GOTTSCHALL
MAGISTRATE JUDGE ASHMAN
```

# EXHIBIT A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

LAWRENCE LEWANDOWSKI and BERNICE
LEWANDOWSKI,

                                    Plaintiffs,

            v.                                          NO. 06 L 0 11181

SOUTH WEST INDUSTRIES, INC., d/b/a ANDERSON          Calendar D
ELEVATOR CO., an Illinois corporation; and          JURY DEMAND
PROFESSIONAL ELEVATOR SERVICES, INC., an
Illinois corporation; CITY OF CHICAGO, a
municipal corporation; NAES CENTRAL INC., d/b/a
RELIANCE ELEVATOR COMPANY; BRUGG
WIRE ROPE, LLC; and BRUGG CABLES, LLC.

                                    Defendants.


                    FIRST AMENDED COMPLAINT AT LAW

                              COUNT I
                         (Negligence, SWI)

        NOW COMES plaintiff LAWRENCE LEWANDOWSKI (LAWRENCE), by his attorneys,

POWER ROGERS & SMITH, P.C., and complaining of defendant SOUTH WEST INDUSTRIES,

INC., d/b/a ANDERSON ELEVATOR CO.(SOUTH WEST), an Illinois corporation, pleading

hypothetically and in the alternative, states:

        1.      On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit

Authority (CTA).

        2.      On and prior to July 5, 2006, SOUTH WEST was an Illinois corporation doing

business in Cook County.

        3.      On and prior to July 5, 2006, SOUTH WEST had a contract with the CTA to

inspect, maintain and/or repair elevators, including an elevator located at the Pulaski station of the

CTA's Orange Line ("the elevator"), at or near 5106 S. Pulaski Road, Chicago, Illinois.

        4.      On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

        5.      On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

                                         1

6.    On or about July 5, 2006, no brake, governor or other device prevented the elevator from free falling.

7.    As a proximate result of the elevator's fall, LAWRENCE was injured.

8.    At the time and place alleged, SOUTH WEST was negligent in one or more of the following respects:

a.    Installing unsafe, inadequate or otherwise defective cables; or

b.    Failing to adequately inspect or maintain the cables; or

c.    Failing to repair the elevator or cables though they knew, or should have known, that they were unsafe; or

d.    Failing to install properly working brakes, a governor or other safety device to prevent the elevator's free fall; or

e.    Failing to adequately inspect or maintain the brakes, governor or other safety device; or

f.    Failing to repair the brakes, governor or other safety device though they knew, or should have known, that they were malfunctioning or were otherwise unsafe; or

g.    Was otherwise negligent in its installation, inspection and/or maintenance of the elevator.

9.    As a proximate result of one or more of the foregoing negligent acts and/or omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

WHEREFORE, plaintiff, LAWRENCE LEWANDOWSKI, demands judgment against defendant, SOUTH WEST INDUSTRIES, INC., d/b/a ANDERSON ELEVATOR CO., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

COUNT II
(Strict Liability,SWI)

NOW COMES plaintiff, LAWRENCE LEWANDOWSKI (LAWRENCE) by his attorneys,

POWER ROGERS & SMITH, P.C. and complaining of defendant, SOUTH WEST INDUSTRIES,

INC., d/b/a ANDERSON ELEVATOR CO. (SOUTH WEST),  an Illinois corporation, pleading

hypothetically and in the alternative, states:

1.      On or about July 5, 2006, LAWRENCE was employed by the  Chicago Transit

Authority (CTA).

2.      On and prior to July 5, 2006, SOUTH WEST was an Illinois corporation doing

business in  Cook County.

3.      On and prior to July 5, 2006. SOUTH WEST  assembled and installed elevators

and their components.

4.      Prior to July 5, 2006, SOUTH WEST installed an elevator at the CTA's Pulaski

Station of the Orange Line located at or near 5106 Pulaski Road, Chicago, Illinois.

5.      On and prior to July 5, 2006, SOUTH WEST assembled the components of

the elevator.

6.      On and prior to July 5, 2006, SOUTH WEST procured the cables for the elevator.

7.      On and prior to July 5, 2006, SOUTH WEST installed the cables for the elevator.

8.      On and prior to July 5, 2006, SOUTH WEST was responsible for the installation

of brakes or governors for the elevator.

9.      On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

10.     On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

11.     On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

12.     As a proximate result of the elevator's fall, LAWRENCE was injured.

3

13.    At the time and place alleged, the elevator was unreasonably dangerous in one or more of the following respects:

   a.    It had inadequate cables; or

   b.    Its cables were inadequately maintained and/or repaired; or

   c.    It lacked adequate brakes; or

   d.    Its brakes were inadequately maintained and/or repaired; or

   e.    It lacked a governor or similar safety device; or

   f.    Its governor or otherwise similar safety device was inadequately maintained and/or repaired.

14.    The aforesaid defective and unreasonably dangerous conditions were present at the time the elevator left the control of SOUTH WEST.

15.    As a proximate result of ones a proximate result of one or more of the foregoing unreasonably dangerous conditions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will incur expenses for future medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

WHEREFORE, plaintiff, LAWRENCE LEWANDOWSKI, demands judgment against defendant, SOUTH WEST INDUSTRIES, INC., d/b/a ANDERSON ELEVATOR CO. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

4

<u>COUNT III</u>
(Negligence, PES)

NOW COMES plaintiff LAWRENCE LEWANDOWSKI (LAWRENCE), by his attorneys,

POWER ROGERS & SMITH, P.C., and complaining of defendant PROFESSIONAL ELEVATOR

SERVICES, INC. (PROFESSIONAL ELEVATOR), an Illinois corporation, pleading hypothetically

and in the alternative, states:

1.      On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit

Authority (CTA).

2.      On and prior to July 5, 2006, PROFESSIONAL ELEVATOR was an Illinois

corporation doing business in Cook County.

3.      On and prior to July 5, 2006, PROFESSIONAL ELEVATOR had a contract with

the CTA to inspect, maintain and/or repair elevators, including an elevator located at the Pulaski

station of the CTA's Orange Line ("the elevator"), at or near 5106 S. Pulaski Road, Chicago,

Illinois.

4.      On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

5.      On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

6.      On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

7.      As a proximate result of the elevator's fall, LAWRENCE was injured.

8.      At the time and place alleged, PROFESSIONAL ELEVATOR was negligent in

one or more of the following respects:

      a.      Installing unsafe, inadequate or otherwise defective
        cables; or

      b.      Failing to adequately inspect or maintain the
        cables; or

      c.      Failing to repair the elevator or cables though
        they knew, or should have known, that they were
        unsafe; or

      d.      Failing to install properly working brakes, a governor or other
        safety device to prevent the elevator's free fall; or

5

e.    Failing to adequately inspect or maintain the brakes, governor or other safety device; or

f.    Failing to repair the brakes, governor or other safety device though they knew, or should have known, that they were malfunctioning or were otherwise unsafe; or

g.    Was otherwise negligent in their installation, inspection and/or maintenance of the elevator.

9.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

WHEREFORE, plaintiff, LAWRENCE LEWANDOWSKI, demands judgment against defendant, PROFESSIONAL ELEVATOR SERVICES, INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

<u>COUNT IV</u>
(Strict Liability,PES)

NOW COMES plaintiff, LAWRENCE LEWANDOWSKI (LAWRENCE) by his attorneys,

POWER ROGERS & SMITH, P.C. and complaining of defendant, PROFESSIONAL ELEVATOR

SERVICES, INC. (PROFESSIONAL ELEVATOR), an Illinois corporation, pleading hypothetically

and in the alternative, states:

1.    On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit

Authority (CTA).

2.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR was an Illinois

corporation doing business in Cook County.

3.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR assembled and

installed elevators and their related components.

4.    Prior to July 5, 2006, PROFESSIONAL ELEVATOR installed an elevator at the

CTA's Pulaski Station of the Orange Line located at or near 5106 Pulaski Road, Chicago, Illinois.

5.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR assembled the

components for the elevator.

6.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR procured the cables

for the elevator.

7.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR installed the cables

for the elevator.

8.    On and prior to July 5, 2006 PROFESSIONAL ELEVATOR was responsible for

the installation of brakes or governors for the elevator.

9.    On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

10.    On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

11.    On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

12.    As a proximate result of the elevator's fall, LAWRENCE was injured.

7

13.    At the time and place alleged, the elevator was unreasonably dangerous in one or more of the following respects:

   a.    It had inadequate cables; or

   b.    Its cables were inadequately maintained and/or repaired; or

   c.    It lacked adequate brakes; or

   d.    Its brakes were inadequately maintained and/or repaired; or

   e.    It lacked a governor or similar safety device; or

   f.    Its governor or otherwise similar safety device was inadequately maintained and/or repaired.

14.    The aforesaid defective and unreasonably dangerous conditions were present at the time the elevator left the control of PROFESSIONAL ELEVATOR.

15.    As a proximate result of one or more of the foregoing unreasonably dangerous conditions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will incur expenses for future medical care rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

WHEREFORE, plaintiff, LAWRENCE LEWANDOWSKI, demands judgment against defendant, PROFESSIONAL ELEVATOR SERVICES, INC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

<u>COUNT V</u>
(Negligence, SWI)

NOW COMES plaintiff BERNICE LEWANDOWSKI  (BERNICE) by her attorneys,

POWER ROGERS & SMITH, P.C., and complaining of defendant SOUTH WEST INDUSTRIES,

INC., d/b/a ANDERSON ELEVATOR CO.(SOUTH WEST), an Illinois corporation, pleading

hypothetically and in the alternative, states:

1.      On or about July 5, 2006, LAWRENCE LEWANDOWSKI (LAWRENCE) was

employed by the  Chicago Transit Authority (CTA).

2.      On and prior to July 5, 2006, SOUTH WEST was an Illinois corporation doing

business in Cook County.

3.      On and prior to July 5, 2006, SOUTH WEST had a contract with the CTA to

inspect, maintain and/or repair elevators, including an elevator located at the Pulaski station of the

CTA's Orange Line ("the elevator"), at or near 5106 S. Pulaski Road, Chicago, Illinois.

4.      On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

5.      On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

6.      On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

7.      As a proximate result of the elevator's fall, LAWRENCE was injured.

8.      At the time and place alleged, SOUTH WEST was negligent in one or more of the

following respects:

        a.      Installing unsafe, inadequate or otherwise defective
                cables; or

        b.      Failing to adequately inspect or maintain the
                cables; or

        c.      Failing to  repair the elevator or cables though
                they knew, or should have known, that they were
                malfunctioning  or were otherwise unsafe; or

        d.      Failing to install properly working brakes, a governor or other
                safety device to prevent the elevator's free fall; or

        e.      Failing to adequately inspect or maintain the brakes, governor
                or other safety device; or

9

    f.        Failing to repair the brakes, governor or other safety device though they knew, or should have known, that they were malfunctioning or were otherwise unsafe; or

    g.       Was otherwise negligent in their installation, inspection and/or maintenance of the elevator.

9.     As a proximate result of one or more of the foregoing negligent acts and/or omissions, LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

10.    At all times alleged BERNICE was the wife of LAWRENCE.

11.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, BERNICE has suffered a loss of the society, companionship and support of her husband, LAWRENCE.

WHEREFORE, plaintiff, BERNICE LEWANDOWSKI, demands judgment against defendant, SOUTH WEST INDUSTRIES, INC. , d/b/a ANDERSON ELEVATOR CO. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

<u>COUNT VI</u>
(Strict Liability/SWI)

NOW COMES plaintiff BERNICE LEWANDOWSKI (BERNICE) by her attorneys,

POWER ROGERS & SMITH, P.C. and complaining of defendant, SOUTH WEST INDUSTRIES,

INC., d/b/a ANDERSON ELEVATOR CO. (SOUTH WEST), an Illinois corporation pleading

hypothetically and in the alternative, states:

1.      On or about July 5, 2006, LAWRENCE LEWANDOWSKI (LAWRENCE) was
employed by the Chicago Transit Authority (CTA).

2.      On and prior to July 5, 2006, SOUTH WEST was an Illinois corporation doing
business in Cook County.

3.      On and prior to July 5, 2006, SOUTH WEST assembled and installed elevators
and their related components.

4.      Prior to July 5, 2006, SOUTH WEST installed an elevator at the CTA's Pulaski
Station of its Orange Line located at or near 5106 Pulaski Road, Chicago, Illinois.

5.      On and prior to July 5, 2006, SOUTH WEST assembled the components for
the elevator.

6.      On and prior to July 5, 2006, SOUTH WEST procured the cables for the elevator.

7.      On and prior to July 5, 2006, SOUTH WEST installed the cables for the elevator.

8.      On and prior to July 5, 2006, SOUTH WEST was responsible for installing brakes
and governors on the elevator.

9.      On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

10.     On or about July 5, 2006, the elevator's cables snapped, separated or otherwise
failed, causing the elevator to fall.

11.     On or about July 5, 2006, no brake, governor or other device prevented the
elevator from free falling.

12.     As a proximate result of the elevator's fall, LAWRENCE was injured.

13. At the time and place alleged, the elevator was unreasonably dangerous in one or more of the following respects:

    a. It had inadequate cables; or

    b. Its cables were inadequately maintained and/or repaired; or

    c. It lacked adequate brakes; or

    d. Its brakes were inadequately maintained and/or repaired; or

    e. It lacked a governor or similar safety device; or

    f. Its governor or otherwise similar safety device was inadequately maintained and/or repaired.

14. The aforesaid defective and unreasonably dangerous conditions were present at the time the elevator left the control of SOUTH WEST.

15. As a proximate result of one or more of the foregoing unreasonably dangerous conditions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will incur expenses for future medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

16. At all times alleged BERNICE was the wife of LAWRENCE.

17. As a proximate result of one or more of the foregoing unreasonably dangerous conditions, BERNICE has suffered a loss of the society, companionship and support of her husband LAWRENCE.

WHEREFORE, plaintiff, BERNICE LEWANDOWSKI, demands judgment against defendant, SOUTH WEST INDUSTRIES, INC., d/b/a ANDERSON ELEVATOR CO. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

<u>COUNT VII</u>
(Negligence, PES)

NOW COMES plaintiff BERNICE LEWANDOWSKI (BERNICE) by her attorneys, POWER

ROGERS & SMITH, P.C., and complaining of defendant PROFESSIONAL ELEVATOR

SERVICES, INC. (PROFESSIONAL ELEVATOR) an Illinois corporation, pleading hypothetically

and in the alternative, states:

      1.     On or about July 5, 2006, LAWRENCE LEWANDOWSKI (LAWRENCE) was

employed by the Chicago Transit Authority (CTA).

      2.     On and prior to July 5, 2006, PROFESSIONAL ELEVATOR was an Illinois

corporation doing business in Cook County.

      3.     On and prior to July 5, 2006, PROFESSIONAL ELEVATOR had a contract with

the CTA to inspect, maintain and/or repair elevators, including an elevator located at the Pulaski

station of the CTA's Orange Line ("the elevator"), at or near 5106 S. Pulaski Road, Chicago,

Illinois.

      4.     On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

      5.     On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

      6.     On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

      7.     As a proximate result of the elevator's fall, LAWRENCE was injured.

      8.     At the time and place alleged, PROFESSIONAL ELEVATOR was negligent in

one or more of the following respects:

          a.     Installing unsafe, inadequate or otherwise defective
                cables; or

          b.     Failing to adequately inspect or maintain the
                cables; or

          c.     Failing to repair the elevator or cables though
                they knew, or should have known, that they were
                malfunctioning or were otherwise unsafe; or

         d.     Failing to install properly working brakes, a governor or other
                safety device to prevent the elevator's free fall; or

    e.      Failing to adequately inspect or maintain the brakes, governor or other safety device; or

    f.      Failing to repair the brakes, governor or other safety device though they knew, or should have known, that they were malfunctioning or were otherwise unsafe; or

    g.      Was otherwise negligent in their installation, inspection and/or maintenance of the elevator.

9.    As a proximate result of one or more of the foregoing negligent acts and/or omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

10.    At all times alleged BERNICE was the wife of LAWRENCE.

11.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, BERNICE has suffered a loss of the society, companionship and support of her husband LAWRENCE.

WHEREFORE, plaintiff, BERNICE LEWANDOWSKI, demands judgment against defendant, PROFESSIONAL ELEVATOR SERVICES, INC.,  in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

<u>COUNT VIII</u>
(Strict Liability,PES)

NOW COMES plaintiff, BERNICE LEWANDOWSKI (BERNICE),  by her attorneys,

POWER ROGERS & SMITH, P.C. and complaining of defendant, PROFESSIONAL ELEVATOR

SERVICES, INC. (PROFESSIONAL ELEVATOR),  an Illinois corporation  pleading hypothetically

and in the alternative, states:

1.    On or about July 5, 2006, LAWRENCE LEWANDOWSKI (LAWRENCE) was

employed by the  Chicago Transit Authority (CTA).

2.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR was an Illinois

corporation doing business in  Cook County.

3.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR  assembled and

installed elevators and their related components.

4.    Prior to July 5, 2006, PROFESSIONAL ELEVATOR installed an elevator at the

CTA's Pulaski Station of its Orange Line located at or near 5106 Pulaski Road, Chicago, Illinois.

5.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR assembled the

components for the elevator.

6.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR  procured the cables

for the elevator.

7.    On and prior to July 5, 2006, PROFESSIONAL ELEVATOR  installed the cables

for the elevator.

8.    On and prior to July 5, 2006 PROFESSIONAL ELEVATOR was responsible for

installing brakes and governors on the elevator.

9.    On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

10.    On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

11.    On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

12.    As a proximate result of the elevator's fall, LAWRENCE was injured.

13.    At the time and place alleged, the elevator was unreasonably dangerous in one or more of the following respects:

a.    It had inadequate cables; or

b.    Its cables were inadequately maintained and/or repaired; or

c.    It lacked adequate brakes; or

d.    Its brakes were inadequately maintained and/or repaired; or

e.    It lacked a governor or similar safety device; or

f.    Its governor or otherwise similar safety device was inadequately maintained and/or repaired.

14.    The aforesaid defective and unreasonably dangerous conditions were present at the time the elevator left the control of PROFESSIONAL ELEVATOR.

15.    As a proximate result of ones a proximate result of one or more of the foregoing unreasonably dangerous conditions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will incur expenses for future medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

16.    At all times alleged BERNICE was the wife of LAWRENCE.

17.    As a proximate result of one or more of the foregoing unreasonably dangerous conditions, BERNICE has suffered a loss of the society, companionship and support of her husband, LAWRENCE.

WHEREFORE, plaintiff, BERNICE LEWANDOWSKI, demands judgment against defendant, PROFESSIONAL ELEVATOR SERVICES, INC. in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

<u>COUNT IX</u>
(Negligence, CITY)

NOW COMES plaintiff LAWRENCE LEWANDOWSKI (LAWRENCE), by his attorneys,

POWER ROGERS & SMITH, P.C., and complaining of defendant CITY OF CHICAGO, a

municipal corporation, pleading hypothetically and in the alternative, states:

      1.      On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit

Authority (CTA).

      2.      On and prior to July 5, 2006, CITY OF CHICAGO was a municipal corporation

existing under the laws of the State of Illinois.

      3.      Prior to July 5, 2006, CITY OF CHICAGO inspected and approved the

installation of an elevator located at the Pulaski station of the CTA's Orange Line ("the elevator),

at or near 5106 S. Pulaski Road, Chicago, Illinois.

      4.      On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

      5.      On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

      6.      On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

      7.      As a proximate result of the elevator's fall, LAWRENCE was injured.

      8.      At the time and place alleged, CITY OF CHICAGO was negligent in one or more

of the following respects:

           a.      Negligently inspecting and approving
                    installation of the elevator; or

           b.      Permitting the elevator to be and remain in an unsafe and dangerous
                    condition; or

           c.      Failing to warn of the unsafe and dangerous conditions of the elevator;
                    or

           d.      Was otherwise negligent.

9.      As a proximate result of one or more of the foregoing negligent acts and/or omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

WHEREFORE, plaintiff, LAWRENCE LEWANDOWSKI, demands judgment against defendant, CITY OF CHICAGO, a municipal corporation, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

COUNT X
(Negligence, City)

NOW COMES plaintiff BERNICE LEWANDOWSKI (BERNICE) by her attorneys, POWER

ROGERS & SMITH, P.C., and complaining of defendant CITY OF CHICAGO, a municipal

corporation, pleading hypothetically and in the alternative, states:

1.      On or about July 5, 2006, LAWRENCE LEWANDOWSKI (LAWRENCE) was

employed by the Chicago Transit Authority (CTA).

2.      On and prior to July 5, 2006, CITY OF CHICAGO was a municipal corporation

existing under the laws of the State of Illinois.

3.      Prior to July 5, 2006, CITY OF CHICAGO inspected and approved the

installation of an elevator located at the Pulaski station of the CTA's Orange Line ("the elevator),

at or near 5106 S. Pulaski Road, Chicago, Illinois.

4.      On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

5.      On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

6.      On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

7.      As a proximate result of the elevator's fall, LAWRENCE was injured.

8.      At the time and place alleged, CITY OF CHICAGO was negligent in one or more

of the following respects:

    a.      Negligently inspecting and approving
            installation of the elevator; or

    b.      Permitting the elevator to be and remain in an unsafe and dangerous
            condition; or

    c.      Failing to warn of the unsafe and dangerous conditions of the elevator; or

    d.      Was otherwise negligent.

19

9.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

10.    At all times alleged BERNICE was the wife of LAWRENCE.

11.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, BERNICE has suffered a loss of the society, companionship and support of her husband, LAWRENCE.

WHEREFORE, plaintiff, BERNICE LEWANDOWSKI, demands judgment against defendant, CITY OF CHICAGO, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

<div align="center">

COUNT XI
(Negligence, Reliance)

</div>

NOW COMES plaintiff LAWRENCE LEWANDOWSKI (LAWRENCE), by his attorneys,

POWER ROGERS & SMITH, P.C., and complaining of defendant, NAES CENTRAL, INC. d/b/a

RELIANCE ELEVATOR COMPANY (RELIANCE), an Illinois corporation, pleading hypothetically

and in the alternative, states:

1.     On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit

Authority (CTA).

2.     On and prior to July 5, 2006, RELIANCE was an Illinois corporation doing

business in Cook County.

3.     On and prior to July 5, 2006, RELIANCE had a contract with the CTA to inspect,

maintain and/or repair elevators, including an elevator located at the Pulaski station of the CTA's

Orange Line ("the elevator"), at or near 5106 S. Pulaski Road, Chicago, Illinois.

4.     On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

5.     On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

6.     On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

7.     As a proximate result of the elevator's fall, LAWRENCE was injured.

8.     At the time and place alleged, RELIANCE was negligent in one or more of the

following respects:

      a.     Installing unsafe, inadequate or otherwise defective
          cables; or

      b.     Failing to adequately inspect or maintain the
          cables; or

      c.     Failing to repair the elevator or cables though
          they knew, or should have known, that they were
          unsafe; or

      d.     Failing to install properly working brakes, a governor or other
          safety device to prevent the elevator's free fall; or

<div align="center">

21

</div>

     e.     Failing to adequately inspect or maintain the brakes, governor
or other safety device; or

     f.     Failing to repair the brakes, governor or other safety device
though they knew, or should have known, that they were
malfunctioning or were otherwise unsafe; or

     g.     Was otherwise negligent in its installation, inspection and/or
maintenance of the elevator.

9.     As a proximate result of one or more of the foregoing negligent acts and/or
omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering;
has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has
incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a
loss of wages; and has been damaged in his capacity to earn a living.

WHEREFORE, plaintiff, LAWRENCE LEWANDOWSKI, demands judgment against
defendant, NAES CENTRAL INC., d/b/a RELIANCE ELEVATOR COMPANY, in an amount in
excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just
compensation.

<u>COUNT XII</u>
(Strict Liability, Reliance)

NOW COMES plaintiff, LAWRENCE LEWANDOWSKI (LAWRENCE) by his attorneys, POWER ROGERS & SMITH, P.C. and complaining of defendant, NAES CENTRAL, INC., d/b/a RELIANCE ELEVATOR COMPANY (RELIANCE),  an Illinois corporation, pleading hypothetically and in the alternative, states:

1.      On or about July 5, 2006, LAWRENCE was employed by the  Chicago Transit Authority (CTA).

2.      On and prior to July 5, 2006, RELIANCE was an Illinois corporation doing business in  Cook County.

3.      On and prior to July 5, 2006, RELIANCE  assembled and installed elevators and their components.

4.      Prior to July 5, 2006, RELIANCE  installed an elevator at the CTA's Pulaski Station of the Orange Line located at or near 5106 Pulaski Road, Chicago, Illinois.

5.      On and prior to July 5, 2006, RELIANCE  assembled the components of the elevator.

6.      On and prior to July 5, 2006, RELIANCE procured the cables for the elevator.

7.      On and prior to July 5, 2006, RELIANCE installed the cables for the elevator.

8.      On and prior to July 5, 2006, RELIANCE was responsible for the installation of brakes or governors for the elevator.

9.      On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

10.     On or about July 5, 2006, the elevator's cables snapped, separated or otherwise failed, causing the elevator to fall.

11.     On or about July 5, 2006, no brake, governor or other device prevented the elevator from free falling.

12.     As a proximate result of the elevator's fall, LAWRENCE was injured.

23

13.    At the time and place alleged, the elevator was unreasonably dangerous in one or more of the following respects:

a.    It had inadequate cables; or

b.    Its cables were inadequately maintained and/or repaired; or

c.    It lacked adequate brakes; or

d.    Its brakes were inadequately maintained and/or repaired; or

e.    It lacked a governor or similar safety device; or

f.    Its governor or otherwise similar safety device was inadequately maintained and/or repaired.

14.    The aforesaid defective and unreasonably dangerous conditions were present at the time the elevator left the control of RELIANCE.

15.    As a proximate result of ones a proximate result of one or more of the foregoing unreasonably dangerous conditions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will incur expenses for future medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

WHEREFORE, plaintiff, LAWRENCE LEWANDOWSKI, demands judgment against defendant, NAES CENTRAL, INC., d/b/a RELIANCE ELEVATOR COMPANY, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

24

<u>COUNT XIII</u>
(Negligence, Reliance)

NOW COMES plaintiff BERNICE LEWANDOWSKI (BERNICE), by her attorneys,

POWER ROGERS & SMITH, P.C., and complaining of defendant, NAES CENTRAL, INC. d/b/a

RELIANCE ELEVATOR COMPANY (RELIANCE), an Illinois corporation, pleading hypothetically

and in the alternative, states:

1.    On or about July 5, 2006, LAWRENCE LEWANDOWSKI (LAWRENCE) was

employed by the Chicago Transit Authority (CTA).

2.    On and prior to July 5, 2006, RELIANCE was an Illinois corporation doing

business in Cook County.

3.    On and prior to July 5, 2006, RELIANCE had a contract with the CTA to inspect,

maintain and/or repair elevators, including an elevator located at the Pulaski station of the CTA's

Orange Line ("the elevator"), at or near 5106 S. Pulaski Road, Chicago, Illinois.

4.    On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

5.    On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

6.    On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

7.    As a proximate result of the elevator's fall, LAWRENCE was injured.

8.    At the time and place alleged, RELIANCE was negligent in one or more of the

following respects:

      a.    Installing unsafe, inadequate or otherwise defective
          cables; or

      b.    Failing to adequately inspect or maintain the
          cables; or

      c.    Failing to repair the elevator or cables though
          they knew, or should have known, that they were
          unsafe; or

      d.    Failing to install properly working brakes, a governor or other
          safety device to prevent the elevator's free fall; or

      e.    Failing to adequately inspect or maintain the brakes, governor
          or other safety device; or

     f.    Failing to repair the brakes, governor or other safety device though they knew, or should have known, that they were malfunctioning or were otherwise unsafe; or

     g.    Was otherwise negligent in its installation, inspection and/or maintenance of the elevator.

9.    As a proximate result of one or more of the foregoing negligent acts and/or omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

10.    At all times alleged BERNICE was the wife of LAWRENCE.

11.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, BERNICE has suffered a loss of the society, companionship and support of her husband, LAWRENCE.

WHEREFORE, plaintiff, BERNICE LEWANDOWSKI, demands judgment against defendant, NAES CENTRAL INC., d/b/a RELIANCE ELEVATOR COMPANY, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

## COUNT XIV
### (Strict Liability, Reliance)

NOW COMES plaintiff, BERNICE LEWANDOWSKI (BERNICE) by her attorneys,

POWER ROGERS & SMITH, P.C. and complaining of defendant, NAES CENTRAL, INC., d/b/a

RELIANCE ELEVATOR COMPANY (RELIANCE),  an Illinois corporation, pleading hypothetically

and in the alternative, states:

   1. On or about July 5, 2006, LAWRENCE LEWANDOWSKI (LAWRENCE) was

employed by the  Chicago Transit Authority (CTA).

   2. On and prior to July 5, 2006, RELIANCE was an Illinois corporation doing

business in  Cook County.

   3. On and prior to July 5, 2006, RELIANCE  assembled and installed elevators and

their components.

   4. Prior to July 5, 2006, RELIANCE  installed an elevator at the CTA's Pulaski

Station of the Orange Line located at or near 5106 Pulaski Road, Chicago, Illinois.

   5. On and prior to July 5, 2006, RELIANCE  assembled the components of

the elevator.

   6. On and prior to July 5, 2006, RELIANCE procured the cables for the elevator.

   7. On and prior to July 5, 2006, RELIANCE installed the cables for the elevator.

   8. On and prior to July 5, 2006, RELIANCE was responsible for the installation of

brakes or governors for the elevator.

   9. On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

   10. On or about July 5, 2006, the elevator's cables snapped, separated or otherwise

failed, causing the elevator to fall.

   11. On or about July 5, 2006, no brake, governor or other device prevented the

elevator from free falling.

12.    As a proximate result of the elevator's fall, LAWRENCE was injured.

13.    At the time and place alleged, the elevator was unreasonably dangerous in one or more of the following respects:

    a.    It had inadequate cables; or

    b.    Its cables were inadequately maintained and/or repaired; or

    c.    It lacked adequate brakes; or

    d.    Its brakes were inadequately maintained and/or repaired; or

    e.    It lacked a governor or similar safety device; or

    f.    Its governor or otherwise similar safety device was inadequately maintained and/or repaired.

14.    The aforesaid defective and unreasonably dangerous conditions were present at the time the elevator left the control of RELIANCE.

15.    As a proximate result of ones a proximate result of one or more of the foregoing unreasonably dangerous conditions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will incur expenses for future medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

16.    At all times alleged BERNICE was the wife of LAWRENCE.

17.    As a proximate result of one or more of the foregoing negligent acts and/or omissions, BERNICE has suffered a loss of the society, companionship and support of her husband, LAWRENCE.

WHEREFORE, plaintiff, BERNICE LEWANDOWSKI, demands judgment against defendant, NAES CENTRAL, INC., d/b/a RELIANCE ELEVATOR COMPANY, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

## COUNT XV
(Negligence, Brugg Wire/Brugg Cables)

NOW COMES plaintiff LAWRENCE LEWANDOWSKI (LAWRENCE), by his attorneys,

POWER ROGERS & SMITH, P.C., and complaining of defendants, BRUGG WIRE ROPE, LLC, a

Georgia corporation (BRUGG WIRE) and BRUGG CABLES, LLC., a Georgia corporation,

(BRUGG CABLES), pleading hypothetically and in the alternative, states:

1.     On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit
Authority (CTA).

2.     On and prior to July 5, 2006, BRUGG WIRE was a corporation doing business in
Cook County, Illinois.

3.     On and prior to July 5, 2006, BRUGG CABLES was a corporation doing business
in Cook County, Illinois.

4.     On and prior to July 5, 2006, BRUGG WIRE was engaged in the business of
designing, manufacturing, distributing, selling and/or installing elevator cables and/or ropes.

5.     On and prior to July 5, 2006, BRUGG CABLES was engaged in the business of
designing, manufacturing, distributing, selling and/or installing elevator cables and/or ropes.

6.     On and prior to July 5, 2006, there was an elevator located at the Pulaski station
of the Chicago Transit Authority's "Orange Line," at or near 5106 S. Pulaski Rd., Cook County,
Illinois ("the elevator").

7.     Prior to July 5, 2006, BRUGG WIRE designed cables and/or ropes for the
elevator.

8.     Prior to July 5, 2006, BRUGG CABLES designed cables and/or ropes for the
elevator.

9.     Prior to July 5, 2006, BRUGG WIRE manufactured cables and/or ropes for the
elevator.

10.     Prior to July 5, 2006, BRUGG CABLES manufactured cables and/or ropes for the
elevator.

11.     Prior to July 5, 2006, BRUGG WIRE distributed cables and/or ropes for the
elevator.

29

12.    Prior to July 5, 2006, BRUGG CABLES distributed cables and/or ropes for the elevator.

13.    Prior to June 5, 2006, BRUGG WIRE sold cables and/or ropes for the elevator.

14.    Prior to June 5, 2006, BRUG CABLES sold cables and/or ropes for the elevator.

15.    Prior to June 5, 2006, BRUGG WIRE installed cables and/or ropes for the elevator.

16.    Prior to June 5, 2006, BRUGG CABLES installed cables and/or ropes for the elevator.

17.    On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

18.    On or about July 5, 2006, the elevator's cables and/or ropes snapped, separated or otherwise failed, causing the elevator to fall.

19.    On or about July 5, 2006, no brake, governor or other device prevented the elevator from free falling.

20.    As a proximate result of the elevator's fall, LAWRENCE was injured.

21.    At the time and place alleged, BRUGG WIRE and/or BRUGG CABLES, and each of them, were negligent in one or more of the following respects:

    a.    Designing, manufacturing, distributing ,selling and/or installing unsafe, inadequate or otherwise defective cables and/or ropes; or

    b.    Failing to properly test said cables and/or ropes; or

    c.    Were otherwise negligent.

22.    As a proximate result of one or more of the foregoing negligent acts and/or omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

WHEREFORE, plaintiff, LAWRENCE LEWANDOWSKI, demands judgment against defendants, BRUGG WIRE ROPE, LLC and BRUGG CABLES, LLC, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

31

<u>COUNT XVI</u>
(Strict Liability, Brugg Wire/Brugg Cables)

NOW COMES plaintiff, LAWRENCE LEWANDOWSKI (LAWRENCE) by his attorneys, POWER ROGERS & SMITH, P.C. and complaining of defendants, BRUGG WIRE ROPE, LLC, a Georgia corporation (BRUGG WIRE) and BRUGG CABLES, LLC., a Georgia corporation (BRUGG CABLES), pleading hypothetically and in the alternative, states:

NOW COMES plaintiff LAWRENCE LEWANDOWSKI (LAWRENCE), by his attorneys, POWER ROGERS & SMITH, P.C., and complaining of defendants, BRUGG WIRE ROPE, LLC, a Georgia corporation (BRUGG WIRE) and BRUGG CABLES, LLC., a Georgia corporation, (BRUGG CABLES, pleading hypothetically and in the alternative, states:

1.    On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit Authority (CTA).

2.    On and prior to July 5, 2006, BRUGG WIRE was a corporation doing business in Cook County, Illinois.

3.    On and prior to July 5, 2006, BRUGG CABLES was a corporation doing business in Cook County, Illinois.

4.    On and prior to July 5, 2006, BRUGG WIRE was engaged in the business of designing, manufacturing, distributing, selling and/or installing elevator cables and ropes.

5.    On and prior to July 5, 2006, BRUGG CABLES was engaged in the business of designing, manufacturing, distributing, selling and/or installing elevator cables and ropes.

6.    On and prior to July 5, 2006, there was an elevator located at the Pulaski station of the Chicago Transit Authority's "Orange Line," at or near 5106 S. Pulaski Rd., Cook County, Illinois ("the elevator").

7.    Prior to July 5, 2006, BRUGG WIRE designed cables and/or ropes for the elevator.

8.    Prior to July 5, 2006, BRUGG CABLES designed cables and/or ropes for the elevator.

9.    Prior to July 5, 2006, BRUGG WIRE manufactured cables and/or ropes for the

32

elevator.

10.    Prior to July 5, 2006, BRUGG CABLES manufactured cables and/or ropes for the elevator.

11.    Prior to July 5, 2006, BRUGG WIRE distributed cables and/or ropes for the elevator.

12.    Prior to July 5, 2006, BRUGG CABLES distributed cables and/or ropes for the elevator.

13.    Prior to June 5, 2006, BRUGG WIRE sold cables and/or ropes for the elevator.

14.    Prior to June 5, 2006, BRUG CABLES sold cables and/or ropes for the elevator.

15.    Prior to June 5, 2006, BRUGG WIRE installed cables and/or ropes for the elevator.

16.    Prior to June 5, 2006, BRUGG CABLES installed cables and/or ropes for the elevator.

17.    On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

18.    On or about July 5, 2006, the elevator's cables and/or ropes snapped, separated or otherwise failed, causing the elevator to fall.

19.    On or about July 5, 2006, no brake, governor or other device prevented the elevator from free falling.

20.    As a proximate result of the elevator's fall, LAWRENCE was injured.

21.    That said elevator cables and/or ropes were unreasonably dangerous in one or more of the following respects:

      a.    They were defectively designed; or

      b.    They were defectively manufactured; or

      c.    They were not accompanied by adequate warnings for use; or

      d.    They were not accompanied by adequate instructions for maintenance; or

      e.    Were otherwise defective and unreasonably dangerous.

22.    The aforesaid defective and unreasonably dangerous conditions were present at the time the cables and/or ropes left the control of BRUGG WIRE and/or BRUGG CABLES.

33

23.    As a proximate result of one or more of the foregoing negligent acts and/or omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

WHEREFORE, plaintiff, LAWRENCE LEWANDOWSKI, demands judgment against defendant, BRUGG WIRE ROPE, LLC and BRUGG CABLES, LLC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

<u>COUNT XVII</u>
(Bernice/Negligence/Brugg Wire/Brugg Cables)

NOW COMES plaintiff BERNICE LEWANDOWSKI (BERNICE), by her attorneys,

POWER ROGERS & SMITH, P.C., and complaining of defendants, BRUGG WIRE ROPE, LLC, a

Georgia corporation (BRUG WIRE) and BRUGG CABLES, LLC., a Georgia corporation (BRUGG

CABLES), pleading hypothetically and in the alternative, states:

1.      On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit

Authority (CTA).

2.      On and prior to July 5, 2006, BRUGG WIRE was a corporation doing business in

Cook County, Illinois.

3.      On and prior to July 5, 2006, BRUGG CABLES was a corporation doing business

in Cook County, Illinois.

4.      On and prior to July 5, 2006, BRUGG WIRE was engaged in the business of

designing, manufacturing, distributing, selling and/or installing elevator cables and ropes.

5.      On and prior to July 5, 2006, BRUGG CABLES was engaged in the business of

designing, manufacturing, distributing, selling and/or installing elevator cables and ropes.

6.      On and prior to July 5, 2006, there was an elevator located at the Pulaski station

of the Chicago Transit Authority's "Orange Line," at or near 5106 S. Pulaski Rd., Cook County,

Illinois ("the elevator").

7.      Prior to July 5, 2006, BRUGG WIRE designed cables and/or ropes for the

elevator.

8.      Prior to July 5, 2006, BRUGG CABLES designed cables and/or ropes for the

elevator.

9.      Prior to July 5, 2006, BRUGG WIRE manufactured cables and/or ropes for the

elevator.

10.      Prior to July 5, 2006, BRUGG CABLES manufactured cables and/or ropes for the

elevator.

11.      Prior to July 5, 2006, BRUGG WIRE distributed cables and/or ropes for the

elevator.

12.    Prior to July 5, 2006, BRUGG CABLES distributed cables and/or ropes for the elevator.

13.    Prior to June 5, 2006, BRUGG WIRE sold cables and/or ropes for the elevator.

14.    Prior to June 5, 2006, BRUG CABLES sold cables and/or ropes for the elevator.

15.    Prior to June 5, 2006, BRUGG WIRE installed cables and/or ropes for the elevator.

16.    Prior to June 5, 2006, BRUGG CABLES installed cables and/or ropes for the elevator.

17.    On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

18.    On or about July 5, 2006, the elevator's cables and/or ropes snapped, separated or otherwise failed, causing the elevator to fall.

19.    On or about July 5, 2006, no brake, governor or other device prevented the elevator from free falling.

20.    As a proximate result of the elevator's fall, LAWRENCE was injured.

21.    At the time and place alleged, BRUGG WIRE and/or BRUGG CABLES, and each of them, were negligent in one or more of the following respects:

        a.    Designing, manufacturing, distributing ,selling and/or installing unsafe, inadequate or otherwise defective cables and/or ropes; or

        b.    Failing to properly test said cables and/or ropes; or

        c.    Were otherwise negligent.

22.    As a proximate result of one or more of the foregoing negligent acts and/or omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

23.    At all times alleged BERNICE was the wife of LAWRENCE.

24.     As a proximate result of one or more of the foregoing negligent acts and/or omissions, BERNICE has suffered a loss of the society, companionship and support of her husband, LAWRENCE.

WHEREFORE, plaintiff, BERNICE LEWANDOWSKI, demands judgment against defendants, BRUGG WIRE ROPE, LLC and BRUGG CABLES, LLC, in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

<u>COUNT XVI</u>
(Strict Liability, Brugg Wire/Brugg Cables)

NOW COMES plaintiff, BERNICE LEWANDOWSKI (BERNICE) by her attorneys,

POWER ROGERS & SMITH, P.C. and complaining of defendants, BRUGG WIRE ROPE, LLC, a

Georgia corporation (BRUGG WIRE) and BRUGG CABLES, LLC., a Georgia corporation

(BRUGG CABLES), pleading hypothetically and in the alternative, states:

      1.      On or about July 5, 2006, LAWRENCE was employed by the Chicago Transit

Authority (CTA).

      2.      On and prior to July 5, 2006, BRUGG WIRE was a corporation doing business in

Cook County, Illinois.

      3.      On and prior to July 5, 2006, BRUGG CABLES was a corporation doing business

in Cook County, Illinois.

      4.      On and prior to July 5, 2006, BRUGG WIRE was engaged in the business of

designing, manufacturing, distributing, selling and/or installing elevator cables and ropes.

      5.      On and prior to July 5, 2006, BRUGG CABLES was engaged in the business of

designing, manufacturing, distributing, selling and/or installing elevator cables and ropes.

      6.      On and prior to July 5, 2006, there was an elevator located at the Pulaski station

of the Chicago Transit Authority's "Orange Line," at or near 5106 S. Pulaski Rd., Cook County,

Illinois ("the elevator").

      7.      Prior to July 5, 2006, BRUGG WIRE designed cables and/or ropes for the

elevator.

      8.      Prior to July 5, 2006, BRUGG CABLES designed cables and/or ropes for the

elevator.

      9.      Prior to July 5, 2006, BRUGG WIRE manufactured cables and/or ropes for the

elevator.

      10.      Prior to July 5, 2006, BRUGG CABLES manufactured cables and/or ropes for the

elevator.

      11.      Prior to July 5, 2006, BRUGG WIRE distributed cables and/or ropes for the

elevator.

12.     Prior to July 5, 2006, BRUGG CABLES distributed cables and/or ropes for the elevator.

13.     Prior to June 5, 2006, BRUGG WIRE sold cables and/or ropes for the elevator.

14.     Prior to June 5, 2006, BRUG CABLES sold cables and/or ropes for the elevator.

15.     Prior to June 5, 2006, BRUGG WIRE installed cables and/or ropes for the elevator.

16.     Prior to June 5, 2006, BRUGG CABLES installed cables and/or ropes for the elevator.

17.     On or about July 5, 2006, LAWRENCE was a passenger on the elevator.

18.     On or about July 5, 2006, the elevator's cables and/or ropes  snapped, separated or otherwise failed, causing the elevator to fall.

19.     On or about July 5, 2006, no brake, governor or other device prevented the elevator from free falling.

20.     As a proximate result of the elevator's fall, LAWRENCE was injured.

21.     That said elevator cables and/or ropes were unreasonably dangerous in one or more of the following respects:

    a.     They were defectively designed; or

    b.     They were defectively manufactured; or

    c.     They were not accompanied by adequate warnings for use; or

    d.     They were not accompanied by adequate instructions for maintenance; or

    e.     Were otherwise defective and unreasonably dangerous.

22.     The aforesaid defective and unreasonably dangerous conditions were present at the time the elevator left the control of BRUGG WIRE and/or BRUGG CABLES.

23.     As a proximate result of one or more of the foregoing negligent acts and/or omissions LAWRENCE was injured; has endured and will in the future endure pain and suffering; has become disfigured and disabled; has suffered the loss of the enjoyment of a normal life; has incurred and will in the future incur expenses for medical and rehabilitative care; has suffered a loss of wages; and has been damaged in his capacity to earn a living.

24.   At all times alleged BERNICE was the wife of LAWRENCE.

25.   As a proximate result of one or more of the foregoing negligent acts and/or omissions, BERNICE has suffered a loss of the society, companionship and support of her husband, LAWRENCE.

WHEREFORE, plaintiff, BERNICE LEWANDOWSKI, demands judgment against defendant,   BRUGG WIRE ROPE, LLC and BRUGG CABLES, LLC., in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) which shall represent fair and just compensation.

POWER ROGERS & SMITH, P.C.

By: _____

Thomas G. Siracusa

POWER ROGERS & SMITH, PC.
Attorney I.D. No. 31444
70 W. Madison Street
#5500
Chicago, IL 60602
Phone: (312) 236-938l
Fax: (312) 236-0920

40

```
08 CV 1828          JH
JUDGE GOTTSCHALL
MAGISTRATE JUDGE ASHMAN
```

# EXHIBIT B

DEV
260-04
# 140
07 OCT 31 AM 9: 3

SV/plm                           F-1896                    #43210

STATE OF ILLINOIS      )
                       )SS
COUNTY OF COOK         )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

LAWRENCE LEWANDOWSKI and        )
BERNICE LEWANDOWSKI,            )
              Plaintiffs,       )
                                )
   v.                           )        No. 06 L 11181
                                )
SOUTH WEST INDUSTRIES, INC.,    )
d/b/a ANDERSON ELEVATOR CO., an )
Illinois corporation; and PROFESSIONAL )
ELEVATOR SERVICES, INC., an Illinois )
corporation, et. al             )
              Defendants.       )

FILED
CV-1172
OCT 2 4 2007
DORO
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY

## DEFENDANT SOUTH WEST INDUSTRIES, INC.'S THIRD-PARTY COMPLAINT FOR CONTRIBUTION

NOW COMES defendant/third-party plaintiff, SOUTH WEST INDUSTRIES, INC. d/b/a ANDERSON ELEVATOR CO., ("SOUTH WEST") by and through its attorneys, GARRETSON SANTORA URGO & NUGENT, LTD., and for its Third-Party Complaint for Contribution against third-party defendant, CHICAGO TRANSIT AUTHORITY, ("CTA") alleges as follows:

### COUNT I – NEGLIGENCE BY A COMMON CARRIER (CTA)

1.     On or about October 24, 2006, plaintiffs filed their multi-count complaint against defendants, including SOUTH WEST, for bodily injuries arising out of an incident that involved the plaintiff, LAWRENCE LEWANDOWSKI on or about July 6, 2006, involving a CTA elevator at or near 5106 S. Pulaski Road in the City of Chicago, County of Cook, State of Illinois.

2.     SOUTH WEST has filed an answer to the Complaint that denied all allegations of wrongdoing directed against SOUTH WEST.

3.    At the date, time and place of the aforesaid incident, CTA was charged with the management, operation, and control of the aforementioned property, and as such was a common carrier with respect to the elevator located therein, and had the duty to use the highest degree of care consistent with the management, operation, and control of said property to avoid injury to those on the premises.

4.    Notwithstanding said duty, CTA acted or failed to act in one or more of the following ways that amounted to negligent or careless conduct:

a.    failed to maintain the elevator in good and proper condition when it knew or should have known in the exercise of the highest degree of care and caution that the elevator created a situation of imminent danger for persons, such as the plaintiff;

b.    allowed said elevator to fall into a state of disrepair for an unreasonable length of time when it knew or should have known in the exercise of the highest degree of care and caution that such condition created a situation of imminent danger for persons, such as plaintiff;

c.    failed to notify SOUTH WEST of the alleged defective condition of the elevator prior to the date of the alleged incident so that SOUTH WEST could come to the premises and repair the alleged condition, when it knew or should have known in the exercise of the highest degree of care and caution that such condition created a situation of imminent danger for persons, such as the plaintiff;

d.    failed to warn passengers and other intended users of the subject elevator of the alleged defective condition of the elevator when it knew or should have known in the exercise of the highest degree of care and caution that such condition created a situation of imminent danger for persons, such as the plaintiff;

e.    failed to have a Type A safety installed in the elevator when the station was built, which is the proper safety for an elevator that is under 100 feet;

f.    failed to keep the hoistway/pit of the elevator free from chemicals such as those used to remove graffiti, and free from water vapor, salt, ice, water and rain, which caused the cables to deteriorate.

5.    SOUTH WEST denies all liability as alleged by the plaintiff, but if it is found that SOUTH WEST is liable to the plaintiff, one or more of the foregoing acts or omissions on the part of the third-party defendant contributed in whole or in part to proximately cause the injuries alleged to have been sustained by the plaintiffs.

In the event that the plaintiffs recover a judgment from SOUTH WEST, then pursuant to 740 ILCS 100/2, SOUTH WEST is entitled to judgment by way of contribution against third-party defendant for that portion of said judgment in excess of SOUTH WEST'S pro rata share of liability to the full extent allowed by law.

WHEREFORE, defendant, SOUTH WEST INDUSTRIES, INC. d/b/a ANDERSON ELEVATOR CO., prays that in the event a judgment is entered in favor of the plaintiffs and against SOUTH WEST, that a judgment be entered in its favor and against the third-party defendant, CTA, for that portion of said judgment entered against it in excess of its pro rate share of liability.

### COUNT II – SPOLIATION OF EVIDENCE (CTA)

NOW COMES defendant/third-party plaintiff, SOUTH WEST INDUSTRIES, INC. d/b/a ANDERSON ELEVATOR CO., ("SOUTH WEST") by and through its attorneys, GARRETSON SANTORA URGO & NUGENT, LTD., and for its Third-Party Complaint for Contribution against third-party defendant, CHICAGO TRANSIT AUTHORITY, ("CTA") alleges as follows:

1.      That on or about July 6, 2006, the third-party defendant, CTA, and its duly authorized agents or servants had exclusive actual physical possession of the elevator and all of its component parts.

2.      That third-party defendant, CTA, was charged with the management, operation, and control of the aforementioned elevator and all of its component parts.

3.      That after the plaintiff, LAWRENCE LEWANDOWSKI, was involved in the incident of July 6, 2006, third-party defendant, CTA, knew or should have known that the elevator and its component parts had to be maintained for inspection and preservation.

4.      That third-party defendant, CTA, had a duty to maintain, preserve and secure the elevator and its component parts and keep them free from water, ice, salt, chemicals and debris.

5.    That, notwithstanding said duties, third-party defendant, CTA, allowed water, ice, salt, chemicals and debris to build up and sit in the pit/hoist way causing the hoist ropes and other component parts to rust and further deteriorate.

7.    That third-party defendant, CTA, allowed the elevator and its component parts to sit in ice, water, chemicals and debris for a significant and unreasonable length of time which caused further deterioration to the evidence which has impaired defendant SOUTH WEST's ability to defend itself by an examination of the allegedly defective product, hoist ropes, elevator and its component parts.

8.    SOUTH WEST denies all liability as alleged by the plaintiff and if it is found that SOUTH WEST is liable to the plaintiffs, one or more of the foregoing acts or omissions on the part of third-party defendant, CTA, contributed in whole or in part to proximately cause the injuries alleged to have been sustained by the plaintiffs.

9.    In the event that the plaintiffs recover a judgment from SOUTH WEST, then pursuant to 740 ILCS 100/2, SOUTH WEST is entitled to judgment by way of contribution against third-party defendant, CTA, for that portion of said judgment in excess of SOUTH WEST'S pro rata share of liability to the full extent allowed by law.

WHEREFORE, defendant, SOUTH WEST INDUSTRIES, INC. d/b/a ANDERSON ELEVATOR CO.; prays that in the event a judgment is entered in favor of the plaintiff and against SOUTH WEST, that a judgment be entered in its favor and against the third-party defendant, CTA, for that portion of said judgment entered against it in excess of its pro rata share of liability.

## COUNT III– NEGLIGENCE – CITY OF CHICAGO

1.    On or about October 24, 2006, plaintiffs filed their multi-count complaint against defendants, including SOUTH WEST, for bodily injuries arising out of an incident that involved the plaintiff, LAWRENCE LEWANDOWSKI on or about July 6, 2006, involving a CITY OF CHICAGO elevator at or near 5106 S. Pulaski Road in the City of Chicago, County of Cook, State of Illinois.

2.    SOUTH WEST has filed an answer to the Complaint that denied all allegations of wrongdoing directed against SOUTH WEST.

3.    At the date, time and place of the aforesaid incident, the CITY OF CHICAGO was the owner and was charged with the management, operation, and control of the aforementioned property, and as such was a common carrier with respect to the elevator located therein, and had the duty to use the highest degree of care consistent with the management, operation, and control of said property to avoid injury to those on the premises.

4.    Notwithstanding said duty, the CITY OF CHICAGO acted or failed to act in one or more of the following ways that amounted to negligent or careless conduct:

a.    failed to maintain the elevator in good and proper condition when it knew or should have known in the exercise of the highest degree of care and caution that the elevator created a situation of imminent danger for persons, such as the plaintiff;

b.    allowed said elevator to fall into a state of disrepair for an unreasonable length of time when it knew or should have known in the exercise of the highest degree of care and caution that such condition created a situation of imminent danger for persons, such as plaintiff;

c.    failed to notify SOUTH WEST of the alleged defective condition of the elevator prior to the date of the alleged incident so that SOUTH WEST could come to the premises and repair the alleged condition, when it knew or should have known in the exercise of the highest degree of care and caution that such condition created a situation of imminent danger for persons, such as the plaintiff;

d.    failed to warn passengers and other intended users of the subject elevator of the alleged defective condition of the elevator when it knew or should have known in the exercise of the highest degree of care and caution that such condition created a situation of imminent danger for persons, such as the plaintiff;

e.    failed to have a Type A safety installed in the elevator when the station was built, which is the proper safety for an elevator that is under 100 feet;

f.    failed to keep the hoistway/pit of the elevator free from chemicals such as those used to remove graffiti, and free from water vapor, salt, ice, water and rain, which caused the cables to deteriorate.

5.    SOUTH WEST denies all liability as alleged by the plaintiff, but if it is found that SOUTH WEST is liable to the plaintiff, one or more of the foregoing acts or omissions on the part of the third-party defendant contributed in whole or in part to proximately cause the injuries alleged to have been sustained by the plaintiffs.

In the event that the plaintiffs recover a judgment from SOUTH WEST, then pursuant to 740 ILCS 100/2, SOUTH WEST is entitled to judgment by way of contribution against third-party defendant for that portion of said judgment in excess of SOUTH WEST'S pro rata share of liability to the full extent allowed by law.

WHEREFORE, defendant, SOUTH WEST INDUSTRIES, INC. d/b/a ANDERSON ELEVATOR CO., prays that in the event a judgment is entered in favor of the plaintiffs and against SOUTH WEST, that a judgment be entered in its favor and against the third-party defendant, CITY OF CHICAGO, for that portion of said judgment entered against it in excess of its pro rate share of liability.

## COUNT IV – SPOLIATION OF EVIDENCE – CITY OF CHICAGO

NOW COMES defendant/third-party plaintiff, SOUTH WEST INDUSTRIES, INC. d/b/a ANDERSON ELEVATOR CO., ("SOUTH WEST") by and through its attorneys, GARRETSON SANTORA URGO & NUGENT, LTD., and for its Third-Party Complaint for Contribution against third-party defendant, CITY OF CHICAGO alleges as follows:

1.    That on or about July 6, 2006, the third-party defendant, CITY OF CHICAGO, and its duly authorized agents or servants had exclusive actual physical possession of the elevator and all of its component parts.

2.      That third-party defendant, CITY OF CHICAGO, was the owner and was charged with the management, operation, and control of the aforementioned elevator and all of its component parts.

3.      That after the plaintiff, LAWRENCE LEWANDOWSKI, was involved in the incident of July 6, 2006, third-party defendant, CITY OF CHICAGO, knew or should have known that the elevator and its component parts had to be maintained for inspection and preservation.

4.      That third-party defendant, CITY OF CHICAGO, had a duty to maintain, preserve and secure the elevator and its component parts and keep them free from water, ice, salt, chemicals and debris.

5.      That, notwithstanding said duties, third-party defendant, CITY OF CHICAGO, allowed water, ice, salt, chemicals and debris to build up and sit in the pit/hoist way causing the hoist ropes and other component parts to rust and further deteriorate.

7.      That third-party defendant, CITY OF CHICAGO, allowed the elevator and its component parts to sit in ice, water, chemicals and debris for a significant and unreasonable length of time which caused further deterioration to the evidence which has impaired defendant SOUTH WEST's ability to defend itself by an examination of the allegedly defective product, hoist ropes, elevator and its component parts.

8.      SOUTH WEST denies all liability as alleged by the plaintiff and if it is found that SOUTH WEST is liable to the plaintiffs, one or more of the foregoing acts or omissions on the part of third-party defendant, CITY OF CHICAGO, contributed in whole or in part to proximately cause the injuries alleged to have been sustained by the plaintiffs.

9.      In the event that the plaintiffs recover a judgment from SOUTH WEST, then pursuant to 740 ILCS 100/2, SOUTH WEST is entitled to judgment by way of contribution

against third-party defendant, CITY OF CHICAGO, for that portion of said judgment in excess of

SOUTH WEST'S pro rata share of liability to the full extent allowed by law.

WHEREFORE, defendant, SOUTH WEST INDUSTRIES, INC. d/b/a ANDERSON

ELEVATOR CO., prays that in the event a judgment is entered in favor of the plaintiff and

against SOUTH WEST, that a judgment be entered in its favor and against the third-party

defendant, CITY OF CHICAGO, for that portion of said judgment entered against it in excess of

its pro rata share of liability.

Respectfully submitted,

One of the attorneys for defendant,
SOUTH WEST INDUSTRIES, INC.
d/b/a ANDERSON ELEVATOR CO.

Sladjana Vuckovic
GARRETSON SANTORA
    URGO & NUGENT, LTD.
2 N. LaSalle St.
Suite 1100
Chicago, IL  60602
Atty. No. 43210

```
08 CV 1828        JH
JUDGE GOTTSCHALL
MAGISTRATE JUDGE ASHMAN
```

# EXHIBIT C

Client#: 68589                                    ~OL    2

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
11/15/06

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|
| Arthur J. Gallagher RMS, Inc.<br>Two Pierce Place<br>Itasca, IL  60143<br>Chuck Hamman 630-694-5192 | | |
| | INSURERS AFFORDING COVERAGE | NAIC # |
| INSURED<br><br>Southwest  Industries, Inc.<br>Anderson Elevator Company, Inc.<br>2801 South 19th Avenue<br>Broadview, IL  60155 | INSURER A: StarNet Insurance Company | 40045 |
| | INSURER B: The Hanover Insurance Company | 22292 |
| | INSURER C: RSUI Indemnity | |
| | INSURER D: SeaBright Insurance Company | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>X  COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE  X OCCUR | JMS000017100 | 03/31/06 | 03/31/07 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $100,000 |
| | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>☐ POLICY  X PRO-JECT  ☐ LOC | | | | GENERAL AGGREGATE | $3,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $1,000,000 |
| B | | **AUTOMOBILE LIABILITY**<br>X  ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>X  HIRED AUTOS<br>X  NON-OWNED AUTOS | ACC8253958 | 03/31/06 | 03/31/07 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC<br>AUTO ONLY:      AGG | $<br>$ |
| C | | **EXCESS/UMBRELLA LIABILITY**<br>☐ OCCUR  ☐ CLAIMS MADE<br><br>☐ DEDUCTIBLE<br>☐ RETENTION    $ | NHA034391 | 03/31/06 | 03/31/07 | EACH OCCURRENCE | $4,000,000 |
| | | | | | | AGGREGATE | $4,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| D | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | BB1060853 | 03/31/06 | 03/31/07 | X  WC STATU-TORY LIMITS ☐ OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $500,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $500,000 |
| | | OTHER | | | | E.L. DISEASE - POLICY LIMIT | $500,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

RE: Contract #B990P00219, Monthly Inspection, Servicing, Maintenace, and Repair of Electric and Electric Hydraulic Elevators

A waiver of subrogation in favor of Chicago Transit Authority is included (See Attached Descriptions)

NOV 17 RECD ELR

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Chicago Transit Authority<br>Attn: Gail Clisby<br>Merchandise Mart Plaza PO Box<br>3555, Room 700<br>Chicago, IL  60654 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL  30  DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE<br>*[signature]* |

ACORD 25 (2001/08)  1  of 3        #S283504/M254532        JMM        © ACORD CORPORATION 1988

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

# DISCLAIMER

The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

ACORD 25-S (2001/08)    2 of 3    #S283504/M254532

## DESCRIPTIONS (Continued from Page 1)

under the workers compensation coverage as evidenced herein as required by written contract.

POLICY NUMBER:  JMS0000171-00

**COMMERCIAL GENERAL LIABILITY**
**CG DS 01 10 01**

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

| Company Name and Address: | Agent Name and Address: |
|---|---|
| STARNET INSURANCE COMPANY | JM ASSOCIATES, LTD. |
| 475 STEAMBOAT ROAD | ONE BRIDGE PLAZA NORTH |
| GREENWICH, CT  06830 | SUITE 360 |
| PHONE: 800-343-0592 | FORT LEE, NJ 07024 |

NAMED INSURED:   SOUTHWEST INDUSTRIES, INC.

MAILING ADDRESS:   2801 19TH AVENUE

                         BROADVIEW, IL 60153

POLICY PERIOD:  FROM _____3/31/2006_____ TO _____3/31/2007_____ AT 12:01 A.M. TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| LIMITS OF INSURANCE | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ 1,000,000 | |
|    DAMAGE TO PREMISES | | |
|    RENTED TO YOU LIMIT | $ 100,000 | Any one premises |
|    MEDICAL EXPENSE LIMIT | $ 10,000 | Any one person |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | Any one person or organization |
| GENERAL AGGREGATE LIMIT | $ 3,000,000 | |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ 1,000,000 | |

| RETROACTIVE DATE (CG 00 02 ONLY) |
|---|
| THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW. |
| RETROACTIVE DATE: _____ |
| (ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| DESCRIPTION OF BUSINESS |
|---|
| FORM OF BUSINESS: |

☐ INDIVIDUAL      ☐ PARTNERSHIP      ☐ JOINT VENTURE      ☐ TRUST

☐ LIMITED LIABILITY COMPANY    ☒ ORGANIZATION, INCLUDING A CORPORATION (BUT NOT IN-CLUDING A PARTNERSHIP, JOINT VENTURE OR LIMITED LIABILITY COMPANY)

BUSINESS DESCRIPTION:   ELEVATOR CONTRACTOR

| ALL PREMISES YOU OWN, RENT OR OCCUPY | |
|---|---|
| LOCATION NUMBER | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| 001 | 2801 19th Avenue, Broadview, IL 60153 |
| | |
| | |
| | |
| | |

| CLASSIFICATION AND PREMIUM | | | | | | | |
|---|---|---|---|---|---|---|---|
| LOCATION NUMBER | CLASSIFICATION | CODE NO. | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
| | | | | Prem/ Ops | Prod/ Comp Ops | Prem/ Ops | Prod/Comp Ops |
| See attached Schedule of Classifications and Premiums | | | | $  INCL | $  INCL | $ 309,375 | $ 0 |

| | | |
|---|---|---|
| | STATE TAX OR OTHER (if applica-ble) | $                    0.00 |
| | TOTAL PREMIUM (SUBJECT TO AUDIT) | $         309,375.00 |
| PREMIUM SHOWN IS PAYABLE: | AT INCEPTION | $         309,375.00 |
| | AT EACH ANNIVERSARY | $ |
| | (IF POLICY PERIOD IS MORE THAN ONE YEAR AND PRE-MIUM IS PAID IN ANNUAL INSTALLMENTS) | |

| AUDIT PERIOD (IF APPLICABLE) | ☒ ANNUALLY | ☐ SEMI-ANNUALLY | ☐ QUARTERLY | ☐ MONTHLY |
|---|---|---|---|---|

| ENDORSEMENTS |
|---|
| ENDORSEMENTS ATTACHED TO THIS POLICY: |
| SEE SCHEDULE OF FORMS AND ENDORSEMENTS |

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

| Countersigned: | By: |
|---|---|
| (Date) | (Authorized Representative) |

**NOTE**

OFFICERS' FACSIMILE SIGNATURES MAY BE INSERTED HERE, ON THE POLICY COVER OR ELSE-WHERE AT THE COMPANY'S OPTION.

Policy Number:     <u>JMS0000171-00</u>

IN WITNESS WHEREOF, StarNet Insurance Company has caused the facsimile signatures of its President and Secretary to be affixed hereto, but if required by state law, this policy shall not be valid unless countersigned by a duly author ized representative of the Company.

Secretary

President and CEO

| **StarNet Insurance Company** | **Policy No.** | JMS0000171-00 |
|---|---|---|

### SCHEDULE – NAMED INSURED(S)

Named Insured:   SOUTHWEST INDUSTRIES, INC.

Effective Date:   3/31/2006
12:01 a.m., Standard Time

Name of Agent:   JM Associates, Ltd.

Agent No.

ANDERSON ELEVATOR CO. DBA

**CG DS 20 03 05**

**Page 1 of 1**

| **StarNet Insurance Company** | **Policy No.** | JMS0000171-00 |

### SCHEDULE OF FORMS AND ENDORSEMENTS

Named Insured:  SOUTHWEST INDUSTRIES, INC.

Effective Date:  3/31/2006
12:01 a.m., Standard Time
Agent No.

Name of Agent: JM Associates, Ltd.

Common Policy Forms And Endorsements

| CG DS 01 10 01 | Commercial General Liability Declarations |
| IL DS 18 03 05 | Policy Execution Clause |
| CG DS 20 03 05 | Schedule - Named Insured(s) |
| CG DS 23 03 05 | Schedule Of Forms And Endorsements |
| IL 00 03 07 02 | Calculation of Premium |
| IL 00 17 11 98 | Common Policy Conditions |
| IL 00 21 07 02 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |

General Liability Forms And Endorsements

| CG DS 22 03 05 | Schedule Of Classifications and Premiums |
| EV 99 10 03 05 | Composite Rating Endorsement |
| CG 00 01 12 04 | Commercial General Liability Coverage Form (Occurrence Version) |
| CG 00 67 03 05 | Exclusion - Violation of Statutes That Govern E-Mails, Fax, Phone Calls, or Other |
| CG 02 00 12 04 | Illinois Changes - Cancellation and Nonrenewal |
| CG 21 47 07 98 | Employment-related Practices Exclusion |
| CG 21 67 12 04 | Fungi or Bacteria Exclusion |
| CG 21 75 12 02 | Exclusion Of Certified Acts Of Terrorism And Other Acts Of Terrorism |
| CG 21 87 05 04 | Conditional Exclusion Of Terrorism (relating To Disposition Of Federal Terrorism Risk |
| CG 24 04 10 93 | Waiver of Transfer of Rights of Recovery Against Others to Us |
| CG 24 15 10 01 | Limited Pollution Liability Extension Endorsement |
| CG 25 03 03 97 | Designated Construction Project(s) General Aggregate Limit |
| EV 20 45 03 05 | Blanket Additional Insured Endorsement |
| EV 21 21 03 05 | Asbestos and Lead Exclusion Endorsement |
| EV 99 21 03 05 | Undisclosed Hazards |
| EV 99 22 03 05 | Knowledge of Occurrence |

CG DS 23 03 05

IL 00 03 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

      BOILER AND MACHINERY COVERAGE PART
      CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
      COMMERCIAL AUTOMOBILE COVERAGE PART
      COMMERCIAL GENERAL LIABILITY COVERAGE PART
      COMMERCIAL INLAND MARINE COVERAGE PART
      COMMERCIAL PROPERTY COVERAGE PART
      CRIME AND FIDELITY COVERAGE PART
      EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
      FARM COVERAGE PART
      LIQUOR LIABILITY COVERAGE PART
      OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
      POLLUTION LIABILITY COVERAGE PART
      PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
      PROFESSIONAL LIABILITY COVERAGE PART
      RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

© ISO Properties, Inc.,  2001

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 21 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

 © ISO Properties, Inc.,  2001

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

**(a)** Any "nuclear reactor";

**(b)** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

**(c)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**(d)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2001
IL 00 21 07 02    □

| StarNet Insurance Company | | **Policy No.** | JMS0000171-00 |
|---|---|---|---|

### SCHEDULE OF CLASSIFICATIONS AND PREMIUMS

Named Insured:  SOUTHWEST INDUSTRIES, INC.

Name of Agent:  JM Associates, Ltd.

Effective Date:    3/31/2006
12:01 a.m., Standard Time
Agent No.

| Code No. Composite Rate | Premium Basis: Payroll | Premises/Operations | |
|---|---|---|---|
| Location No. | Exposure $    3,800,000 | Rate | Premium |
| Classification: | | $  81.283 | $  308,875 |
| See Composite Rate Endorsement (Payroll) | | Products/Completed Operations | |
| | | Rate | Premium |
| | | $  INCL | $  INCL |
| Code No. 92593 | Premium Basis: Premium Level | Premises/Operations | |
| Location No.  001 | Exposure $    308,875 | Rate | Premium |
| Limited Pollution Liability Extension Endorsement | | $ | $  500 |
| | | Products/Completed Operations | |
| | | Rate | Premium |
| | | $ | $ |
| Code No. | Premium Basis: | Premises/Operations | |
| Location No. | Exposure  $ | Rate | Premium |
| | | $ | $ |
| | | Products/Completed Operations | |
| | | Rate | Premium |
| | | $ | $ |
| Code No. | Premium Basis: | Premises/Operations | |
| Location No. | Exposure  $ | Rate | Premium |
| | | $ | $ |
| | | Products/Completed Operations | |
| | | Rate | Premium |
| | | $ | $ |

POLICY NUMBER: JMS0000171-00

COMMERCIAL GENERAL LIABILITY
EV 99 10 03 05

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMPOSITE RATING ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Classification(s) | Classification Code | Premium Basis (P = Payroll; S = Sales) |
|---|---|---|
| Elevator or Escalator Inspecting, Installation, Servicing or Repair - Products - Completed Operations are subject to the General Aggregate Limit | 92593 | p |
| Machine Shops | 97220 | p |
| | | |
| | | |
| | | |
| | | |

| | Payroll | Sales |
|---|---|---|
| Composite Rate (per $1,000) | $ 81.283 | $ 0.000 |
| Estimated Annual Exposure | $ 3,800,000 | $ 0 |
| Advance Premium | $ 308,875 | $ 0 |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The coverage provided by this endorsement is subject to the provisions applicable to the Commercial General Liability Coverage Form, except as provided below.

For those classifications designated in the Schedule, the premium for the Premises/Operations and Products/Completed Operations exposures is made up of an Advance Premium and an Earned Premium component.

**A.** The Advance Premium is calculated at policy inception, by multiplying the Estimated Annual Exposure by the applicable Composite Rate shown in the Schedule.

Following the end of the policy period, an audit of the insured's books and records is conducted in order to determine actual payroll expenditures and/or gross sales receipts.

Includes copyrighted material of Insurance Services Office, Inc., with its permission
Copyright, Insurance Services Office, Inc., 2002

**B.** The Earned Premium is calculated, subsequent to the audit, by multiplying the actual payroll expenditures and/or gross sales receipts by the applicable Composite Rate shown in the Schedule.

    **a.** If the Earned Premium exceeds the Advance Premium paid, the difference between the two amounts will be billed to the insured.

    **b.** If the Advance Premium paid exceeds the Earned Premium, the difference between the two amounts will be refunded to the insured.

**C.** The composite rate applies per $1,000 of payroll or gross sales.

**D. Premium Bases**

    **1. Payroll**

        Payroll means remuneration. Remuneration means money or substitutes for money.

        Payroll includes:

        **a.** Commissions;

        **b.** Bonuses;

        **c.** Extra pay for overtime work;

            Overtime means those hours worked for which there is an increase in the rate of pay:

            **(1)** For work in any day or in any week in excess of the number of hours normally worked, or

            **(2)** For hours worked in excess of 8 hours in any day or 40 hours in any week, or

            **(3)** For work on Saturdays, Sundays or Holidays.

        In the case of guaranteed wage agreements, overtime means only those hours worked in excess of the number specified in such agreement.

        Overtime does not include:

        The extra pay from the payroll on which premium is computed as indicated in **(1)** or **(2)**, provided the insured's books and records are maintained to show overtime pay separately by "employee" and in summary by classification.

    **(1)** If the records show separately the extra pay earned for overtime, the entire extra pay shall be excluded.

    **(2)** If the records show the total pay earned for overtime (regular pay plus overtime pay) in one combined amount, 1/3 of this total pay shall be excluded. If double time is paid for overtime and the total pay for such overtime is recorded separately, 1/2 of the total pay for double time shall be excluded.

Exclusion of overtime pay does not apply to payroll assigned to the Stevedoring classifications.

    **d.** Pay for holidays, vacations, or periods of sickness;

    **e.** Payment by an employer of amounts otherwise required by law to be paid by "employees" to statutory insurance or pension plans, such as the Federal Social Security Act;

    **f.** Payment to "employees" on any basis other than time worked, such as piecework, profit sharing, or incentive plans;

    **g.** Payment or allowance for hand tools or power tools used by hand, provided by "employees", and used in their work or operations for the insured;

    **h.** The rental value of an apartment or a house provided for an "employee" based on comparable accommodations;

    **i.** The value of lodging, other than an apartment or house, received by "employees" as part of their pay, to the extent shown in the insured's records;

    **j.** The value of meals received by "employees" as part of their pay, to the extent shown in the insured's records;

    **k.** The value of store certificates, merchandise, credits, or any other substitute for money received by "employees" as part of their pay;

l.  The payroll of mobile equipment opera-tors and their helpers, whether or not the operators are designated or licensed to operate automobiles. If the operators and their helpers are provided to the in-sured along with equipment hired under contract, and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;

m.  The payroll of "executive officers" of a corporation and individual insureds and co-partners, subject to the applicable state payroll limitation. For the purposes of payroll determination, managers of limited liability companies shall be con-sidered "executive officers" and mem-bers of limited liability companies shall be considered co-partners;

The "executive officers" of a corporation are those persons holding any of the of-ficer positions created by the named in-sured's charter, constitution, bylaws, or any other similar governing document.

The payroll of all "executive officers" of a corporation and individual insureds or co-partners engaged principally in cleri-cal operations or as salespersons, and officers and co-partners who are inac-tive for the entire policy period, shall not be included for premium purposes.

For part-time or seasonal businesses, the payroll amounts may be reduced by 2 percent for each full calendar week in excess of twelve during which the risk performs no operations.

n.  The payroll of "leased workers" fur-nished to the named insured by a labor leasing firm. Premium on such payroll shall be based on the classifications and rates which would have applied if the "leased workers" had been the direct "employees" of the named insured. If payroll is unavailable, use 100% of the total cost of the contract for "leased workers" as the payroll of "leased work-ers". The premium shall be charged on that amount as payroll;

However, if investigation of a specific "employee" leasing contract discloses that a definite amount of the contract price represents payroll, such amount shall be considered payroll for premium computation purposes.

o.  Fees paid to employment agencies for temporary personnel provided to the in-sured.

Payroll excludes:

a.  Tips and other gratuities received by "employees";

b.  Payments by an employer to group in-surance or group pension plans for "em-ployees", other than payments covered by Paragraph D.1.e.;

c.  The value of special rewards for individ-ual invention or discovery;

d.  Dismissal or severance payments ex-cept for time worked or accrued vaca-tion;

e.  The payroll of clerical office "employ-ees";

Clerical office "employees" are those "employees" who work in an area which is physically separated by walls, floors, or partitions from all other work areas of the insured and whose duties are strictly limited to keeping the insured's books or records or conducting correspondence, including any other "employees" en-gaged in clerical work in the same area.

f.  The payroll of salespersons, collectors, or messengers who work principally away from the insured's premises. Salespersons, collectors, or messen-gers are those "employees" engaged principally in any such duties away from the premises of the employer;

This term does not apply to any "em-ployee" whose duties include the deliv-ery of any merchandise handled, treated, or sold.

g.  The payroll of drivers and their helpers, if their principal duties are to work on or in connection with automobiles;

h.  The payroll of aircraft pilots or co-pilots, if their principal duties are to work on or in connection with aircraft in either capacity; and

i.  The payroll of draftsmen if their duties are limited to office work only and who are engaged strictly as draftsmen in such a manner that they are not exposed to the operative hazards of the business.

2.  **Gross Sales**

The gross amount charged by the named insured, concessionaires of the named insured, or by others trading under the insured's name for:

a.  All goods or products, sold or distributed;

b.  Operations performed during the policy period;

c.  Rentals; and

d.  Dues or fees.

The following items shall not be deducted from gross sales:

a.  Foreign exchange discounts;

b.  Freight allowance to customers;

c.  Total sales of consigned goods and warehouse receipts;

d.  Trade or cash discounts;

e.  Bad debts; and

f.  Repossession of items sold on installments (amount actually collected).

The following items shall be deducted from gross sales:

a.  Sales or excise taxes which are collected and submitted to a governmental division;

b.  Credits for repossessed merchandise and products returned. Allowances for damaged and spoiled goods;

c.  Finance charges for items sold on installments;

d.  Freight charges on sales if freight is charged as a separate item on customers invoice;

e.  Royalty income from patent rights or copyrights which are not product sales, and

f.  Rental receipts for products liability coverage only.

COMMERCIAL GENERAL LIABILITY
CG 00 01 12 04

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

   **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

   **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

 © ISO Properties, Inc., 2003    □

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© ISO Properties, Inc., 2003

CG 00 01 12 04    □

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

 © ISO Properties, Inc., 2003

(2) Any loss, cost or expense arising out of any:

  (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

  (b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

  (a) Less than 26 feet long; and

  (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

  (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

  (b) the operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

 © ISO Properties, Inc., 2003 CG 00 01 12 04 □

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

    © ISO Properties, Inc., 2003

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage A.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

**a.** All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

 © ISO Properties, Inc., 2003 □

c.  The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d.  All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e.  All costs taxed against the insured in the "suit".

f.  Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g.  All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2.  If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a.  The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b.  This insurance applies to such liability assumed by the insured;

c.  The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d.  The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e.  The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f.  The indemnitee:

    (1)  Agrees in writing to:

        (a)  Cooperate with us in the investigation, settlement or defense of the "suit";

(b)  Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c)  Notify any other insurer whose coverage is available to the indemnitee; and

(d)  Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2)  Provides us with written authorization to:

    (a)  Obtain records and other information related to the "suit"; and

    (b)  Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a.  We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b.  The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

**SECTION II – WHO IS AN INSURED**

1.  If you are designated in the Declarations as:

a.  An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b.  A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c.  A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    © ISO Properties, Inc., 2003    CG 00 01 12 04    □

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage **C**;

   b. Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over:

**(1)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(a)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(b)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(c)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(d)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(2)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in a. above;

(2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

**b.** Your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in **(2)** above and supervisory, inspection, architectural or engineering activities.

**10.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**11.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**12.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

© ISO Properties, Inc., 2003

(1) Equipment designed primarily for:

    (a) Snow removal;

    (b) Road maintenance, but not construction or resurfacing; or

    (c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    **a.** False arrest, detention or imprisonment;

    **b.** Malicious prosecution;

    **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

    **f.** The use of another's advertising idea in your "advertisement"; or

    **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

      (1) Products that are still in your physical possession; or

      (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        (a) When all of the work called for in your contract has been completed.

        (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    **b.** Does not include "bodily injury" or "property damage" arising out of:

      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

      (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

      (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

 © ISO Properties, Inc., 2003 □

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

COMMERCIAL GENERAL LIABILITY
CG 00 67 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section I – Coverage A – Bodily Injury And Property Damage Liability:

   **2. Exclusions**

   This insurance does not apply to:

   **DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

   "Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

   **a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

   **b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

   **c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section I – Coverage B – Personal And Advertising Injury Liability:

   **2. Exclusions**

   This insurance does not apply to:

   **DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

   "Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

   **a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

   **b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

   **c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

COMMERCIAL GENERAL LIABILITY
CG 02 00 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ILLINOIS CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART

**A. Cancellation** (Common Policy Conditions) is replaced by the following:

**Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing to us advance written notice of cancellation.

2. a. We may cancel this policy by mailing to you written notice stating the reason for cancellation.

   b. If we cancel for nonpayment of premium, we will mail the notice at least 10 days prior to the effective date of cancellation.

   c. If we cancel for a reason other than nonpayment of premium, we will mail the notice at least;

      (1) 30 days prior to the effective date of cancellation if the policy has been in effect for 60 days or less.

      (2) 60 days prior to the effective date of cancellation if the policy has been in effect for more than 60 days.

3. If this policy has been in effect for more than 60 days, we may cancel only for one or more of the following reasons:

   a. Nonpayment of premium;

   b. The policy was obtained through a material misrepresentation;

   c. Any insured has violated any of the terms and conditions of the policy;

   d. The risk originally accepted has measurably increased;

   e. Certification of the Director of Insurance of the loss of reinsurance by the insurer that provided coverage to us for all or a substantial part of the underlying risk insured; or

   f. A determination by the Director of Insurance that the continuation of the policy could place us in violation of the insurance laws of this State.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund will be less than pro rata. The cancellation will be effective even if we have not offered a refund.

**B.** The following is added and supercedes any provision to the contrary:

**Nonrenewal**

1. If we decide not to renew this policy, we will mail written notice stating the reason for nonrenewal no less than 60 days before the expiration date to:

   a. You; and

   b. The broker, if known to us, or the agent of record.

2. Even if we do not comply with these terms, this policy will terminate:

   a. On the expiration date, if:

     (1) You fail to perform any of your obligations in connection with the payment of the premium for the policy, or any installment payment, whether payable directly to us or our agents or indirectly under any premium finance plan or extension of credit; or

     (2) We have indicated our willingness to renew this policy to you or your representative; or

     (3) You have notified us or our agent that you do not want to renew this policy.

   b. On the effective date of any other insurance replacing this policy.

**C.** Mailing of Notices

We will mail cancellation and nonrenewal notices to you, and the agent or broker, at the last addresses known to us. Proof of mailing will be sufficient proof of notice.

© ISO Properties, Inc., 2003
**CG 02 00 12 04**    □

COMMERCIAL GENERAL LIABILITY
CG 21 47 07 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

  **(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  **(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

 **(1)** Whether the insured may be liable as an employer or in any other capacity; and

 **(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

  **(1)** A person arising out of any:

   **(a)** Refusal to employ that person;

   **(b)** Termination of that person's employment; or

   **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  **(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

 **(1)** Whether the insured may be liable as an employer or in any other capacity; and

 **(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

COMMERCIAL GENERAL LIABILITY
CG 21 67 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi Or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

© ISO Properties, Inc., 2003

COMMERCIAL GENERAL LIABILITY
CG 21 75 12 02

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism" or an "other act of terrorism". However, with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act:

1. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

2. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

    **a.** Physical injury that involves a substantial risk of death; or

    **b.** Protracted and obvious physical disfigurement; or

    **c.** Protracted loss of or impairment of the function of a bodily member or organ; or

3. The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

4. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

5. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs 1. and 2. describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

    **a.** The act resulted in aggregate losses in excess of $5 million; and

        © ISO Properties, Inc., 2002               □

   b. The act is a violent act or an act that is
      dangerous to human life, property or infra-
      structure and is committed by an individual
      or individuals acting on behalf of any foreign
      person or foreign interest, as part of an ef-
      fort to coerce the civilian population of the
      United States or to influence the policy or
      affect the conduct of the United States
      Government by coercion.

3. "Other act of terrorism" means a violent act or
   an act that is dangerous to human life, property
   or infrastructure that is committed by an indi-
   vidual or individuals and that appears to be part
   of an effort to coerce a civilian population or to
   influence the policy or affect the conduct of any
   government by coercion, and the act is not cer-
   tified as a terrorist act pursuant to the federal
   Terrorism Risk Insurance Act of 2002. Multiple
   incidents of an "other act of terrorism" which
   occur within a seventy-two hour period and ap-
   pear to be carried out in concert or to have a
   related purpose or common leadership shall be
   considered to be one incident.

C. In the event of any incident of a "certified act of
   terrorism" or an "other act of terrorism" that is not
   subject to this exclusion, coverage does not apply
   to any loss or damage that is otherwise excluded
   under this Coverage Part.

     © ISO Properties, Inc.,  2002     CG 21 75 12 02     □

COMMERCIAL GENERAL LIABILITY
CG 21 87 05 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CONDITIONAL EXCLUSION OF TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT OF 2002)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A. Applicability Of The Provisions Of This Endorsement**

1. The provisions of this endorsement will become applicable commencing on the date when any one or more of the following first occurs:

   a. The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act of 2002, has terminated with respect to the type of insurance provided under this Coverage Part or Policy; or

   b. A renewal, extension or continuation of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:

      (1) Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or

      (2) Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

      (3) Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

The Program is scheduled to terminate at the end of December 31, 2005 unless renewed, extended or otherwise continued by the federal government.

2. If the provisions of this endorsement become applicable, such provisions:

   a. Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to an incident(s) of terrorism (however defined) which results in injury or damage that occurs on or after the date when the provisions of this endorsement become applicable (for claims made policies, such an endorsement is superseded only with respect to an incident of terrorism (however defined) that results in a claim for injury or damage first being made on or after the date when the provisions of this endorsement become applicable); and

   b. Remain applicable unless we notify you of changes in these provisions, in response to federal law.

3. If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.

© ISO Properties, Inc., 2004

B. The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are enclosed in quotation marks:

1. "Terrorism" means activities against persons, organizations or property of any nature:

   a. That involve the following or preparation for the following:

      (1) Use or threat of force or violence; or

      (2) Commission or threat of a dangerous act; or

      (3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   b. When one or both of the following applies:

      (1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      (2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

2. "Any injury or damage" means any injury or damage covered under any Coverage Part or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or Policy.

C. The following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for "any injury or damage" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury or damage" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. **But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":**

1. The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

3. The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

6. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs **C.5.** or **C.6.** are exceeded.

With respect to this Exclusion, Paragraphs **C.5.** and **C.6.** describe the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Part or Policy.

In the event of any incident of "terrorism" that is not subject to this Exclusion, coverage does not apply to "any injury or damage" that is otherwise excluded under this Coverage Part or Policy.

          © ISO Properties, Inc., 2004          CG 21 87 05 04    □

POLICY NUMBER: JMS0000171-00

**COMMERCIAL GENERAL LIABILITY**
**CG 24 04 10 93**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

**Name of Person or Organization:**

APPLICABLE ONLY TO ANY PERSON OR ORGANIZATION WHERE THERE IS A WRITTEN CONTRACT/AGREEMENT IN EFFECT.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US Condition (Section **IV** – COMMER-CIAL GENERAL LIABILITY CONDITIONS) is amended by the addition of the following:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

POLICY NUMBER:  JMS0000171-00

**COMMERCIAL GENERAL LIABILITY**
**CG 24 15 10 01**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED POLLUTION LIABILITY
# EXTENSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| | |
|---|---|
| **Limited Pollution Liability Extension Aggregate Limit** | $  100,000 |
| **Premium $**  500 | |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**I.** Exclusion **f.** under Section **I – Coverage A** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(b)** Which are or were at any time transported, handled, stored, treated, disposed of or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible;

**(c)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(d)** At or from a storage tank or other container, ducts or piping which is below or partially below the surface of the ground or water or which, at any time, has been buried under the surface of the ground or water and then subsequently exposed by erosion, excavation or any other means if the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" arises at or from any premises, site or location:

**(i)** Which is or was at any time owned or occupied by, or rented or loaned to, any insured; or

© ISO Properties, Inc.,  2000

(ii) Which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

Subparagraph **(d)** does not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement issued or made pursuant to any environmental protection or environmental liability statutes or regulations that any insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for those sums the insured becomes legally obligated to pay as damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**II.** With respect to "bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**A.** The "Each Occurrence Limit" shown in the Declarations does not apply.

**B.** Paragraph **7.** of **Limits Of Insurance** (Section **III**) does not apply.

**C.** Paragraph **1.** of **Section III – Limits Of Insurance** is replaced by the following:

1. The Limits Of Insurance shown in the Schedule of this endorsement, or in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

**D.** The following are added to **Section III – Limits Of Insurance:**

8. Subject to **2.** or **3.** above, whichever applies, the Limited Pollution Liability Extension Aggregate Limit shown in the Schedule is the most we will pay for the sum of:

   **a.** Damages under Coverage **A;** and

   **b.** Medical expenses under Coverage **C**

   because of "bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants".

9. Subject to **8.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants".

    © ISO Properties, Inc., 2000    CG 24 15 10 01    □

POLICY NUMBER: JMS0000171-00

**COMMERCIAL GENERAL LIABILITY**
**CG 25 03 03 97**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# DESIGNATED CONSTRUCTION PROJECT(S) GENERAL AGGREGATE LIMIT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

---

Designated Construction Projects:

Each elevator or escalator that is serviced, repaired, installed, renovated or worked upon by you away from premises owned by or rented to you during the policy period.

---

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE **A** (SECTION I), and for all medical expenses caused by accidents under COVERAGE **C** (SECTION I), which can be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

  **1.** A separate Designated Construction Project General Aggregate Limit applies to each designated construction project, and that limit is equal to the amount of the General Aggregate Limit shown in the Declarations.

  **2.** The Designated Construction Project General Aggregate Limit is the most we will pay for the sum of all damages under COVERAGE **A,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard", and for medical expenses under COVERAGE **C** regardless of the number of:

   **a.** Insureds;

   **b.** Claims made or "suits" brought; or

   **c.** Persons or organizations making claims or bringing "suits".

  **3.** Any payments made under COVERAGE **A** for damages or under COVERAGE **C** for medical expenses shall reduce the Designated Construction Project General Aggregate Limit for that designated construction project. Such payments shall not reduce the General Aggregate Limit shown in the Declarations nor shall they reduce any other Designated Construction Project General Aggregate Limit for any other designated construction project shown in the Schedule above.

  **4.** The limits shown in the Declarations for Each Occurrence, Fire Damage and Medical Expense continue to apply. However, instead of being subject to the General Aggregate Limit shown in the Declarations, such limits will be subject to the applicable Designated Construction Project General Aggregate Limit.

**B.** For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under COVERAGE **A** (SECTION I), and for all medical expenses caused by accidents under COVERAGE **C** (SECTION I), which cannot be attributed only to ongoing operations at a single designated construction project shown in the Schedule above:

  **1.** Any payments made under COVERAGE **A** for damages or under COVERAGE **C** for medical expenses shall reduce the amount available under the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, whichever is applicable; and

  **2.** Such payments shall not reduce any Designated Construction Project General Aggregate Limit.

**C.** When coverage for liability arising out of the "products-completed operations hazard" is provided, any payments for damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard" will reduce the Products-Completed Operations Aggregate Limit, and not reduce the General Aggregate Limit nor the Designated Construction Project General Aggregate Limit.

**D.** If the applicable designated construction project has been abandoned, delayed, or abandoned and then restarted, or if the authorized contracting parties deviate from plans, blueprints, designs, specifications or timetables, the project will still be deemed to be the same construction project.

**E.** The provisions of Limits Of Insurance (SECTION III) not otherwise modified by this endorsement shall continue to apply as stipulated.

Copyright, Insurance Services Office, Inc., 1996
CG 25 03 03 97   □

COMMERCIAL GENERAL LIABILITY
EV 20 45 03 05

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# BLANKET ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The coverage provided by this endorsement is subject to the provisions applicable to the Commercial General Liability Coverage Form, except as provided below.

**A.** **Item 2.** of **SECTION II – WHO IS AN INSURED** is amended to include the following as an additional insured:

    **e.** any person or organization for whom you are performing operations if:

        **(1)** the addition of the person or organization as an additional insured is required by the terms of a written contract:

            **(a)** that is in effect, or that will go into effect during the term of the policy; and

            **(b)** whose execution precedes an "occurrence" of "bodily injury", "property damage", or "personal and advertising injury"; or

        **(2)** the addition of the person or organization as an additional insured is required by an oral agreement or contract:

            **(a)** that is in effect, or that will go into effect during the term of the policy; and

            **(b)** whose execution precedes an "occurrence" of "bodily injury", "property damage", or "personal and advertising injury" and

        a certificate of insurance showing that person or organization as an additional insured has been issued.

Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused by your acts or omissions or the acts or omissions of others acting on your behalf, provided that such acts or omissions take place:

    **(i)** in connection with premises owned by, occupied by, leased to, or rented to you; or

    **(ii)** in connection with "your work" performed for that additional insured and included in the "products-completed operations hazard".

**B.** With respect to the coverage provided by this endorsement, **SECTION III – LIMITS OF INSURANCE** is amended by the addition of the following:

Coverage under this endorsement is subject to the applicable Limit(s) of Insurance shown on the Declarations. The attachment of this endorsement to the policy does not increase the applicable Limit(s) of Insurance.

**C.** The following exclusion is added to **item 2.** under **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY,** and **COVERAGE C MEDICAL PAYMENTS**:

This insurance does not apply to:

"Bodily injury", "property damage" or "personal and advertising injury" arising out of an architect's, engineer's, or surveyor's rendering or failure to render any professional services, including:

    **a.** The preparation, approval, or failure to prepare or approve, maps, drawings, opinions, reports, surveys, field orders, change orders, designs, or specifications; or

    **b.** Supervisory, inspection, architectural, or engineering services.

Professional services include any of the items specified in items **a.** and **b.** above, if you are acting in the capacity of architect, engineer, or surveyor.

Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

D. **Item 4.b.** of **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS** is amended by the addition of the following:

(3) Any other valid and collectible insurance available to the Additional Insured, whether primary, excess, contingent, or on any other basis unless a written contract, executed prior to the date of loss, specifically requires that this insurance be primary and/or non-contributory.

COMMERCIAL GENERAL LIABILITY
EV 21 21 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ASBESTOS AND LEAD EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **SECTION I – COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

**q.** "Bodily injury"or "property damage" arising out of or in any way relating to any of the following:

   **(1)** The use of asbestos or lead in constructing or manufacturing any good, product, or structure;

   **(2)** The manufacture, mining, processing, installation, handling, testing, ownership, sale, resale, abatement, removal, transportation, storage, or disposal of asbestos or lead:

      **(a)** Dust;

      **(b)** Goods; or

      **(c)** Products; including any:

         **i.** Products containing asbestos or lead, and
         **ii.** Material containing asbestos or lead;

   **(3)** Inhaling, ingesting, or prolonged physical exposure to asbestos or lead:

      **(a)** Dust;

      **(b)** Goods; or

      **(c)** Products; including any:

         **i.** Products containing asbestos or lead, and
         **ii.** Material containing asbestos or lead;

   **(4)** Any error or omission in supervision, instructions, recommendations, notices, warnings, advice given, or that should have been given, in connection with asbestos or lead:

      **(a)** Dust;

      **(b)** Goods; or

      **(c)** Products; including any:

         **i.** Products containing asbestos or lead, and
         **ii.** Material containing asbestos or lead; or

**(5)** Any device or product that is designed or used to protect any person or organization from exposure to, inhalation of, or ingestion of asbestos or lead:

   **(a)** Dust;

   **(b)** Goods; or

   **(c)** Products; including any:

      **i.** Products containing asbestos or lead, and
      **ii.** Material containing asbestos or lead.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **SECTION I – COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY:**

  **p.** "Personal and Advertising Injury" arising out of or in any way relating to any of the following:

   **(1)** The use of asbestos or lead in constructing or manufacturing any good, product, or structure;

   **(2)** The manufacture, mining, processing, installation, handling, testing, ownership, sale, resale, abatement, removal, transportation, storage, or disposal of asbestos or lead:

    **(a)** Dust;

    **(b)** Goods; or

    **(c)** Products; including any:

       **i.** Products containing asbestos or lead, and
       **ii.** Material containing asbestos or lead;

   **(3)** Inhaling, ingesting, or prolonged physical exposure to asbestos or lead:

    **(a)** Dust;

    **(b)** Goods; or

    **(c)** Products; including any:

       **i.** Products containing asbestos or lead, and
       **ii.** Material containing asbestos or lead;

   **(4)** Any error or omission in supervision, instructions, recommendations, notices, warnings, advice given, or that should have been given, in connection with asbestos or lead:

    **(a)** Dust;

    **(b)** Goods; or

    **(c)** Products; including any:

       **i.** Products containing asbestos or lead, and
       **ii.** Material containing asbestos or lead; or

**(5)** Any device or product that is designed or used to protect any person or organization from exposure to, inhalation of, or ingestion of asbestos or lead:

    **(a)** Dust;

    **(b)** Goods; or

    **(c)** Products; including any:

        **i.** Products containing asbestos or lead, and
        **ii.** Material containing asbestos or lead.

COMMERCIAL GENERAL LIABILITY
EV 99 21 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# UNDISCLOSED HAZARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following is added to **Section IV – COMMERCIAL GENERAL LIABILITY** Conditions:

**Undisclosed Hazards**

The coverage afforded by this policy will not be adversely affected by your failure to disclose all of the hazards related to your operations, provided that such failure to disclose did not result from your intentional withholding of pertinent information.

COMMERCIAL GENERAL LIABILITY
EV 99 22 03 05

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# KNOWLEDGE OF OCCURRENCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following provision is added to Items **1.b.**, **1.c.**, and **1.d.** of **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, SECTION 1 – COVERAGES**:

Knowledge of an "occurrence" by anyone other than:

**(1)**  an insured listed under Paragraph **1.** of Section **II** – Who Is An Insured; or
**(2)**  any "employee" authorized by you to give or receive notice of an "occurrence" or claim

does not, in and of itself, constitute knowledge by you of an "occurrence" or claim.

```
08 CV 1828        JH
JUDGE GOTTSCHALL
MAGISTRATE JUDGE ASHMAN
```

# EXHIBIT D - PART 1

**SPECIAL CONDITIONS**

**SPECIFICATION NO. CTA 820-04
CONTRACT NO. B04OP00219**

## PERFORMANCE BOND
None required.

## INSURANCE
The Contractor shall furnish Workmen's Compensation, Rail Road Protective Liability, Public Liability and Property Damage and Automobile Public Liability and Property Damage Insurance, in accordance with requirements set forth on the separate sheet bearing this Specification number and entitled, "INSURANCE REQUIREMENTS" attached hereto and made a part thereof.

## QUALIFICATIONS OF BIDDER
Contractors shall be familiar and experienced with, and regularly engaged in the maintenance, installation, repairing and servicing of elevators and all other related equipment covered under this contract.

Contractors shall be required to provide proof of having under contract currently and during the two preceding years, an amount of equipment similar to the amount of equipment (units) upon which he is bidding under these specifications. Contractors shall further be required to show that such maintenance is being and was performed under the procedures as outlined in these bid documents.

No Contractor shall be considered acceptable for award of this work unless he shall have developed and ready for implementation the following elements of written maintenance procedures to insure regular coverage of all maintenance operations and identification of possible sources of operating troubles.

## SAFETY TRAINING

A.    The Contractor is advised that he may be working in close proximity to a 600-volt DC electrified operating railroad. AT NO TIME WILL THE CONTRACTOR BE PERMITTED TO INTERFERE WITH THE OPERATION OF THE RAILROAD.

B.    All of the Contractor's and Subcontractor's employees assigned to work on CTA right-of-way will be required to attend in all-day Rapid Transit Right-of-Way Safety Training Session at $75.00 per employee, maximum of eight (8) employees per session, paid for in advance by the Contractor.

C.    The letter from the Contractor requesting the training shall be accompanied by a check payable to the Chicago Transit Authority in an amount equal to seventy-five dollars times the number of individuals needing training.

D.    The $75.00 fee is non-refundable. If any individual fails to report for training or is rejected for training and must be rescheduled, an additional $75.00 fee will be required.

E.    Upon completion, employees will be issued a card which must be carried at all times while on CTA right-of-way.

F.    The Contractor shall endeavor to minimize personnel turnover while performing the services under this contract.

### SPECIAL CONDITIONS

SPECIFICATION NO. CTA 820-04
CONTRACT NO. B04OP00219

### GOVERNING PRINCIPLES OF MAINTENANCE PERFORMANCE REQUIRED UNDER THIS CONTRACT

It shall be the responsibility of the Contractor to insure that personnel assigned to CTA provide service efforts as directed by CTA in a manner such that all equipment covered under this Contract runs safely, essentially trouble-free and with minimum wear during the entire life of this Contract. The Contractor's personnel shall maintain the highest degree of good appearance of equipment satisfactory to the CTA.

The Contractor shall agree that for whatever time the equipment is not running safely and trouble-free, the CTA is not receiving full value for the expense of maintenance. Such condition thus must then be considered an emergency (call-back), which must receive immediate and full attention from the Contractor.

The Contractor shall agree that the mere fact that a piece of equipment is running is not irrefutable evidence that it is running safely, trouble-free or not wearing out excessively. The Contractor shall maintain the equipment as specified in the Detail Specifications and as required by good elevator practice at all times.

The Contractor accepts the responsibility of expediting service to correct emergencies (call-backs) and all repairs. Recognizing that the frequency of call-backs is possibly a reflection on the quality of performance of the Contractor under this Contract, the Contractor shall coordinate his efforts to hold such call-backs to a minimum.

### CONTRACTOR'S RESPONSIBILITIES AND PERFORMANCE STANDARDS

The intent of this Specification is for the Contractor to provide personnel to allow for twenty-four (24) hour, seven (7) day a week coverage for Full Maintenance (including Inspections and Repair) Service for the equipment and replacement of all operating parts which may burn out, wear out or fail in normal service. On this basis the Contractor shall:

a)     Be responsible for and provide all work or materials required to regularly maintain the operation of the equipment in accordance with the performance standards set for each type and kind of equipment listed in the Detailed Specifications. This maintenance shall be performed in accordance with the weekly, semi-monthly, monthly, quarterly, semi-annual, and annual schedule of service specified.

b)     Check for the possible mis-operations at the time of each regularly scheduled inspection.

c)     Answer any call-backs as defined in item (d) below, reported to him, including those reported to him after regular working hours of the shift.

d)     Arrange to carry an adequate stock of parts, lubricants, and cleaning materials to enable it to not only correct regular maintenance and minor equipment failure with parts on hand, but also some of the more common major parts emergencies from stock. These include control and relay parts, door parts including Door Detectors with infrared rays, hanger parts, interlocks, door guides, brake coils, etc.

The Contractor will stock common parts in his warehouse or demonstrate that these parts can be obtained from a major elevator/escalator supplier. Contractor must provide part(s) within two(2) hours of a verbal request followed by a fax from the Authority. The parts supplier must have a history of three (3) years or more of supplying elevator/escalator parts.

**SPECIAL CONDITIONS**

SPECIFICATION NO. CTA 820-04
CONTRACT NO. B04OP00219

e)  Pay particular attention to manufacturer's lead times for those long wearing parts which are not normally shelf stock. Outdated and obsolete parts shall be upgraded to available and "state of the art" technology by written permission from the Authority. State of wear should be regularly checked to permit these parts to be ordered sufficiently in advance to be available when they are needed. Examples, door hanger tracks, cable sheaves, motor and generator commutators, brake pads, magnetic tape reader, etc.

f)  Have available and needed special tools both general and special as commutator turning tools, re-cabling tools, pullers, torque wrenches, tachometer, timing devices, gram gauge, flex-stone, SY/MAX Model 100 (or equivalent) CRT program analyzer, solid state board, metric tools, etc. Contractor must show proof of ownership at the pre-award meeting. Also agree to do all the re-programming required for the duration of this contract at no extra cost to the CTA.

g)  Contractor and his Mechanics shall have 2 way radios, with cellular telephones, on the job site in order to communicate with CTA personnel.

h)  The Contractor shall have the ability to provide personnel to work normal eight (8) hour days, for a seven-day coverage per week. Working days per week may vary per individual to maintain required seven (7) day coverage. Occasionally to complete assignments, personnel may be required to work a twelve (12) hour day. Work coverage on Saturday and/or Sunday will be scheduled among the assigned personnel as needed.

i)  Major components shall be brought new or rebuilt at the written discretion of the Authority and not solely determined by the Contractor.

j)  The Contractor is solely responsible for delivery of parts to the work location, all parts are F.O.B. Destination.

CLEANUP

Contractor shall keep premises free from accumulation of waste material or rubbish as the work progresses. At completion of the work, Contractor shall remove all rubbish from pits and about building, and shall remove all tools, scaffolding and surplus materials, leaving work area "broom clean". Pits must be cleaned every three months. In cases of dispute, the CTA may remove rubbish and charge such costs to the Contractor. Any damages caused by the Contractor, either directly or indirectly, shall be the sole responsibility of the Contractor. Contractor will be held to have examined the locations of CTA elevators and satisfied himself as to the existing condition of all portions of the premises and the conditions under which he will be obligated to operate in performing the work and that will in any manner affect the work under this Contract. No allowance shall be made subsequent to contract award in this connection, on behalf of the Contractor, for any error or negligence in this respect.

CONTRACTOR'S MAINTENANCE RECORDS

The Contractor shall prepare and maintain the following records and schedules which shall be turned over to the Senior Coordinator, Elevator Maintenance at West Shops before the start of work each week.

a)  A record of all inspections, call-backs and/or repairs made the previous week by unit and/or group giving the date of the call or repair, the trouble, and corrective steps taken.

SC-3

<u>SPECIAL CONDITIONS</u>

SPECIFICATION NO. CTA 820-04
CONTRACT NO. B04OP00219

b)      In the cases of call backs, repairs, or shut downs, the Contractor or his maintenance man (or his office) shall contact the West Shop Service Desk (773) 722-4977, or (773) 722-4061 as soon as defective unit is returned to service. From the hours of 3:30pm to 7:00am, and Saturdays/Sunday/Holidays, the following number is to be called: (312) 681-8037. The Service Desk shall also be informed if unit cannot be returned to service that day.

c)      Contractor shall have a minimum of one person equipped with a 2 Way radio and a cellular telephone on the job site in order to communicate with CTA personnel and a Pager for immediate contact in case of emergency and Full-Time Office Clerk or Dispatcher, regular working hours, seven (7) days a week.

<u>PROCEDURE FOR ISSUING A RELEASE FOR REPAIR WORK</u>

Notification of Scope of Meeting: As the need exists for performance by the Contractor under the terms of this Contract, the Authority will notify the Contractor of the Repair Work required. The Authority will verbally notify the Contractor of the place and time for the joint scope meeting.

Joint Scope Meeting: The Contractor will visit the proposed facility in the company of the Authority representative and participate in a joint scope meeting which will include discussion and establishment of the following:

(1)     Release number and title
(2)     Existing condition(s) of the equipment
(3)     Definition and refinement of requirements and agreement on the detail scope of the repairs required
(4)     Requirements for materials, equipment, parts, etc., if necessary
(5)     Tentative work schedule
(6)     Preliminary quantity estimates
(7)     Date for submittal of the cost estimate
        The Contractor shall submit his written estimate for the repairs before CTA will issue a release for the service. The estimate shall be mailed or faxed to Chicago Transit Authority, Manager, Customer Facilities Maintenance, 3900 West Maypole St., Chicago, IL 60624, fax: 773-722-4317 or 773-722-1838.
Detail Scope of Work: After the joint scoping of the required repair work with CTA elevator personnel, the Contractor and the Authority will agree on a detail scope of repairs to be made. This detail scope meeting, unless modified by agreement between the Contractor and the Authority, will be the basis on which the Contractor will provide the cost estimate and the Authority will review.

<u>MAINTENANCE SCHEDULE</u>
The Contractor will prepare and submit at the pre-award meeting a written maintenance schedule indicating the type of maintenance for specific equipment as required by the Detailed Specifications. This schedule will be reviewed by the Department of Customer Facilities Maintenance and revised by the Contractor to the satisfaction of the CTA. The schedule shall consist of:

## SPECIAL CONDITIONS

### SPECIFICATION NO. CTA 820-04
### CONTRACT NO. B04OP00219

a)     <u>A programmed preventive maintenance approach in written form</u> for the types and kinds of units to be maintained under this contract shall be provided to the Senior Coordinator, Elevator Maintenance at the contract pre-award meeting.  The program shall be sufficiently detailed to insure, at least, minimum attention to parts and subassemblies of the units covered in this Specification.

b)     An established written procedure to record call-backs by unit give time, date, the trouble, and the corrective actions taken to be included on the above schedule.

## PAYMENT

Invoices shall list each individual assigned to CTA during the week(s), together with dates, time in, time out, total hours (time charged) to job.

In addition, the Contractor shall do repair work, <u>as required and authorized by CTA</u>, beyond that covered by the scheduled full maintenance service.  For this repair work, Contractor shall be paid on a time and material basis. All repairs will require a written estimate for labor and material, and a written approval from the Senior Coordinator, Elevator Maintenance, or his designate.  In an emergency the estimate and approval may be verbal, with a written estimate to follow within five working days. All repairs shall be guaranteed for a period of ninety (90) days against defects in material and workmanship.

Invoices for emergency repair work shall show the locations of the work, time in, time out, total time charged to job, the CTA release number, CTA work order number, the specific date or dates and hours worked, (list straight time and overtime separately) and a complete breakdown of parts used or other allowed expenses with price of each.

Original invoices shall be submitted on a monthly basis. Invoices shall be forwarded to CTA Accounts Payable Department, P.O. Box 7554, 567 W. Lake, Chicago, IL 60661. A copy of each invoice shall be forwarded to CTA , Customer Facilities Maintenance, 3900 W. Maypole, Chicago, IL  60624, Attn: Senior Coordinator, Elevator Maintenance.  Payment to Contractor will be made net 30 days after final acceptance of completed work, receipt of Contractor's invoice, or in accordance with the terms of the Contractor's invoice, whichever is most favorable to the Authority. Payment date(s) shall be calculated from receipt of invoice or final acceptance of goods or service, whichever is later.  Each invoice must include the CTA release number.

## RESPONSE TIME

The ability of the Contractor to provide personnel for full elevator maintenance service within a reasonable response time is mandatory.  In this regard, overtime will be used only as approved by the Manager, Customer Facilities Maintenance or his chosen representative. The Contractor shall respond to all emergencies within two (2) hours of notice from the Authority.

## SPECIAL CONDITIONS

### SPECIFICATION NO. CTA 820-04
### CONTRACT NO. B04OP00219

### DELIVERY
As directed per proposal pages.

### PROPOSAL PAGE PREPARATION
The Bidder shall state on the Proposal pages Company bidding, person to contact, phone number, including emergency number(s), (24-hour), pager number(s), (24-hour), mechanic, helper and adjuster hourly rates ("A", "B" and "C"), Percentage added to actual cost of parts furnished by contractor, terms of payment and shall state whether his pricing are firm or subject to escalation for the second year of the contract. The bidder shall submit with his proposal literature as may be required to clarify the bid. Note: Approximately 130 servicing locations are listed on the proposal pages.

### BASIS OF CONTRACT AWARD
Award shall be made to the lowest responsive and responsible bidder who meets all terms and conditions of this contract including specification CTA 820-04.

Bids will be evaluated on the following "Evaluated Total"

Evaluated Total:
4,160 hours X Straight Time Hourly Rate for Mechanics +
416 hours X Saturday/Overtime Hourly Rate for Mechanic +
416 hours X Sunday/Holiday Hourly Rate for Mechanic +

2,080 hours X Straight Time Hourly Rate for Helper +
416 hours X Saturday/Overtime Hourly Rate for Helper +
832 hours x straight Time hourly rate for Adjuster +
1000 x Percentage added to actual cost of parts furnished by the Contractor.

The labor rates to be quoted by the Bidder in his proposal shall include all wages, benefits, taxes on labor, all insurance requirements, use of Contractor's tools and equipment of the trade, travel, Contractor's general expense, profits and any other expenses involved pertaining to the performance of service, except materials and parts.

Material and parts shall be invoiced at the purchased price plus Contractor's stated markup. Upon request the Contractor shall furnished to CTA copies of their vendor's price list(s) and /or invoice, upon which invoicing was/is based and/or copies of actual invoices and indirect material cost data, which CTA shall use for price verification, review and audit.

### DURATION OF CONTRACT
This Contract shall become effective as soon as a contract is executed and shall continue in effect for a period of twenty-four (24) months from the date of contract execution.

### ESCALATION
CTA encourages bidders to quote prices that are firm for the Contract period. If the bidder cannot offer firm prices, then he shall quote prices with a maximum percentage ceiling on escalation for the second twelve (12) months of the Contract. Bidder shall submit, 30 days prior to any escalation, justification for said price increase. Note: Escalation, if quoted, is not automatically applied to the second 12 month period of the Contract. Rather, contractors shall provide to the Authority a request for and documentation

**SPECIAL CONDITIONS**

**SPECIFICATION NO. CTA 820-04**
**CONTRACT NO. B04OP00219**

justifying said request. Escalation will not be applied until the request and acceptable documentation are furnished.

ACCOUNTING SERVICES
The contract issued to the successful bidder will state the total expenditure authorization on the signed acceptance page. Contractor shall notify Authority in writing when ninety percent (90%) of the total authorization has been expended. Contractor shall not accept any requests for material and/or service in excess of the total contract expenditure authorization unless authorized in writing by the General Manager, Purchasing Department. Contractor shall be liable for any costs incurred as a result of his failure to either notify Authority or accepting requests not authorized by the General Manager, Purchasing Department.

COMPLIANCE, LAWS, REGULATIONS AND CODES
If any part of this Specification shall be, at date of issue, or shall later become, in non-conformity with current or future city, county, state or federal laws and/or codes or regulations because of equipment or requirements specified therein, Chicago Transit Authority shall have the right to negotiate for and accept or reject substitute equipment and/or requirements. In addition, all equipment supplied by the Contractor shall comply with the requirements of all Federal, State and Local regulations, including but not limited to (1) the Occupational Safety and Health Administration and (2) City of Chicago Noise Ordinance. The Contractor shall be liable and responsible for obtaining any permit(s) required to transport equipment over City of Chicago or State of Illinois streets or highways.

TERMINATION FOR CONVENIENCE
The Chicago Transit Authority may terminate this Contract, in whole or in part, without cause, at any time, by written notice to the Contractor whenever the Authority determines that such terminations is in the best interest of the Authority. Upon receipt of written notice of termination, all services and any other performance hereunder by the Contractor shall cease to the extent specified in the notice of termination. In the event of termination in whole, the Contractor shall prepare a final invoice within thirty (30) days of such termination, reflecting the services actually furnished pursuant to this Contract to the satisfaction of the Authority and for which no previous invoice was submitted to the Authority.

The Contractor shall be paid cost, including closeout costs, and profit for the service performed up to the time of termination. The Contractor shall promptly submit, in accordance with the terms hereof, a termination claim to the Authority and the parties shall negotiate a termination settlement to be paid to the Contractor. If the Contractor has any property in his possession belonging to the Authority, the Contractor will account for same, and dispose of it in the manner the Authority directs. Note; failure of the Contractor to perform satisfactorily the work covered by this Specification shall be cause for cancellation of the Contract.

CTA ETHICS ORDINANCE
The Contractor agrees to comply with the CTA Code of Ethics, CTA Ordinance No. 004-99, as amended from time to time, the provisions of which are hereby incorporated into this Agreement. The Contractor further agrees that any contract negotiated, entered into or performed in violation of the Code of Ethics shall be voidable as to the CTA.

ACCESS TO RECORDS
The Contractor shall permit and agree to cooperate with the authorized representatives of the CTA, including, but not limited to, the CTA's Inspector General and Auditors, who may inspect and audit all data and records of the Contractor relating to the Contractor's performance and Subcontractor contracts under this Contract from the date of this Contract through and until the expiration of five years after completion of this Contract.

# CHICAGO TRANSIT AUTHORITY

## DETAIL SPECIFICATIONS
### FOR
### INSPECTION, SERVICING, REPAIRS AND MAINTENANCE
### OF ELECTRIC AND ELECTRIC-HYDRAULIC ELEVATORS

## SPECIFICATION NO. CTA 820-04

1. **SCOPE**

1.1     The intent of this specification is for the Contractor to provide a complete Repair and Maintenance Service which includes the furnishing of materials, tools, replacement parts, and trained personnel, assigned to work only at the CTA on all the Chicago Transit Authority elevators listed in the Contract Document. Note: the term elevator shall be used to include dumbwaiters and lifts.

1.2     The personnel assigned to the CTA shall report daily, for the life of the contract, to do inspections, maintenance, and repair work on CTA elevators as required and as directed by CTA.   Assigned personnel responsibilities shall include repairs, inspections, trouble shooting, replacing failed components, checking and correcting all city/local authority code violations, load testing, preventing ADA violations, and assisting in third party inspections of the elevators for the City of Chicago/Local Authorities.

1.3     Although the Contractor's service personnel furnished to CTA shall be directed and given daily assignments by CTA, the Contractor is required to maintain a computer data base of all work related activities for his provide personnel. This shall include elevator(s) location worked, work performed, repairs, replacement parts, hours worked and costs associated with this contract.

2. **GENERAL REQUIREMENTS**

2.1     Contractor shall supply fully trained, experienced and qualified persons for continuous and uninterrupted assignment to work only on CTA elevators for inspections, and maintenance. Daily work assignments and working hours shall be scheduled and directed by CTA's Senior Coordinator or designee.

2.1.1   Personnel required for this CTA assignment shall consist of five (5) Elevator Mechanics and one (1) Helper unless specified otherwise in the Contract Document. Contractor employees must have photo identification and safety vests identifying them as employees of the Contractor. The identification must be in the employees' possession with the CTA property passes when on the CTA property (see section 2.8). The Contractor personnel must wear the safety vests while on CTA property

D - 1

CTA 820-04

2.    <u>GENERAL REQUIREMENTS</u> (Contd.)

(for security purposes). This identification and safety vests applies to all subcontractors of the Contractor. Note: Personnel shall not wear vests around moving equipment or in hoist way.

2.1.2  Personnel provided shall report daily to the Sr. Coordinator, Elevator Maintenance at 3900 W. Maypole, Chicago, IL 60624, telephone (773) 722-4854 for daily work assignments of repair/inspection locations.

2.1.2.1    CTA facilities and locations with elevators (including dumbwaiters & lifts) to be serviced (approximately 127) are listed in the Contract Document. This contract will include any CTA elevators (dumbwaiters/lifts) added after their warranty period expires (i.e. 6 units on Douglas –Blue Line, new Lift in State Subway, etc.)

2.1.3  Four (4) mechanics will be assigned to work normal eight (8) hour days, for a seven day coverage per week. Working days per week may vary per individual to maintain required seven (7) day coverage. Occasionally to complete assignments, personnel may be required to work a 12 hour day. Work coverage on Saturday and/or Sunday will be scheduled among the assigned personnel as needed.

2.1.3.1  In addition to above personnel provided, the Contractor shall provide a team of one (1) Elevator Mechanic and one (1) Elevator Helper to work a normal eight (8) hour day for five (5) day coverage (Monday thru Friday) on maintenance only. The Sr. Coordinator or designee shall provide a weekly schedule for elevator maintenance.

2.1.4  Contractor shall agree to provide, as needed, additional qualified Elevator Mechanics or Elevator Helpers for day-to-day assignments (within 24 hours after a verbal request). Contractor shall provide an emergency crew within 2 hours of a verbal request by CTA. (Note: CTA shall determine what defines an emergency.)

2.1.5  Contractor's supervisor must notify CTA of extra crews on CTA property within (1) one hour of the additional personnel starting work on CTA property. The Contractor's supervisor must visit, weekly, one (1) work site in each CTA elevator zone to evaluate personnel, work, safety and condition of elevator.

2.1.5.1  The Contractor shall give CTA 2 days or more notice prior to their personnel assigned to CTA taking vacations and scheduled days off. The Contractor must supply replacement personnel.

2.  **GENERAL REQUIREMENTS** (Contd.)                           CTA 820-04

2.1.6   Contractor must remove all debris & material within 2 days of verbal notice to the Contractor site. If CTA is required to remove the material or debris the Contractor will reimburse CTA the cost of the removal.

2.1.6.1   Contractor MUST supply an adjuster (technician) on the fourth (4) day if a mechanic or group of mechanics cannot repair/solve the problem on elevator. After the fifth (5) day CTA will only pay for the adjuster and if required his/her helper. CTA will not pay for any mechanic time unless an exception is justified in writing.

2.1.6.2   All sills are to be nickel silver and replacement of a sill should be a standard charge for eight (8) hours unless CTA is notified of a problem/exception in writing. CHR + HALL

2.1.6.3   All installation of door sensitive edges shall be the "Gatekeeper" type or (equivalent with CTA's permission). The CTA shall require (in areas of repeated vandalism) the Contractor to install the wiring for sensitive edges in armor cable or similar protection.

2.1.7   Mechanics or Helpers whose work is unsatisfactory or who are considered by the CTA to be careless, incompetent, unskilled or otherwise objectionable shall be dismissed from work, by Contractor, upon request from the CTA. Dismissed personnel shall not be allowed to return to work for CTA under this contract.

2.1.8   Assigned personnel & ADDITIONAL PERSONNEL AS NECESSARY, must be REQUIRED to make Weekly and Semi-monthly systematic INSPECTIONS, lubricate, make repairs, replace parts, and make adjustments to all CTA elevators in accordance with the manufacturers' recommendations. The Contractor's supervisor shall sign all time sheets and inspection sheets before they are forwarded to CTA. Contractor shall supply a monthly master checklist of all inspection and time sheets. Contractor shall supply copies of all original invoices for all parts/material used on CTA elevators on a monthly basis.

2.2   It is the Contractor's responsibility to provide all replacement parts and furnish certifications as required by CTA to clarify type and quality of all materials. Contractor shall provide certifications from the original equipment manufacturers, that replacement parts utilized and Contractors past work performance on manufacturers equipment meets or exceeds original manufacturers specifications. All certifications shall be obtained by the Contractor at no cost to CTA.

CTA 820-04

2.    <u>GENERAL REQUIREMENTS</u> (Contd.)

2.2.1  Unless otherwise specified, all replacement materials shall be new and shall be original manufacturer's equipment or CTA approved equal. Both workmanship and materials shall be of the best quality as certified by the original equipment manufacturer or approved parts submitted by the Contractor.

2.2.2  The Contractor must keep on hand adequate inventory of repair parts in order to satisfy CTA's response time requirements. Moreover, Contractor must provide the CTA at the pre-award meeting a price list of all parts anticipated to be used for repair work and a list of replacement parts on hand.

2.2.3  The percentage of load added to the actual costs of parts and material (for shipping, warehousing &handling) and all other (including administrative) fees shall be limited to 10% for this contract. Exceptions will be allowed up to 15% for parts and material coming from a country outside of North America. Exceptions must be in writing with the original invoice(s).

2.2.4  The Contractor will stock common parts in his warehouse or demonstrate the parts can be obtained from a major elevator/escalator supplier within two (2) hours. The supplier must have a history of (3) three years or more of supplying elevator parts in Chicago.

2.2.5  The Contractor and his personnel cannot charge cartage (shipping /handling) for deliveries or moving parts in their vehicle to CTA's locations.

2.3   The Contractor must have in his possession and show proof of ownership of the following portable test equipment or equivalent to check the elevator's CRT Program and Solid State Control Boards.

2.3.1  Square D SY/MAX Model 100 CRT Program Analyzer Class 8010 and OMRON 620 Micro-Processor diagnostic device capable of analyzing the operation of CTA elevators.

2.4   Contractor must have an in-house phone specialist to provide maintenance on all elevator phones. ALL PHONES INSIDE THE ELEVATOR CAB MUST BE REPAIRED/REPLACED WITHIN 24 HOURS after notification, all other phones and routers must be repaired/replaced within 48 hours after notification. All mechanics & helpers must be trained (by the Contractor at the Contractor's expense) to repair the elevator phones, routers, and wires for phones/routers from elevators to controllers and/or routers. The Contractor will provide the mechanics/helpers with properly

D - 4

2.     **GENERAL REQUIREMENTS** (Contd.)                    CTA 820-04

2.4     (Contd.)

preprogrammed phones for each elevator (location) by the Contractor's phone specialist or shop personnel under the specialist's direction.

2.5     All Contractor employees (supervisors, mechanics, and helpers) who are working on CTA elevators must have pagers and cellular telephones.

2.5.1     Contractor must supply eight (8) cellular rugged telephones with carrying cases at no cost to CTA for the life of this contract. This is all-inclusive requirement including unlimited call plans, service, maintenance and replacement at no cost to CTA. These cellular phones shall be equipped with cameras. The Contractor shall supply all necessary interfacing equipment so CTA can download pictures on to CTA computers (at no cost to CTA). These cellular phones shall allow CTA personnel to communicate the Contractor's employees via an intercom type system.

2.6     Contractor <u>must</u> maintain a computer database of CTA elevators and shall furnish monthly to the Sr. Coordinator, on disc, work related activities of all elevator inspections, repairs and maintenance. List must include all work completed which shall include the date of inspection and/or maintenance, location, itemized maintenance, itemized repairs and repair costs associated for each elevator (CTA will determine software program for database).



2.6.1     The monthly summary of elevator maintenance costs (labor & parts) per elevator must include a running (month by month) matrix to evolve into an annual summary of maintenance cost per elevator.     HARd copy

2.7     The Contractor's service and personnel provided are required to maintain the elevators in operating condition in accordance with the Chicago City Codes, all ADA rules and regulations, ASME/ANSI Code A17.1-1996 or latest, this specification and any local codes for elevators located outside the City of Chicago. In the event of conflict, local codes and latest revisions shall prevail. All these codes and regulations also apply for new installations.

2.8     All Contractor employees are required to visually display proper identification while they are performing work on CTA property. Proper ID's shall consist of a property pass, photo ID, and a rail safety pass for employees working on platforms or around rail stations. Violation of this requirement shall be sufficient cause for removal of personnel from CTA (section 2.1.7).

CTA 820-04

2.    <u>GENERAL REQUIREMENTS</u> (Contd.)

2.8.1  Obtaining and distribution of proper identification cards is the Contractor's responsibility. Information on CTA's requirements pertaining to property passes, photo identification cards, and rail safety classes is detailed in the Special Conditions of the Contract Document.



2.8.2  The Contractor must submit a Safety Plan to CTA for approval.

2.9    All proposals (additional work assignments) for installation/safety test(s)/repairs submitted by Contractor with estimates for labor, cost, time, etc. shall include the Contractor's statement " upon completion of this proposal the above mentioned elevator shall be in operational order and shall be able to be safely returned to service". This is required to assure CTA that Contractor's personnel performing work on the elevator will upon completion of assignment, test run elevator so that elevator operates properly before returning elevator to service.

2.10   The Contractors' mechanics & helpers must be able to repair/replace all elevator lighting (including bulbs, ballast, fixtures, and associated wiring) in cab, on top of car, under car, and in hoist way. The Contractor personnel shall replace bulbs in machine rooms. The Contractor must supply all lighting replacement parts.

2.10.1 This contract includes the maintenance of all Fire Service Systems and Smoke Detector System. The Smoke Detector System includes the maintenance of the Smoke Detector controller located in the elevator machine rooms. All the smoke detector heads must be inspected and cleaned on a monthly basis. The Fire Service Systems monthly inspections must be documented (logged) per the local Authorities requirements. Log books shall be supplied by Contractor in each elevator machine room at the start of the contract.

2.11   The Contractor shall survey all hydraulic elevators for low oil safety devices. If the unit is not equipped with such a device (or its equivalent), the Contractor will submit a proposal to install this safety device.

2.12   The Contractor shall survey all traction elevators for all temperature synthetic gear oil. If the units are not equipped with this type of gear oil (or its equivalent), the Contractor will replace the gear oil.

CTA 820-04

3.  MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE.

**ALL LOCATIONS WITH TRACTION ELEVATORS:**

3.1  Minimum Expected Weekly/Semi-Monthly Servicing, Checking, Oiling or Adjust:

3.1.1  Ride each elevator, check operation, correct or report problems found. Clean, oil, adjust all hoistway doors. Check all control switches. Check all electrical lights, floor indicators, bells, and emergency communication systems.

3.1.2  Clean door tracks, car and hoistway sills, and check all door gibs (and door sill heat tapes in winter months of October thru March).

3.1.3  Check torque, door must operate with a torque not to exceed 30 foot pounds of pressure.

3.1.4  Every Two Weeks: Observe operation of controller, machine, brake, motor, MG set (if applicable), clean and adjust as needed. Check lubrication of machine, motor, MG set, overhead sheaves and governor.

3.1.5  Every Four Weeks: Check lubrication of door operations and selectors.

3.1.6  Every Eight Weeks: The elevator car top shall be thoroughly vacuumed and cleaned.

3.1.7  Every 13 Weeks or Quarterly. Check waiting times on hall/corridor call, test and record rectifier voltages of Controller Power Supply, check car doors and door operator adjustments, hoistway doors at upper and lower level, check and adjust car leveling, check all cables, lubricate and adjust as required, lubricate selector tapes, clean as needed. Clean and replace all car lighting, all station and floor indicators. Replace ballast and bulb inside of elevator cab.

3.1.8  Every 26 Weeks: Lubricate (graphite/slipit) pushbutton guides and check overload relays. Clean and examine door detector edges with infrared rays, electric eyes, detector edges, roller guide shoes, lubricate, adjust and correct as necessary. Check door sill heat tape for proper operation and correct as necessary.

3.1.9  Every 52 Weeks: Clean and check all control stations in car and corridor, clean and check hoistway switches, controllers, selector tapes including all electrical connections for tightness. Check remaining Hoistway Doors not included in 13 week check. Check all safety equipment to see that it operates freely. Lubricate

CTA 820-04

3.   <u>MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE</u> (Contd.)

**ALL LOCATIONS WITH TRACTION ELEVATORS: (Contd.)**

3.1.9   (Contd.)

and adjust all of the above as needed.  Full machine brake check (see section 2.12 & 3.4.2), drain, flush, refill gear case oil, check worm to gear clearance and adjust as required.

3.2   <u>Doors and Door Operation:</u>

3.2.1   Frequency of inspection and adjustment shall be as previously outlined in the Weekly and Semi-Monthly Servicing or as specified more frequently below.

3.2.2   Car and Hoistway Doors: Clean and lubricate track and hangers as needed.  Clean car and hoistway sills, check door gibs.  Check backplate and hanger to door fastenings and relating devices to insure tightness. Check up-thrust adjustment and fastening (nominal 0.010" to track), should clearance exceed 0.035" it should be adjusted.  Check and lubricate door closing device, check fastening, set closing adjustment to permit the doors to close without power and without interfering with the action of the door detector edges with infrared rays in door reversal.  Door interlock adjustment shall be set to permit the latch to drop within 3/8" or less of full closure. Check contact setting for pressure and contact wipe. Bottom door guides should be fastened tight and replaced where panel moves in and out by 1/4" or more.  Check and tighten photo eyes, adjust reflectors focus, etc.  Check and tighten non-vision wings at each inspection.  Car door contact shall prevent movement of the car unless car door is 2" or less from full closure.

3.2.3   Door detector edges with beam safety rays:  Device shall be checked monthly for freedom of movement to permit operation with even a somewhat glancing blow, but not sloppy, permitting it to rub against door.  While the retractable projection at opening should be slight but permit the door to be held open with pressure on the edge, in closing, edge should permit door to reopen within 1-1/2" of full closure or less.  Reopening action shall be such that reversal movement shall occur at such a point or before the leading edge of the vane and door are in the same plane, i.e. at or before complete collapse of the edge.  Contact edge of door should be free of cuts or bulges. Control contact microswitches and retracting cable, where used, shall be held clear of snagging on other moving parts.

CTA 820-04

3.  <u>MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE
    MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED
    UNDER THIS CONTRACT FOR SERVICE</u> (Contd.)

### ALL LOCATIONS WITH TRACTION ELEVATORS: (Contd.)

3.2.4  Door Protective Devices:

3.2.4.1   Beam safety rays:  Where used, two beam safety rays shall be located 5 inches and 29 inches above car floor. Inspect and maintain to verify system is operating, also adjust and clean lenses monthly.

3.2.4.2   Infra red safety dectector:  Where used;  Inspect and maintain to verify system is operating, also adjust and clean lenses monthly.

3.2.4.3   3D Infrared detector:  Where used:  Inspect and maintain to verify system is operating,  Also adjust and clean lenses monthly.

3.2.5  Door Operator:  Check, lubricate and adjust monthly.  When gear operators are used, gear oil level should be checked and the unit cleaned, flushed and refilled. Opening motion shall be, at design speed, smooth start, slowdown and stop, with each car being checked to avoid drag in the opening of the door(s) and drop out of the opening relay preventing doors from closing.  Closing time shall be adjusted to that given herein before.  Closing adjustment shall permit door reversal within travel of the door detector edges with infrared rays as above and without further drift.

3.2.6  Door Restrictor:

3.2.6.1   When a car is outside the unlocking zone, the hoistway doors or car doors shall be so arranged that the hoistway doors or car doors cannot be opened more than 4 inches from inside the car.

3.2.6.2   When the car doors are so arranged that they cannot be opened when the car is outside the unlocking zone, the car doors shall be openable from outside the car without the use of special tools.

3.2.6.3   The doors shall be unlocked when the car is within 3 inch above or below the landing and may be configured to be unlocked up to 18 inches above or below the landing.

CTA 820-04

3.  <u>MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE</u> (Contd.)

**ALL LOCATIONS WITH TRACTION ELEVATORS: (Contd.)**

3.2.7  Door Timing:

3.2.7.1    Door reopening devices:  Car must stop and reopen the doors if they are obstructed by an object or person and must be timed to stay open for at least 20 seconds.

3.2.7.2    Car doors and signal timing:  Minimum time of 5 seconds is required from the notification that a car is answering a call; ie. Hall light indicator.  Likewise for audible and visual signaling before doors close.

3.2.7.3    Door delay for car calls:  Car doors must remain open for a minimum of 3 seconds when responding to car calls or pressing buttons on panel, such as floor number.

3.3    <u>Control</u>

3.3.1  Provide regular inspection and adjustments as outlined hereinbefore.  The effects of control fault can be most easily detected for individual car operation by riding the unit and observing operation.  At each scheduled control inspection the operation of the relays in the panel during normal service can suggest trouble areas such as erratic relay operation or contact sparking.   Touch up adjustment suggested by these observations can frequently avoid drift off of adjustment and major tune up, or failure of a more serious nature.  Mechanical check of relay operation can best be done with the power off, testing contact pressure and wipe, as well as friction where relays appear sluggish.  At first power cut off, check frequent operating relays for overheating by touch. This should be done particularly for relays in the circuit where undue sparking is apparent.  At the same time transformers and rectifiers shall be checked for heat.  The rectified voltage shall be checked monthly and compared to posted values, confirming periodic check and recording variation, if any.  Contacts should be found to be clean if contact wipe is sufficient.  They shall only be dressed if they have developed ridges, blisters, or are excessively pitted.  Should the condition be beyond correction, they shall be replaced.  On occasion, pins or relay fulcrum points may give rough or sluggish relay action and may need slight lubrication or dressing. Proper values of timing relays shall be posted on the control cabinet or panel and checked at control inspection schedule.  Particular attention shall be paid to all overload and phase failure relays where they are used, checking adjustments and freedom of movement.  Log of corrections and adjustment of each controller, studied at each scheduled inspection can be a time saver in clearing troubles and preventive maintenance adjustment.   Checks for any burn outs, including fire, originating in the apparatus from previous repairs. Solid state

D - 10

CTA 820-04

3.   MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE
     MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED
     UNDER THIS CONTRACT FOR SERVICE (Contd.)

     **ALL LOCATIONS WITH TRACTION ELEVATORS: (Contd.)**

3.3   Control (Contd.)

      controllers and all programmable controllers shall be cleaned and vacuumed
      monthly, with static free vacuum cleaner. Controller with heaters and ventilation
      shall be adjusted for seasonal temperature requirements and manufacturer's
      recommendations.

3.4   Machine Motors and (where applicable) Motor Generator Sets

3.4.1  Machine: Shall be checked every two weeks for oil leakage, wiping the oil which
       has dripped from worm gland (some oil seepage at the gland prevents galling worm
       shaft). Check worm to gear clearance at the time the brake is dismantled by
       turning the brake drum to see how far it may be moved before drive sheave moves.
       On machines which can be reset, gear shall be lowered when this movement
       exceeds 1/4", when the movement exceeds this value, gear or worm may have to
       be re-operated which should be done on those machines where the movement is
       ½" to 1", i.e., when clearance between worm and gear (nominally 0.005") exceeds
       0.075" gear backlash is virtually impossible to take out and can only get worse. Also
       note when clearance can no longer be taken up by lowering the gear, gear backlash
       cannot be eliminated, and replacement is inevitable. Clean, flush, and replace
       worm gear oil once a year (see section 2.12), examine oil wiper between drive
       sheave and gear inside the machine to reduce oil seepage to drive sheave. Drive
       sheaves may be regrooved but never so deep that the metal below the groove is
       less than ½".

3.4.2  Machine Brake: Should be thoroughly cleaned, lubricated and checked for freedom
       of operation at least once a year. Since this requires dismantling for a thorough
       inspection and lubrication, counterweights should be landed. The brake should be
       set to handle 150% of full load and was so set by the original equipment
       manufacturer. To retain this setting, compressed length of the brake springs should
       be measured before dismantling and restored in reassembly. This length should be
       checked periodically and the spring(s) readjusted as the shoes are brought closer to
       the brake pulled to compensate for brake lining wear. Lining should be replaced
       when wear reaches a point where the drum could be scored. Check operating
       armature and its guide for excessive wear to avoid erratic brake operation.

3.4.3  Motor MG Set: (where applicable) Every two weeks check bearings for heating and
       lubrication, check brushes and commutator for wear and color. Care should be
       exercised in brush wear and the brushes applied. Blow out yearly, check insulation
       of coils and apply insulating paint as needed but not to exceed three years. Dry

D - 11

3. <u>MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE</u> (Contd.)

**ALL LOCATIONS WITH TRACTION ELEVATORS: (Contd.)**

3.4.3 (Contd.)

and brittle insulation can result in burn out and fire. Coils in stock can get brittle and their insulation should be examined and restored as needed.

## 3.5 Hoistway Equipment

3.5.1 Car, Hall, and Corridor Stations: Shall be opened up each year for cleaning and all switches examined for positive reaction, contact pressure, wear and wipe. All connections shall be checked to see that they are tight. When re-installing panels, weather-stripping must be added to interior edges to ensure weather-tightness of panels.

3.5.2 Hoistway Switches: Quarterly shall be checked for contact pressure, wear, and wipe, where involved in the landing of the elevator, annually for all safety equipment, slowdown and limits.

3.5.3 Safety Equipment: Annually shall be checked for freedom of movement and lubricated as required, including oil buffers. Governor and its tension sheave shall be lubricated each quarter. Note: Should water level in the pit rise above buffer reservoir, oil buffers shall be drained, flushed, and refilled.

3.5.4 Overhead and Deflector Sheaves: Annually check lubrication and grooves, same stipulation to regrooving and groove depth as drive sheaves.

3.5.5 Guide Rails and Roller Guides: Annually clean, roller guides and adjust rail where applicable, check guide shoes, guides, oilers and fill as required. Should a safety have set for any reason, rail should be examined for possible scoring and restored as needed. Note: guide shoes must be checked monthly for lubrication, wear and overall condition.

3.5.6 Electric Cables: Every 13 weeks (90 days) examine control cables for cover deterioration which may be corrected by re-taping unless individual wire insulation is affected or major portions of the insulating cover are brittle. Guards may be required to cover points which may cause traveling cable abrasion.

CTA 820-04

3.  MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE (Contd.)

**ALL LOCATIONS WITH TRACTION ELEVATORS: (Contd.)**

3.5.7  Ropes:  Governor ropes and hoist ropes should be examined for breaks, particularly in the valley of the rope which could indicate internal breakage and ultimate strand separation.  Hoist ropes may need cleaning and on occasion, added lubricant.  Lube with NY-LUBE Lubricant Spray (16 oz. spray can) or 1 gallon liquid with applicator or Montgomery Lubricable, Montgomery Part No. 45786-001.  Governor ropes should be fairly dry in order to assure consistent setting should the governor trip.

4.  MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE

**ALL LOCATIONS WITH HYDRAULIC ELEVATORS**

4.1   Minimum Expected Weekly/Semi-Monthly Servicing, Checking, Oiling and Adjustments:

4.1.1  Ride each car, check operation and correct problems found.  Clean, oil, and adjust all hoistway doors.  Check all control switches, car, hall, and corridor station.  Check all electrical lights, floor indicator, bells, and emergency communication systems.

4.1.2  Clean door tracks, car and hoistway sills, and check all door gibs.

4.1.3  Doors must operate with a torque not to exceed 30 foot pounds of pressure.

4.1.4  Every 13 Weeks: Check adjustment of car doors and door operator, adjust if needed, check landing switches.  Check guide lubrication.

4.1.5  Every 26 Weeks: Clean and examine all door detector edges with infrared rays, guide shoes and fastenings, check the packing gland and ram.  Check pit switches, pit lights and buffers.

4.1.6  Every 52 Weeks: Clean, oil, adjust all hoistway doors, check all control switches, car, hall, and corridor stations.  Make sure all electrical connections are tight.  Check hydraulic oil in tank filter or replace as needed.

4.2   Doors and Operation:

4.2.1  Frequency of inspection and adjustment covered herein before.

CTA 820-04

4. <u>MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE</u>

**ALL LOCATIONS WITH HYDRAULIC ELEVATORS**

4.2    <u>Doors and Operation:</u>

4.2.2    Car and Hoistway Doors: Clean and lubricate track and hangers as needed. Check backplate and hanger to door fastenings and relating devices to insure tightness. Check up-thrust adjustment and fastening (nominal 0.010" to track), adjusted. Door relating cables should be adjusted. Door relating cables shall be taut enough that they will not sag in normal opening and closing but provide some flexibility in door reversal to reduce the shock of reversal on cable and fastenings. Door interlock adjustment to be set to permit the latch to drop within 3/8" or less of full closure. Check contact setting for pressure and contact wipe. Bottom door guides should be fastened tight and replaced when panel may be moved in and out by 1/4" or more. Check and tighten non-vision wings at each inspection. Check car door contact to prevent movement of the car unless car door is 2" or less from full closure. Check car and hoistway doors, clean and lubricate track and hangers, check backplate and hangers, to door fasteners and relating devices to insure tightness, check and adjust up-thrust, door interlocks, bottom door guides, safety edge, electric eyes and detector edges.

4.2.3    Door detector edges with Beam Safety Rays, Electrical Eyes and Detector Edges: Device shall be checked monthly for freedom of movement to permit it to operate with even a somewhat glancing blow, but not sloppy, permitting it to rub against door. While the retractable projection at opening should be the slight but permit the door to be held open with pressure on the edge, in closing, edge should permit door to reopen within 1-1/2" of full closure or less. Reopening action shall be such that reversal of the door movement will occur at such a point or before the leading edge of the vane and door are in the same plane, i.e., at or before complete collapse of the edge. Action contact line of edge should be free of cuts or bulges. Control contact microswitch and retracting cable, where used, shall be held clear of snagging on other moving parts. Check electric eyes for focus alignment, adjust and clean as needed.

4.2.3.1    Beam Safety Rays: Where used, two beam safety rays shall be located 5 inches and 29 inches above car floor. Inspect and maintain to verify system is operating, also adjust and clean lenses monthly.

D - 14

CTA 820-04

4.  <u>MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE</u> (Contd.)

**ALL LOCATIONS WITH HYDRAULIC ELEVATORS (Contd.)**

4.2.4  Infrared Safety Detector and 3-D infrared detector: Where used; Inspect and maintain to verify system is operating properly, also adjust and clean lenses monthly.

4.2.5  Door Operator: Check, lubricate and adjust monthly. When gear operators are used, gear oil level should be checked and the unit cleaned and flushed and refilled once a year. Opening motion shall be, at design speed, smooth start, slowdown and stop, with each car being checked to avoid drag in the opening action as the door reaches full open position. Drag at this point can prevent full opening of the door and cause a drop out of the opening relay preventing doors from closing. Closing time shall be adjusted to that given in the Specific Equipment Performance Standard. Closing adjustment shall permit door reversal within travel of the door detector edges with infrared rays as above and without further drift. Lubricate and adjust. When gear operators are used, unit should be cleaned, fluid refilled as needed. Drain, flush, and refill with new fluid yearly.

4.2.6  Door Restrictor:

4.2.6.1  When a car is outside the unlocking zone, the hoistway doors or car doors shall be so arranged that the hoistway doors or car doors cannot be opened more than 4 inches from inside the car.

4.2.6.2  When the car doors are so arranged that they cannot be opened when the car is outside the unlocking zone, the car doors shall be openable from outside the car without the use of special tools.

4.2.6.3  The doors shall be unlocked when the car is within 3 inch above or below the landing and may be configured to be unlocked up to 18 inches above or below the landing.

4.2.7  Door Timing;

4.2.7.1  Door reopening devices: Car must stop and reopen the doors if they are obstructed by an object or person and must be timed to stay open for at least 20 seconds.

D - 15

CTA 820-04

4.    **MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE** (Contd.)

**ALL LOCATIONS WITH HYDRAULIC ELEVATORS (Contd.)**

4.2.7   Door Timing; (Contd.)

4.2.7.2       Car doors and signal timing:  Minimum time of 5 seconds is required from the notification that a car is answering a call; ie. Hall light indicator.  Likewise for audible and visual signaling before doors close.

4.2.7.3       Door delay for car calls:  Car doors must remain open for a minimum of 3 seconds when responding to car calls or pressing buttons on panel, such as floor number.

4.3   Control

4.3.1   Provide regular inspection and adjustments as outlined hereinbefore.  The effects of control fault can be most easily detected for individual car operation by riding the unit and observing operation.  At each scheduled control inspection, the operation of the relays in the panel in normal service can suggest trouble areas, erratic relay operation or contact sparking.   Touch up adjustment suggested by these observations can frequently avoid drift off or adjustment and major tune up, or failure of a more serious nature.  Mechanical check of relay operation can best be done with the power off when testing contact pressure and wipe, as well as friction where relays appear sluggish. At first power cut off check frequent operating relays for overheating by touch.  This should be done particularly for relays in the circuit where undue sparking is apparent.  At the same time  transformers and rectifiers shall be checked for heat.   The rectified voltage shall be checked monthly and compared to posted values, confirming periodic check and recording variation, if any.  Contacts should be found to be clean if contact wipe is sufficient.  They shall only be dressed if they have developed ridges, blisters, or are excessively pitted. Should the condition be beyond correction, they shall be replaced.  On occasion, pins or relay fulcrum points may give rough or sluggish relay action and may need slight lubrication or dressing.  Proper values of timing relays shall be posted on the control cabinet or panel and checked at control inspection schedule.  Particular attention shall be paid to all overload and phase failure relays where they are used, checking adjustment and freedom of movement.   A log of corrections and adjustment of each controller, studied at each scheduled inspection can be a time saver in clearing troubles and preventive maintenance adjustment.  Checks shall be made for any burn out, including fire, originating from previous repairs.  Inspect and adjust operation of relays, transformer, and rectifiers.  Particular attention shall be

D - 16

CTA 820-04

4.  <u>MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED UNDER THIS CONTRACT FOR SERVICE</u> (Contd.)

**ALL LOCATIONS WITH HYDRAULIC ELEVATORS (Contd.)**

4.3   <u>Control</u> (Contd.)

paid to all overloads and phase failure relays. All safety equipment slowdown and limit switches shall be checked for contact pressure, wear, and wipe. Guides and guide shoes, shall be checked for lubrication, wear and condition. Car and corridor stations shall be opened up for cleaning, and   each switch examined for positive action, contact pressure, wear and wipe. Check all connections for tightness. Controllers of the solid state type, CRT's, and programmable controllers shall be cleaned and vacuumed with a static free vacuum cleaner monthly. Adjust ventilation and heater fan per manufacturer recommendations.

4.3.2  Hoistway Switches: Shall be checked for contact pressure, wear and wipe quarterly where involved in the landing of the elevator.  Do same annually for all safety equipment, slowdown and limits.

4.3.3  Guide rails, roller guides, and guide shoes: Shall be checked monthly for lubrication, wear and condition.  Oilers shall be filled as required.  Should safety have set for any reason, rails shall be examined for possible scoring and restored as needed. Annually clean roller guides and adjust rails where applicable.

4.3.4  Car and Corridor Stations:  Shall be opened up each year for cleaning and each switch examined for positive action, contact pressure, wear and wipe.  All connections shall be checked to see that they are tight.  Re-install with weather-stripping per section 3.5.1.

4.3.5  Selector and selector tape where applicable: Operation shall be observed every two weeks, lubricating the traveling nut carriage bearings, cams, and shafts as needed and the ball bearings, hinge link and lever pins, and the leveling switch magnet cores every 6 months, with the leveling switch rollers to be lubricated every 2 months.  Tapes shall be lubricated every 3 months and cleaned when required.

CTA 820-04

4.    <u>MINIMUM EQUIPMENT PERFORMANCE STANDARDS AND PREVENTIVE</u>
<u>MAINTENANCE REQUIREMENTS FOR EACH ELEVATOR TO BE ACHIEVED</u>
<u>UNDER THIS CONTRACT FOR SERVICE</u> (Contd.)

**ALL LOCATIONS WITH HYDRAULIC ELEVATORS (Contd.)**

4.4    <u>Valve and Power Unit:</u>

4.4.1    Valve adjustment is only required when trouble is encountered with control contact and valve coil failures. The first area to check is the in line strainer. Strainers shall be checked on a quarterly basis (90 days), with an oil level check at each visit. The condition of the oil, clarity, color, and odor shall be checked each year or in the event of <u>excessive leveling and speed adjustment problems</u>. Any evidence of moisture in the oil suggests replacement, clarity, a cloudy oil shall be filtered and the filtering sequence repeated at least once several days later to make sure the residual oil in the cylinder circulates and is also filtered. Change in odor or color shall require a chemical analysis. Check the condition of belts and their tension on the power unit quarterly. Should oil which seeped through the packing be reintroduced, check for clarity, contaminates, dirt, etc. before pouring oil in tank.

4.4.2    Scavenger Return Pumps: Monthly maintenance to assure proper operation of pump. Check filter screens and return lines to be clean and free of debris and contaminants monthly.

4.4.3    Motor: Check bearings for heating and lubrication every four weeks. Blow out yearly, check insulation of coils and apply insulating paint every year. Dry and brittle insulation can result in burn out and fire. Coils in stock can get brittle and their insulation shall be examined and restored as needed. Check bearings for heating and lubrication and blow out, check insulation of coils and apply insulation paint.

4.5    <u>Hoistway Equipment</u>

4.5.1    Jack Unit and Piping

Check and adjust plunger and guide bearings, packing gland, casing gasket, packing, and piping system including valves.

4.5.2    Plunger and guide bearing, packing gland, casing gasket, packing, and piping system including valves shall be checked quarterly and adjusted and repaired as required.

D - 18

CTA 820-04

5. __THE FOLLOWING ARE MINIMUM EXPECTED PERIODIC SERVICING, INSPECTING, OILING AND ADJUSTMENTS (WHERE APPLICABLE), NOT TO EXCLUDE, BUT MUST STILL FOLLOW ALL MAINTENANCE INSPECTIONS AND REPAIRS FROM MANUFACTURERS' RECOMMENDED PROCEDURES, GUIDELINES AND LOCAL CODES.__

## DUMBWAITERS, MATERIAL LIFTS, FREIGHT ELEVATORS, & PASSENGER LIFTS

5.1    Run Unit observing operation, adjust if needed.  Check for oil seepage from gear reducer and check oil lever in gear reducer.  Check interlocks.

5.2    Every Thirteen Weeks: Check car guide shoes for wear.  Change oil in gear reducer using oil of a viscosity recommended by the manufacturer for existing ambient conditions.

5.3    Every Twenty-Six Weeks: Check hoistway ropes, check and tighten nuts on all rail clips.  Lubricate sheave bushings, bearings and roller chain on doors.

5.4    Every Fifty-Two Weeks: Clean, oil, adjust all hoistway and car doors.  Check and blow out all control switches, car and corridor stations.  Make sure all electrical connections are clean and tight.

5.5    Doors and Operation:

5.5.1  Frequency of inspection and adjustment covered herein before.

5.5.2  Chain deflecting sheaves have sealed bearings and require no lubrication.  Roller chains shall be lightly lubricated.

5.5.3  Interlock keeper should be checked to be sure keeper is securely fastened to door panel and is engaging interlock properly.

5.6    Control:

5.6.1  Transformers should be checked for heat.  The rectified voltage should be periodically checked and compared to posted values, confirming periodic check and recording variation, if any.

CTA 820-04

5.    THE FOLLOWING ARE MINIMUM EXPECTED PERIODIC SERVICING, INSPECTING, OILING AND ADJUSTMENTS (WHERE APPLICABLE), NOT TO EXCLUDE, BUT MUST STILL FOLLOW ALL MAINTENANCE INSPECTIONS AND REPAIRS FROM MANUFACTURERS' RECOMMENDED PROCEDURES, GUIDELINES AND LOCAL CODES. (Contd.)

**DUMBWAITERS, MATERIAL LIFTS, FREIGHT ELEVATORS, & PASSENGER LIFTS (Contd.)**

5.7    Hoistway Equipment:

5.7.1  If hoist ropes or governor ropes have any broken strands, kinks or bent portions, replace immediately also check and tighten nuts on all rail clips.

5.8    Brake:

5.8.1  Adjust monthly to maintain proper leveling of car.  The amount of usage the dumbwaiter is subjected to shall determine adjustment for wear interval.  Brake discs shall be replaced when wear adjustment has reached near maximum.  The brake solenoid and actuator assembly should be disassembled, cleaned, inspected, and all worn parts replaced. Reassemble, test run for weight and leveling adjustments.

6.    ADDITIONAL INFORMATION FOR POTENTIAL BIDDERS

6.1    Bidders requiring additional information shall contact the Procurement Administrator listed on the front page of this Contract Document.  Potential bidders requiring additional information from a person or persons listed in the Special Conditions must route their request through the Procurement Administrator.  Potential bidders who contact any Authority personnel other than the Procurement Administrator will be considered in violation of the provisions of the Contract Document.

Distribution:  Mgr. Customer Facilities Maint.
                    Sr. Coord. Elev. Maint.

7th Revision -  9/5/91
SPN/spn – 12th Revision – 9/08/04

**PROPOSAL**

**SPECIFICATION NO. CTA 820-04**
**CONTRACT NO. B04OP00219**

By execution of this Proposal the undersigned offers, in accordance with the terms of the Contract Documents of which this Proposal is a part, to provide monthly inspection, servicing, maintenance and repairs of electric and electric hydraulic elevators as described in these General and Special Conditions and Detail Specification No. CTA 820-04, at the prices shown on the following proposal page(s). This Contract shall become effective as soon thereafter as the Contract is executed and will continue in effect for a period of twenty-four (24) months.

Prices quoted shall be **firm** for the contract duration unless escalation is stated below. Escalation shall be allowed for the second year of the contract only.

Escalation prices with ___0___ % maximum ceiling on escalation, for the second twelve (12) months of the contract only. All requests for price increases, if any, must give the CTA a written thirty (30) day advance notice before the price increase is to go into effect.

**Note:**
**All rates are to be based on a regular 8-hour work day and a 40-hour work week. Overtime rates are based on time in excess of regular work schedules.
**Regular work hours are 0700 to 1530, Monday through Friday.
**CTA shall have the right upon ten (10) days written notice to the Contractor to add or delete one or more elevators to the Contract. Contractor shall provide personnel to provide full maintenance service which shall consist of inspections, maintenance and repairs to all CTA Elevators as covered by Specification No. CTA 820-04.

|  | "A" | "B" | "C" |
|---|---|---|---|
| **MECHANIC** (hourly rate) | $ 94 | $ 130 | $ 150 |
| **HELPER** (hourly rate) | $ 68 | $ 68 | $ 128 |
| **ADJUSTER** (hourly rate) | $ 94 | $ 130 | $ 150 |

"A"   7AM THROUGH 3:30 PM, MONDAY THROUGH FRIDAY (straight time)
"B"   SATURDAY (overtime)
"C"   SUNDAY/HOLIDAYS (overtime)

Percentage added to actual cost of parts furnished by Contractor: ___10___ %.

P-1

| BID ITEM | WORK-SITE LOCATION | REQUENCY OF INSPECTION (scheduled inspections) |
|---|---|---|
| 1 | Loyola Rail Sta. - 1200-08 W. Loyola Ave. Once passenger elevator | once (1) per week |
| 2 | Granville Rail Sta. - 1119 W. Granville Once passenger elevator | once (1) per week |
| 3 | Western Rail Sta. - 4645 N. Western Ave. Once passenger elevator (East platform) | once (1) per week |
| 4 | Western Rail Sta. - 4645 N. Western Ave. Once passenger elevator (West Bound) | once (1) per week |
| 5 | O'Hare Rail St. - 11601 W. Touhy Ave. Once passenger elevator (South platform | once (1) per week |
| 6 | O'Hare Rail Sta. - 11601 W. Touhy Ave. Once passenger elevator (Transp. Office) | once (1) per week |
| 7 | O'Hare Rail Sta. - 11601 W. Touhy Ave. Once "dumb waiter" | twice (2) per month |
| 8 | Rosemont Shop-5800 N. River Rd. Rosemont Once freight elevator (mandatory team site) | twice (2) per month |
| 9 | River Rail Sta.-5801 N. River Rd. Rosemont Once passenger elevator | once (1) per week |
| 10 | Cumberland Rail Sta. - 5800 N. Cumberland Once passenger elevator (Bus Rotunda) | once (1) per week |
| 11 | Cumberland Rail Sta. - 5800 N. Cumberland Once passenger elevator (north pedway) | once (1) per week |
| 12 | Cumberland Rail Sta. - 5800 N. Cumberland Once passenger elevator (south pedway) | once (1) per week |
| 13 | Cumberland Rail Sta.-5800 N. Cumberland Ave.  Once passenger elevator (platform) | once (1) per week |
| 14 | Cumberland Parking Garage-5800 N. Cumberland Once passenger elevator #1 | once (1) per week |
| 15 | Cumberland Parking Garage-5800 N. Cumberland Ave. Once passenger elevator #2 | once (1) per week |
| 16 | Harlem Rail Sta. - 5500 N. Harlem Ave. Once passenger elevator | once (1) per week |
| 17 | Des Plaines Term. - 711 S. Des Plaines Ave. Forest Park    Once passenger elevator | once (1) per week |

| BID ITEM | WORK-SITE LOCATION | FREQUENCY OF INSPECTION (scheduled inspections) |
|---|---|---|

| | | |
|---|---|---|
| 18 | Polk Rail Sta. - 1713 W. Polk St. Once passenger elevator (No. bound) | once (1) per week |
| 19 | Polk Rail Sta. - 1713 W. Polk St. Once passenger elevator (So. Bound) | once (1) per week |
| 20 | Kedzie Garage - 358 S. Kedzie St. Once passenger elevator | twice (2) per month |
| 21 | State Street Subway - 224 S. State St. Once passenger elevator - Street to Mezzanine | once (1) per week |
| 22 | State Street Subway-224 S. State St. Once passenger elevator   Platform to Mezzanine | once (1) per week |
| 23 | Adams/Jackson Dearborn Subway- 219 S. Dearborn  Once passenger elevator-Mezzanine to street | once (1) per week |
| 24 | Adams/Jackson Dearborn Subway 219 S. Dearborn-Once passenger elevator-Platform to Mezzanine | once (1) per week |
| 25 | James R. Thompson Center - 215 W. Lake St. Once passenger elevator (Platform to Mezzanine) | once (1) per week |
| 26 | James R. Thompson Center - 215 W. Łake St. Once passenger elevator (Mezzanine to St. #1) | once (1) per week |
| 27 | James R. Thompson Center - 215 W. Lake St. Once passenger elevator (Mezzanine to St. #2) | once (1) per week |
| 28 | 203 N. LaSalle-Transp. Bldg. Once passenger elevator - Mezz./St. & Street to Elevated Platform | once (1) per week |
| 29 | Mart - 222 Merch. Mart Plaza Once passenger elevator - No. Bound Platform to Overpass | once (1) per week |
| 30 | Mart - 222 Merch. Mart Plaza Once passenger elevator - So. Bound Mezz. to Platform, to Overpass | once (1) per week |
| 31 | 98th/D. Ryan Rail Shop - 9800 S. State Once freight elevator (mandatory team site) | twice (2) per month |
| 32 | 79th Rail Sta. - 15 W. 79th St. Once passenger elevator | once (1) per week |
| 33 | South Shops, Unit #3 - 7801 S. Vincennes Once freight elevator | twice (2) per month |
| 34 | 63rd/Cottage Grove - No. Bound 800 W. 63rd St.. Once passenger elevator | once (1) per week |

| BID ITEM | WORK-SITE LOCATION | FREQUENCY OF INSPECTION (scheduled inspections) |
|---|---|---|

| 35 | 63rd/Cottage Grove - So. Bound 800 E. 63rd St. Once passenger elevator | once (1) per week |
| 36 | 63rd/King Drive - No Bound –400 E. 63rd St. Once passenger elevator | once (1) per week |
| 37 | 63rd/King Drive - So. Bound-400 E. 63rd. St. Once passenger elevator | once (1) per week |
| 38 | 63rd/Ashland Transp. Off. - 6319 S. Ashland Once "Dumb Waiter" | twice (2) per month |
| 39 | West Shops - 3900 W. Maypole Ave. Once freight elevator | twice (2) per month |
| 40 | Midway - 4612 W. 59th St. No. Bound Once passenger elevator | once (1) per week |
| 41 | Midway - 4612 W. 59th St. So. Bound Once passenger elevator | once (1) per week |
| 42 | 51st/Pulaski-5106 S. Pulaski Rd. Once passenger elevator | once (1) per week |
| 43 | 49th/Kedzie - 4900 S. Kedzie Ave. Once passenger elevator | once (1) per week |
| 44 | 49th/Western–4901 S. Western Ave. Once passenger elevator | once (1) per week |
| 45 | 35th/Archer-3528 S. Leavitt St. Once passenger elevator | once (1) per week |
| 46 | Ashland/Archer-3011 S. Ashland Ave. Once passenger elevator | once (1) per week |
| 47 | Halsted/Archer-2520 S. Archer Ave. Once passenger elevator | once (1) per week |
| 48 | Wabash/Roosevelt - 22 S. Roosevelt Rd. Once passenger elevator (North Bound) | once (1) per week |
| 49 | 18th St. Terminal-1710 W. 18th St. No. Bound Once passenger elevator | once (1) per week |
| 50 | 18th St. Terminal-1710 W. 18th St. So. Bound Once passenger elevator | once (1) per week |
| 51 | Howard Rail Shop - 1825 W. Juneway Terrace Once freight Elevator | twice (2) per month |
| 52 | Evanston - 1612 Benson Ave. No. Bound Once passenger elevator | once (1) per week |
| 53 | Evanston - 1612 Benson Ave. So. Bound Once passenger elevator | once (1) per week |

P-4

| BID ITEM | WORK-SITE LOCATION | FREQUENCY OF INSPECTION (scheduled inspections) |
|---|---|---|
| 54 | Addison - 940 W. Addison St. Once passenger elevator | <u>once (1) per week</u> |
| 55 | Chicago Garage 642 N. Pulaski Once passenger elevator | <u>twice (2) per month</u> |
| 56 | South Shops, Unit #3 - 7801 S. Vincennes Once material lift | <u>twice (2) per month</u> |
| 57 | Howard Rail Shop - 1825 W. Juneway Terrace Once material lift. | <u>twice (2) per month</u> |
| 58 | 901 W. Division – Receiving Once freight elevator | <u>twice (2) per month</u> |
| 59 | 901 W. Division – Finance Once freight elevator | <u>twice (2) per month</u> |
| 60 | 901 W. Division – Shipping Once passenger elevator | <u>twice (2) per month</u> |
| 61 | 901 W. Division – Lobby Once passenger elevator | <u>twice (2) per month</u> |
| 62 | Marion - 1 S. Marion, Oak Park Once passenger elevator | <u>once (1) per week</u> |
| 63 | Central - 350 N. Central Ave. Once passenger elevator | <u>once (1) per week</u> |
| 64 | Cicero - 4800 W. Lake St. Once passenger elevator (West Bound) | <u>once (1) per week</u> |
| 65 | Cicero - 4800 W. Lake St. Once passenger elevator (East Bound) | <u>once (1) per week</u> |
| 66 | Pulaski - 4000 W. Lake St. Once passenger elevator (West Bound) | <u>once (1) per week</u> |
| 67 | Pulaski - 4000 W. Lake St. Once passenger elevator (East Bound) | <u>once (1) per week</u> |
| 68 | Kedzie - 3200 W. Lake St. Once passenger elevator (West Bound) | <u>once (1) per week</u> |
| 69 | Kedzie - 3200 W. Lake St. Once passenger elevator (East Bound) | <u>once (1) per week</u> |
| 70 | Kedzie - 3200 W. Lake St. Once passenger elevator (Street/Mezz) | <u>once (1) per week</u> |
| 71 | California - 2800 W. Lake St. Once passenger elevator (West Bound) | <u>once (1) per week</u> |
| 72 | California - 2800 W. Lake St. Once passenger elevator (East Bound) | <u>once (1) per week</u> |

Case 1:06-cv-01828    Document 1-5    Filed 03/31/2008    Page 34 of 48

| | | |
|---|---|---|
| 92. | Laramie/Lake - 5200 W. Lake St. | once (1) per week |
| 93. | Randolph/Washington - 120 N. State (North Bound) | once (1) per week |
| 94 | Randolph/Washington - 120 N. State (South Bound) | once (1) per week |
| 95. | Randolph/Washington - 120 N. State (Mezzanine/St.) | once (1) per week |
| 96. | Roosevelt/State - 1167 S. State (Mezzanine/St.) | once (1) per week |
| 97. | Roosevelt/State - 1167 S. State (St./Mezzanine) | once (1) per week |
| 98. | Van Buren/Quincy - 26 W. Van Buren (Library South Car) | once (1) per week |
| 99. | Van Buren/Quincy - 26 W. Van Buren (Library North Car) | once (1) per week |
| 100. | Van Buren/Quincy - 26 W. Van Buren (Library - Street/Mezz.) | once (1) per week |
| 101 | Linden Yard - 349 Linden, Wilmette (Wheelchair Lift) | twice (2) per month |
| 102 | Skokie Shop - 3701 Oakton Street Once passenger elevator | twice (2) per month |
| 103 | Jackson/ Van Buren - 312 S. State Street Once passenger - Street to Mezzanine | once (1) per week |
| 104 | Jackson/ Van Buren - 312 S. State Street Once passenger – Mezzanine to platform | once (1) per week |
| 105 | Maintenance Training Center – 3100 S. Federal Once freight elevator | twice (2) per month |
| 106 | Maintenance Training Center – 3125 S. Federal Once freight elevator | twice (2) per month |
| 107 | Indiana 4003 S. Indiana Ave. once passenger (North bound) | twice (2) per month |
| 108 | Indiana 4003 S. Indiana Ave. once passenger (South bound) | twice (2) per month |
| 109 | Chicago/State 800 N. State St. once passenger (St/Mz) | once (1) per week |
| 110 | Chicago/State 800 N. State St. once passenger (N.) | once (1) per week |

| BID ITEM | WORK-SITE LOCAT | FREQUENCY OF INSPECTION (scheduled inspections) |
|---|---|---|

| 111 | Chicago/State 800 N. State St.<br>once passenger (S.) | once (1) per week |
| 112 | 35th/Dan Ryan 142 W. 35th Ave<br>once passenger | once (1) per week |
| 113 | 95th/Dan Ryan 15 W. 95th St.<br>once passenger | once (1) per week |
| 114 | Jefferson Pk. 4917 N. Milwaukee Ave.<br>once passenger elevator | once (1) per week |
| 115 | Logan Sq – 2620 N. Kedzie Ave.<br>once passenger Mz/Plt | once (1) per week |
| 116 | Logan Sq – 2620 N. Kedzie Ave.<br>once passenger Mz/St. | once (1) per week |
| 117 | Western/Milwaukee 2009 S. Milwaukee Ave.<br>once passenger (N. bound) | once (1) per week |
| 118 | Western/Milwaukee 2009 S. Milwaukee Ave.<br>once passenger (S. bound) | once (1) per week |
| 119 | Conservatory 3631 W. Lake St.<br>once passenger (W. bound) | once (1) per week |
| 120 | Conservatory 3631 W. Lake St.<br>once passenger (E. bound) | once (1) per week |
| 121 | 2005 S. Pulaski Ave. *Douglas*<br>(Blue Line) | once (1) per week |
| 122 | 1915 S. Central Pk. *Douglas*<br>(Blue Line) | once (1) per week |
| 123 | 2011 S. California<br>(Blue Line) | once (1) per week |
| 124 | 2010 S. Damen Ave.<br>(Blue Line) | once (1) per week |
| 125 | 1944 S. Kedzie Ave.<br>(Blue Line) | once (1) per week |
| 126 | 121 Roosevelt/Wabash 22 E. Roosevelt Rd.<br>Once passenger elevator (Pedway) | once (1) per week |

Note: Bid item 121 service shall commence after January 22, 2005.
Bid Item 122 service shall commence after January 29, 2005.
Bid Items 123 and 124 service shall commence after July 21, 2005.
Bid Item 125 service shall commence after March 29, 2005.

Proposal Page (continued)

COMPANY BIDDING:     South West Industries,Inc./dba Anderson Elevator Company

PERSON TO CONTACT: Tom Krygowski

Phonce No:_____708/345-9710

Emergency (24 hour) Phone No:___708/345-9710

Pager (24 hour) No:_____

Fax No:_____

TERMS:        DISCOUNT:___0___%_____,_____DAYS

P-8

## Certification Regarding a Drug Free Workplace

Pursuant to the definitions regarding a Drug Free Workplace provided in the Drug-Free Workplace Act of 1988, the Illinois Drug Free Workplace Act, 30 ILCS 580/1 *et seq.*, the Federal Acquisition Regulation System ("FAR"), Procedures for Transportation Workplace Drug & Alcohol Testing Programs, 49 CFR 40, and Prevention of Alcohol Misuse & Prohibited Drug Use in Transit Operation, 49 CFR 655, South West Industries Inc/dba Anderson ("Contractor") certifies to the best of its knowledge and belief that it and its principals:                    Elevator Comp

1.  Maintain a workplace(s) (i.e. the site(s) for the performance of work done by the Contractor in connection with this contract) safe and free from "controlled substances" as described in the Controlled Substances Act (21 U.S.C. 812) and as further described in regulations 21 CFR 1308.11 – 1308.15.

2.  Have neither been convicted, including entering a plea of 'nolo contendere,' nor had sentence imposed by any judicial body charged with the responsibility to determine violations of Federal or State criminal drug statutes.

3.  Publish and give notice to its employees and sub-contractors that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance is prohibited in the Contractor's workplace, and also that actions will be taken against any and all employees and sub-contractors found to be in violation of same.

4.  Provide that all employees engaged in the performance of the contract receive a copy of the above statement, that the employee will abide by the terms of this statement, and that the employee will notify the employer in writing of the employee's conviction no later than five (5) calendar days after such conviction.

5.  Provide for appropriate action against an employee for violation of any and all of these rules and that an employee convicted of drug abuse must satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purposes by Federal, State, or local health or law enforcement or other appropriate agency.

6.  Comply with all drug and alcohol policies, testing programs and reporting requirements set forth in 49 CFR 40 and 49 CFR 655 whenever the Contractor, its employees, or sub-contractor(s) perform one or more of the following functions considered "safety-sensitive", as defined in 49 CFR 655:

    (1)  Operating a revenue service vehicle, including when not in revenue service;
    (2)  Operating a non-revenue service vehicle, when required to be operated by a holder of a Commercial Driver's License;
    (3)  Controlling dispatch or movement of a revenue service vehicle;
    (4)  Maintaining (including repairs, overhaul and rebuilding) a revenue service vehicle or equipment used in revenue service; or
    (5)  Carrying a firearm for security purposes.

7.  Will otherwise comply with all drug and alcohol policies set forth in applicable Federal, State and local laws and regulations, including, but not limited to the Drug-Free Workplace Act of 1988, FAR, Illinois Drug Free Workplace Act, 49 CFR 40 and 49 CFR 655 in such version, prior or subsequent to amendment or revision, as is currently enforced or enforceable at and during the execution and performance of this Contract.

In addition to other remedies, the Contractor's failure to comply with any part of the requirements of the Drug-Free Workplace Act of 1988, FAR, Illinois Drug Free Workplace Act, 49 CFR 40 or 49 CFR 655, may render the Contractor subject to any or all of the following: suspension of payments, termination of contract for default, suspension or debarment.

                                        President                        December 1, 2004
Signature and Title of Authorized Official                                    Date
Certificate revised to conform with proposed revised 49 CFR 40 7/2/01

ATTACHMENT "A"

# CERTIFICATION OF PRIMARY PARTICIPANT
# REGARDING DEBARMENT, SUSPENSION, AND OTHER
# RESPONSIBILITY MATTERS

South West Industries, Inc./dba Anderson Elevator Company , certifies to the best of our knowledge
_____
(company's name)

and belief that it and its principals:

1. Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any Federal department or agency;

2. Have not within a three-year period preceding this proposal been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction or contract under a public transaction; violation of Federal or State antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

3. Are not presently indicted for or otherwise criminally or civilly charged by a government entity (Federal, State, or local) with commission of any of the offenses enumerated in paragraph (2) of this certification; and

4. Have not within a three-year period preceding this application/proposal had one or more public transactions (Federal, State, or local) terminated for cause or default.

THE PRIMARY PARTICIPANT (APPLICANT OR POTENTIAL CONTRACTOR FOR A MAJOR THIRD PARTY CONTRACT) South West Industries, Inc./dba Anderson Elevator Company
                                                              (company name)
CERTIFIES OR AFFIRMS THE TRUTHFULNESS AND ACCURACY OF THE CONTENTS OF THE STATEMENTS SUBMITTED ON OR WITH THIS CERTIFICATION AND UNDERSTANDS THAT THE PROVISIONS OF 31 U.S.C. SECTIONS 3801 *ET SEQ.* ARE APPLICABLE THERETO.

President
_____
Signature and Title of Authorized Official

If you are unable to certify to any of the statements in this certification, the participant shall attach an explanation to this certification.

ATTACHMENT "B"

## CERTIFICATION OF LOWER TIER PARTICIPANT
## REGARDING DEBARMENT, SUSPENSION, AND OTHER
## RESPONSIBILITY MATTERS

*Professional Elevator Services, Inc.* , certifies to the best of our knowledge
(company's name)

and belief that it and its principals:

1. Are not presently debarred, suspended, proposed for debarment, declared ineligible, or
voluntarily excluded from covered transactions by any Federal department or agency;

2. Have not within a three-year period preceding this proposal been convicted of or had a civil
judgment rendered against them for commission of fraud or a criminal offense in connection
with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transac-
tion or contract under a public transaction; violation of Federal or State antitrust statutes or com-
mission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making
false statements, or receiving stolen property;

3. Are not presently indicted for or otherwise criminally or civilly charged by a government entity
(Federal, State, or local) with commission of any of the offenses enumerated in paragraph (2)
of this certification; and

4. Have not within a three-year period preceding this application/proposal had one or more public
transactions (Federal, State, or local) terminated for cause or default.

THE LOWER TIER PARTICIPANT (APPLICANT OR POTENTIAL CONTRACTOR FOR A MAJOR

THIRD PARTY CONTRACT) *Professional Elevator Services*
(company name)

CERTIFIES OR AFFIRMS THE TRUTHFULNESS AND ACCURACY OF THE CONTENTS OF THE

STATEMENTS SUBMITTED ON OR WITH THIS CERTIFICATION AND UNDERSTANDS THAT

THE PROVISIONS OF 31 U.S.C. SECTIONS 3801 *ET SEQ.* ARE APPLICABLE THERETO.

*Kennett W. Mason, President*
Signature and Title of Authorized Official

If you are unable to certify to any of the statements in this certification, the participant shall attach an
explanation to this certification.

**cta** 415.68 (00/90) Purchasing

**LOBBYING CERTIFICATION**

### Certification for Contracts, Grants, Loans and Cooperative Agreements

The undersigned certifies, to the best of his or her knowledge and belief, that:

(1)   No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2)   If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(3)   The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Executed this _____ 1st _____ day of ____ December ____ , 199 2004 .

By: ___ South West Industries, Inc./dba Anderson Elevator Company ___
                              (Type or print name of contractor)

_____
                              (Signature of authorized officer)

_____ President _____
                              (Title of authorized officer)

**PROPOSAL (continued)**

## TO BE EXECUTED BY A CORPORATION

The undersigned hereby acknowledges having received a full set of CONTRACT DOCUMENTS (Requirements for Bidding and Instructions to Bidders; General Conditions; Standard Government Requirements; Special Conditions Disadvantaged Business Enterprise Commitment; Special Conditions, if any, issued with the specifications; and all other forms, certificates, and documents issued with the specifications) AND ADDENDA NOS. (none unless indicated here)

BIDDER MUST INSERT ADDENDA NUMBERS HERE — IF ANY

and the undersigned agrees, if awarded the contract, to perform the contract in accordance with the terms and conditions of the Contract Documents and Addenda, if any, thereto. Notice to the undersigned may be served by mailing to the address hereinafter set forth.

FURTHER, THE UNDERSIGNED, BEING DULY SWORN, DEPOSES AND STATES ON OATH THAT the undersigned has not entered into any agreement with any other bidder or prospective bidder or with any other person, firm or corporation relating to the price or prices named within the undersigned's proposal or any other proposal, nor any agreement or arrangement under which any person, firm or corporation is to refrain from bidding, nor any agreement or arrangement for any act or omission in restraint of free competition among bidders, and has not disclosed to any person, firm or corporation the terms of the undersigned's proposal or the price or prices named herein. As required by Section 33E-11 of the Illinois Criminal Code of 1961, as amended (the "Act"), the undersigned certifies that the undersigned contractor or any agent, partner, employee or officer of the contractor is not barred from contracting with any unit of state or local government as a result of engaging in or being convicted of either bid-rigging in violation of Section 3 of Article 33E or bid-rotating in violation of Section 4 of Article 33E of the Act or any similar offenses of any state or the United States that contain the same elements as the offenses of bid-rigging or bid-rotating.

Name of Corporation: _South West Industries Inc. dba Anderson Elevator Company_
(Print or Type Name of Corporation)

Business Address: _2801 South 19th Avenue, Broadview, Illinois 60155_
(Print or Type Street, City, State and Zip Code)

BY: _____
SIGNATURE OF AUTHORIZED OFFICER*

Title of Signatory: _____
(Print or Type)

*NOTE: If signed by any person other than the corporate President or Vice President, a certified copy of a resolution or by-law authorizing such person to sign must accompany this Proposal.

State of _Illinois_

County of _Cook_

Signed and Sworn to before me on:

December 1, 2004

by _Gregory V. Gibbs_
(name of signatory)

_____
(Signature of Notary Public)

"OFFICIAL SEAL"
Tatiana Metoyer
Notary Public, State of Illinois
My Commission Exp. 07/25/2005

(NOTARIAL SEAL)

IF BIDDER IS A CORPORATION — THIS PAGE MUST BE EXECUTED

The following re_ _ces  tion 3. Indemnity of the General Condition  _ age G-1.

"3.  INDEMNITY

**Construction Contracts:** The Contractor shall indemnify and hold harmless to the maximum extent permitted by law the Authority, its agents, officials and employees against all injuries, death, losses, damages, claims, suits, liabilities, judgments, costs and expenses which may in any manner accrue against the Authority as a consequence of the award or performance of this Contract. This indemnity applies: (a) whether any loss for which the Authority seeks indemnity shall be caused or contributed to by the sole or partial negligent act or omission of the Contractor or Contractor's employees; and (b) whether any of the losses for which the Authority seeks indemnity shall be caused or contributed to by the sole or partial negligence or omission of the Contractor's subcontractors or their employees. The Contractor shall, at Contractor's own expense, appear, defend and pay all charges of attorneys and all costs and other expenses arising in connection with this indemnity. If any judgment shall be rendered against the Authority, the Contractor shall at Contractor's own expense satisfy and discharge the judgment. If indemnity pursuant to this subparagraph shall not be permitted by the applicable law, then, to the maximum extent permitted by law, the Contractor shall make full contribution to the Authority for its percentage share of any liability that is attributable to the Contractor's acts or omissions. Contractor expressly waives any legal limitations on its liability to the Authority for contribution, including but not limited to limitations related to the payment of workers compensation benefits. The Contractor expressly understands and agrees that any performance-payment bond or insurance protection required by this Contract or otherwise provided by the Contractor, shall in no way limit the responsibility to indemnify and defend the Authority pursuant to this Section. The indemnifications contained herein shall survive the termination of this Agreement."

CTA 415.12 (rev.11/93)  G-7

# SPECIAL CONDITIONS
## DISADVANTAGED BUSINESS ENTERPRISE COMMITMENT
### (Construction Contracts)

## I. POLICY AND TERMS

**A.** It is the policy of the Chicago Transit Authority (CTA) that Disadvantaged Business Enterprises (DBE) as defined in United States Department of Transportation (USDOT) Regulation 49 C.F.R., Part 23 and Section 106(c) Surface Transportation and Uniform Relocation Assistance Act of 1987 (STURAA), shall have the maximum opportunity to participate in the performance of contracts financed in whole or in part with federal funds. This policy also applies to contracts financed in whole or in part with funds provided by UMTA, Illinois Department of Transportation (IDOT), Regional Transportation Authority (RTA) and the City of Chicago (City).

**B.** Failure to carry out the commitments and policies set forth herein shall constitute a material breach of contract and may result in the termination of the contract or such remedy as CTA deems appropriate.

**C.** Accordingly, the Contractor agrees to expend not less than the following percentages of the total contract price, if awarded, for contract participation by DBEs (Refer to Item VI, Page 4):

<p align="center"><b>Disadvantaged Business Enterprise Goal:     30%</b></p>

**D.** For purposes of evaluating bidders' responsiveness, the contract DBE participation goal shall be a percentage of the Total Contract Price by the Contractor. However, the DBE participation goal shall apply to the total dollar value of this contract, inclusive of all amendments, modifications and change orders, and the Contractor agrees to make their best effort to include DBE participation in any contract modification work.

**E.** This contract DBE participation goal may be met by the bidder's status as a DBE, or by a joint venture with one or more DBEs, or by the purchase of materials used in the performance of the contract from one or more DBEs or by any combination of the above.

**F.** The Contractor, after exhausting all required efforts to involve DBEs directly and with prior approval by CTA, may also meet all or part of the DBE commitment by contracting with DBEs for the provision of goods and services *not directly* related to the performance of this contract. However, the Contractor shall, in determining the manner of DBE participation, first consider involvement of DBE firms as joint venture partners, subcontractors and suppliers of goods and services *directly* related to the performance of this contract. In all cases CTA requires the Contractor to demonstrate the specific efforts undertaken by it to involve DBE firms *directly* in the performance of this contract.

**G.** The Contractors who fail to meet the DBE goal and fail to demonstrate sufficient "Good Faith" efforts shall not be eligible to be awarded the Contract.

**H.** In connection with the performance of this contract, the contractor will cooperate with CTA in meeting its commitments and goals with regard to maximum utilization of Disadvantaged Business Enterprises (DBE), and will ensure that DBEs shall have the maximum practicable opportunity to compete for subcontract work under this contract agreement.

**I.** Agreements between a contractor and a DBE in which the DBE promises not to provide subcontracting quotations to other contractors are prohibited.

**J.** Contractors and their subcontractors/suppliers agree to ensure that DBEs as defined in U.S.DOT Regulation 49 CFR, Part 23 and Section 106(c) (STURAA) have the maximum opportunity to participate in the performance of contracts and subcontracts financed in whole or in part with federal funds provided under this agreement. In this regard, contractors and their subcontractors shall take all necessary and reasonable steps in accordance with 49 CFR, Part 23 and Section 106(c) (STURAA) to ensure that DBEs have the maximum opportunity to compete for and perform contracts. Contractors and their subcontractors shall not discriminate on the basis of race, color, national origin or sex in the award and performance of contracts assisted by the U.S. Department of Transportation.

## II. DEFINITIONS

**A.** "Disadvantaged Business Enterprise" or "DBE" means a small business concern awarded certification by the CTA as a business owned and controlled by socially and economically disadvantaged individuals in accordance with U.S.DOT Regulation 49 CFR, Part 23 and Section 106(c) (STURAA).

**B.** "Socially and Economically Disadvantaged Individuals" means those individuals who are citizens of the United States (or lawfully admitted permanent residents) and who are Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Asian-Indian Americans or women regardless of ethnicity, and any other minorities or individuals found to be disadvantaged by the Small Business Administration pursuant to Section 8(a) of the Small Business Act.

The Manager, DBE Program/Contract Compliance shall make a rebuttable presumption that individuals in the following groups are socially and economically disadvantaged. The Manager, DBE Program/Contract Compliance may also determine, on a case-by-case

basis, that individuals who are not a member of one of the following groups are socially and economically disadvantaged:

1. **"Black Americans,"** which includes persons having origins in any of the Black racial groups of Africa;

2. **"Hispanic Americans,"** which includes persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race;

3. **"Native Americans,"** which includes persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians;

4. **"Asian-Pacific Americans,"** which includes persons whose origins are from Japan, China, Taiwan, Korea, Vietnam, Laos, Cambodia, the Philippines, Samoa, Guam, the U.S. Trust Territories of the Pacific, and the Northern Marianas; and

5. **"Asian-Indian Americans,"** which includes persons whose origins are from India, Pakistan and Bangladesh.

C. **"Small Business Concern"** means a small business as defined pursuant to Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto except that a small business concern shall not include any concern or groups of concerns controlled by the same socially and economically disadvantaged individual or individuals which has annual average gross receipts in excess of $14 million over the three previous fiscal years.

D. **"Directory"** means the Directory of Certified Disadvantaged Business Enterprises maintained and published by the DBE Program/Contract Compliance Department. The Directory identifies firms that have been certified as DBEs, and includes both the date of their last certification and the area of specialty in which they have been certified. Contractors are responsible for verifying the current certification status of all proposed DBE firms.

E. **"Area of Specialty"** means the description of the DBE firm's business which has been determined by the Manager, DBE Program/Contract Compliance to be most reflective of the DBE firm's claimed specialty or expertise. Each DBE letter of certification contains a description of their Area of Specialty. This information is also contained in the Directory. Credit toward this contract's DBE participation goals shall be limited to the participation of firms performing within their Area of Specialty. CTA reserves the right to investigate and determine active DBE participation and applicable DBE credit specifically identified for this contract prior to award.

**NOTICE:** The Chicago Transit Authority does not make any representations concerning the ability of any DBE to perform work within their Area of Specialty. It is the responsibility of all contractors to determine the capability and capacity of the DBE firms to satisfactorily perform the work proposed.

F. **"Joint Venture"** means an association of two or more businesses to carry out a single business enterprise for profit, and for which purpose they combine their expertise, property, capital, efforts, skill and knowledge. Contractors may develop joint venture agreements as an instrument to provide participation by DBEs in contract work. A joint venture seeking to be credited for DBE participation may be formed among DBE firms or between DBE firm(s) and non-DBE firm(s).

A joint venture is eligible for DBE credit if the DBE partner(s) share in the ownership, control, management responsibilities, risks and profits of the joint venture, and are responsible for a clearly defined portion of the work to be performed, in proportion with the DBE ownership percentage.

## III. THIRD PARTY CHALLENGES TO ELIGIBILITY OF DBE FIRMS

A. Any third party may challenge the socially and economically disadvantaged status of any individual presumed to be socially and economically disadvantaged pursuant to Title 49 C.F.R., Part 23.20 provided that the challenged individual is an owner of a firm certified by or seeking certification from CTA as a disadvantaged business. An individual who has a current 8 (a) certification from the Small Business Administration may not be challenged through this procedure.

B. The challenge shall be in writing and shall include all information available to the challenging party relevant to the determination of whether the challenged individual is in fact socially and economically disadvantaged. The written challenge shall be filed with CTA's Manager, DBE Program/Contract Compliance Department.

C. CTA shall determine, on the basis of the information provided to it, whether there is reason to believe that the challenged individual is, in fact, not socially and economically disadvantaged. If CTA determines that there is no reason to believe that the challenged individual is not socially and economically disadvantaged, CTA shall so inform the challenging party in writing. The decision is final and terminates the proceedings as hereinafter provided. If CTA determines that there is reason to believe that the challenged party is not socially and economically disadvantaged, CTA shall begin a proceeding as follows:

1. CTA shall notify the challenged party that his or her status as a socially and economically disadvantaged individual has been challenged. The notice shall identify the challenging party and summarize the grounds for the challenge. The notice shall also require the challenged individual to provide CTA, within ten (10) business days, information sufficient to permit CTA to evaluate his or her status as a socially and economically disadvantaged individual. Failure to provide the requested information will result in decertification or denial of certification.

2. CTA shall evaluate the information available to it, conduct such investigation as deemed necessary and make a proposed determination of the social and economic disadvantaged status of the challenged individual. CTA shall notify both parties of the proposed determination in writing, setting forth the reason(s) for its proposal. CTA shall also provide an opportunity to the parties for an informal hearing at which time each party shall have the opportunity to respond to this proposed determination in writing

and in person. The rules of evidence shall not apply; there shall be no presentation of witnesses or cross-examination.

   3. Following the informal hearing, CTA shall make a final determination. CTA shall inform the parties, in writing, of the final determination, setting forth the reasons for its decision. In making its determination, CTA shall be guided by the social and economic eligibility standards of Title 49 C.F.R., Part 23.

**D.** During the pendency of a challenge under this office, the presumption that the challenged party is a socially and economically disadvantaged individual shall remain in effect.

**E.** Once CTA has made a final decision on a challenge matter, that determination goes into effect immediately with respect to CTA's Federally-assisted contracts. Except as provided in Title 49 C.F.R., Part 23.55, the decision by CTA shall be final for all contracts being let at the time of the final determination.

**F.** The final determination by CTA may be appealed by the adversely affected party to the Secretary, United States Department of Transportation under the procedures set forth in 49 C.F.R. Section 23.55. Any firm which believes that it has been wrongly denied certification as a DBE or joint venture may file an appeal in writing, signed and dated with the Secretary, United States Department of Transportation, no later than 180 days after the date of CTA's final determination. Third parties who have reason to believe that another firm has been wrongly denied or granted certification may advise the Secretary of the United States Department of Transportation.

## IV.   JOINT VENTURES

Contractors may develop joint venture agreements as an instrument to provide participation by DBEs in contract work. A joint venture seeking to be credited for DBE participation may be formed among DBE firms or between a DBE firm and a non-DBE firm.

**A joint venture is eligible if, and only if, all of the following requirements are satisfied:**

- **the DBE venturer(s) share in the (1) ownership, (2) control, (3) management responsibilities, (4) risks and (5) profits of the joint venture in proportion with the DBE ownership percentage; and**

- **the DBE venturer(s) are responsible for a clearly defined portion of work to be performed, in proportion with the DBE ownership percentage.**

The Manager, DBE Program/Contract Compliance will evaluate the proposed joint venture agreement, Schedule B submitted on behalf of the proposed joint venture, and all related documents to determine whether these requirements have been satisfied. In addition, the Manager, DBE Program/Contract Compliance shall consider the record of the joint venturers as joint venturers on CTA contracts. The decision of the Manager, DBE Program/Contract Compliance, regarding the eligibility of the Joint Venture shall be final.

**NOTE:** Credit for participation by DBEs in joint venture with non-DBEs does not require a minimum participation of 51% venture ownership and control on the part of the DBE. A junior ownership interest only in the venture by the DBE can be credited toward the contract DBE goal in a pro rata fashion as indicated below, V. COUNTING DBE PARTICIPATION TOWARD THE CONTRACT GOAL.

DBE/non-DBE joint ventures are creditable at any tier. **(Notice: CTA requires that, whenever a joint venture is proposed as the prime contractor, each joint venturer must sign the proposal to CTA.).**

## V.   COUNTING DBE PARTICIPATION TOWARD THE CONTRACT GOAL

The inclusion of any DBE in the Contractor's DBE Utilization Plan shall not conclusively establish the Contractor's eligibility for full DBE credit for the firm's participation in the contract.

The Manager, DBE Program/Contract Compliance reserves the right to deny or limit DBE credit to the Contractor where any DBE is found to be engaged in substantial subcontracting or pass-through activities with others. In this regard, a Contractor may count toward its DBE goal only expenditures to firms that are currently certified with the CTA and perform a commercially useful function. A firm is considered to perform a commercially useful function when it is responsible for the performance of a distinct element of the work and in carrying out its responsibilities by actually performing, managing, and supervising the work involved. To determine whether a firm is performing a commercially useful function, the Manager, DBE Program/Contract Compliance shall evaluate the amount of work subcontracted, industry practices and other relevant factors. The amount of DBE participation credit shall be based upon an analysis by the Manager, DBE Program/Contract Compliance of the specific duties that will be performed by the DBE. Each DBE will be expected to perform all of the work contemplated for it by any subcontract or agreement through the use of its own employees and equipment.

Credit for the participation of DBE firms as joint venture partners shall be based upon a detailed analysis of the duties, responsibilities and risks undertaken by the DBE as specified by the joint venturer's executed joint venture agreement. The Manager, DBE Program/Contract Compliance reserves the right to deny or limit DBE credit to the Contractor where any DBE joint venture partner is found to have duties, responsibilities, risks of loss and management control over the joint venture that is not commensurate with or in proportion to its joint venture ownership.

DBE participation shall be counted toward the DBE goal set in the contract as follows:

**A.** Once a DBE is determined to be eligible in accordance with these rules, the total dollar value of the contract awarded to the DBE may be counted toward the DBE goal, except as indicated below.

B. A Contractor may count to        its DBE goal a portion of the total dollar value (        :ontract with a joint venture eligible under the standards of the Special Co...ition      jual to the percentage of the ownership and co    . of the DBE venturer.

C. A Contractor may count toward its DBE goal only expenditns to firms that perform a commercially useful function in the work of a contract. A firm is considered to perform a commercially useful function when it is responsible for execution of a distinct element of the work of a contract and carries out its responsibilities by actually performing, managing, and supervising the work involved. To determine whether a firm is performing a commercially useful function the Manager, DBE Program/Contract Compliance shall evaluate the amount of work subcontracted, industry practices and other relevant factors.

   Consistent with normal industry practices, a DBE may enter into subcontracts. If a DBE Contractor subcontracts a significantly greater portion of the work of the contract than would be expected on the basis of normal industry practices, the DBE shall be presumed not to be performing a commercially useful function. Evidence may be presented by the contractors involved to rebut this presumption.

D. A contractor may count towards its DBE goal sixty percent (60%) of its expenditures for materials and supplies required under the contract and obtained from a DBE regular dealer, and one-hundred percent (100%) of such expenditures to a DBE manufacturer.

   For purposes of this section, a manufacturer is a firm that operates or maintains a factory or establishment that produces on the premises the materials or supplies obtained by the contractor.

   For purposes of this section, a regular dealer is a firm that owns, operates, or maintains a store, warehouse, or other establishment in which the materials or supplies required for performance of the contract are bought, kept in stock, and regularly sold to the public in the usual course of business. To be considered a regular dealer, the firm must engage in, as its principal business, and in its own name, the purchase and sale of the products in question. A regular dealer in such bulk items as steel, cement, gravel, stone, and petroleum products need not keep such products in stock, if it owns or operates distribution equipment. Brokers and packagers shall not be considered as manufacturers or regular dealers within the meaning of this section.

E. A contractor may count towards its DBE goal the following expenditures to DBE firms that are not manufacturers or regular dealers:

   1. The fees or commissions charged for providing a bona fide service, such as professional, technical, contractor or managerial services and assistance in the procurement of essential personnel, facilities, equipment, materials or supplies required for performance of the contract, provided that the fee or commission is determined by the Manager, DBE Program/Contract Compliance to be reasonable and not excessive as compared with fees customarily allowed for similar services.

   2. The fees charged for delivery of materials and supplies required on a job site (but not the cost of the materials and supplies themselves) when the hauler, trucker, or delivery service is not also the manufacturer of or a regular dealer in the materials and supplies provided that the fee is determined by the Manager, DBE Program/Contract Compliance to be reasonable and not excessive as compared with fees customarily allowed for similar services.

   3. The fees or commissions charged for providing any bonds or insurance specifically required for the performance of the contract, provided that the fee or commission is determined by the Manager, DBE Program/Contract Compliance to be reasonable and not excessive as compared with fees customarily allowed for similar services.

## VI. GRANT OF RELIEF FOR BIDDERS: WAIVER OF DBE GOALS

In the event the Contractor finds it impossible to fully meet the DBE goal of this contract, the Contractor must submit a signed petition for grant of relief from this Special Condition on the Contractor's letterhead, accompanied by documentation demonstrating that all reasonable "good faith" efforts were made toward fulfilling the goal.

To demonstrate sufficient reasonable efforts to meet the DBE contract goal, a Contractor shall document the steps it has taken to obtain DBE participation, including but not limited to the following:

A. Attendance at a pre-bid meeting, if any, scheduled by the CTA to inform DBEs of subcontracting opportunities under a given solicitation.

B. Advertisement in general circulation media, trade association publications, and minority-focus media for at least 20 days before bids or proposals are due. If 20 days are not available, publication for a shorter reasonable time is acceptable.

C. Written notification to DBEs that their interest in the contract is solicited.

D. Efforts made to select portions of the work proposed to be performed by DBEs in order to increase the likelihood of achieving the stated goal.

E. Efforts to negotiate with DBEs for specific subbids including at a minimum:

   1. The names, addresses, and telephone numbers of DBEs that were contacted;

   2. A description of the information provided to DBEs regarding the plans and specifications for portions of the work to be performed; and

   3. A statement of why additional agreements with DBEs were not reached;

F. Concerning each DBE the competitor contacted but rejected as unqualified, the reason for the competitor's conclusion;

G. Efforts made to assist the D___ con___ed that needed assistance in obtaining bo___ or ___surance required by Contractor or CTA.

Contractors that fail to meet DBE goals and fail to demonstrate sufficient reasonable efforts will be deemed in non-compliance and shall not be eligible to be awarded the contract.

To ensure that all obligations under contracts awarded to DBEs are met, CTA shall review the contractor's DBE involvement efforts during the performance of the contract. The Contractor shall bring to the attention of CTA, any situation in which regularly scheduled progress payments are not made to DBE subcontractors.

If the contractor does not meet the DBE goal, price alone shall not be an acceptable basis for which the contractor may reject the DBE sub-bid unless the bidder/proposer can show to the satisfaction of CTA that no reasonable price can be obtained from a DBE. A determination of reasonable price is based on such factors as CTA's estimate for work under a specific subcontract, the bidder/proposer's own estimate for the specific subcontracts, and the average of bona fide prices quoted for the specific subcontract. A DBE bid for subcontract will be presumed to be unreasonable if the DBE's price exceeds the average price quoted by more than fifteen (15) percent.

## VII. PROCEDURE TO DETERMINE BID COMPLIANCE

**The following Schedules and described documents constitutes the Contractor's DBE proposal, and must be submitted with the Contractor's bid at time of bid opening. Failure to submit completed Schedules and described documents with Contractor's bid will cause the bid to be considered non-responsive and will be cause to reject the bid in its entirety.**

### A. Schedule B: Affidavit of DBE/Non-DBE Joint Venture

Where the bidder's DBE proposal includes the participation of any DBE as a joint venturer, on any tier, the bidder must submit, together with their bid, a **Schedule B: Affidavit of DBE/Non-DBE Joint Venture** with an attached copy of the joint venture agreement proposed among the parties.

The **Schedule B**, in conjunction with the joint venture agreement must clearly evidence that the DBE venturer will be responsible for a clearly defined portion of the work to be performed, and that the DBE firm's responsibilities are in proportion with their ownership percentage. In order to demonstrate the DBE venturer's share in the ownership, control, management responsibilities, risks and profits of the joint venture, **the proposed joint venture agreement shall include specific details related to (1) the contributions of capital and equipment; (2) work items to be performed by the DBE's own forces; (3) work items to be performed under the supervision of the DBE venturer; and (4) the commitment of management, supervisory and operating personnel employed by the DBE to be dedicated to the performance of the project.**

### B. Schedule C: Letter of Intent from DBE to Perform as Subcontractor/Subcontractor/Supplier.

A **Schedule C**, executed by the DBE firm (or Joint Venture Subcontractor) must be submitted by the contractor with its bid at time of bid opening for each DBE included on their **Schedule D.** Each schedule must accurately detail the work to be performed by the DBE firm and the agreed rates and prices to be paid.

### C. Letters of Certification.

1. A copy of each proposed DBE firm's current Letter of Certification or Recertification from CTA must be submitted with the proposal (LIQ or RFP).

2. All Letters of Certification or Recertification issued by CTA include a statement of the DBE firm's area of specialization and appropriate DBE goal credit (see Section V. COUNTING DBE PARTICIPATION TOWARD THE CONTRACT GOAL). The DBE firm's scope of work, as detailed by their **Schedule C** must conform to their stated area of specialization. Where a DBE is proposed to perform work not covered by their area of specialization, they must request in writing, an expansion of their area of specialization prior to their being proposed to perform such work. The DBE firm's request to expand the scope of their area of specialization, together with all documentation required by CTA to process that request, must be received by the Manager, DBE Program/Contract Compliance prior to the bid opening.

   **NOTE:** In order for a non-certified DBE firm to be considered as a proposed DBE by the Contractor, a **Schedule A, Certification Affidavit or Recertification Affidavit** must be received by the DBE Program/Contract Compliance Department prior to the bid opening.

3. All Letters of Certification or Recertification are dated and are valid for one (1) year from the date of issue by CTA.

### D. Joint Venture Agreements.

1. If the Contractor's DBE proposal includes the participation of DBE firm(s) as joint venturers on any tier (either as the Contractor or as a subcontractor), Contractor must provide a fully executed and notarized copy of the joint venture agreement, with their bid at time of opening.

2. In order to demonstrate the DBE partner's share in the ownership, control, management responsibilities, risks and profits of the joint venture, the agreement must contain specific details related to:

a. Contributions of capital and equipment;
b. Work responsibilities or performance to be undertaken by the DBE firm
c. The commitment of management, supervisory and operating personnel employed by the DBE to be dedicated to the performance of the contract. The joint venture agreement must also clearly define each partner's authority to contractually obligate the joint venture and each partner's authority to expend joint venture funds (e.g. check signing authority).

## E. Schedule D: DBE Utilization Plan

1. Bidder/proposers must submit, together with the bid, a completed **Schedule D** committing them to the utilization of each listed DBE firm.

2. Except in cases where the bidder/proposer has received a complete waiver of the DBE goal in accordance with Section VI herein, the bidder/proposer must commit to the expenditure of a specific dollar amount of participation by each DBE firm included on their **Schedule D**. The total dollar commitment to proposed DBE firms must at least equal the DBE goal. Bidders/proposers are responsible for calculating the dollar equivalent to the DBE goal as a percentage of their total base bids, or, in the case of annual unit price, in conjunction with total estimated annual usage/expenditures.

3. All commitments made by the bidder/proposers **Schedule D** must conform to those presented in the submitted Schedule C. Except In cases where substantial and documented justification is provided, bidder/proposers will not be allowed to reduce the dollar commitment made to any DBE in order to achieve conformity between the Schedules C and D.

4. The submittals must have all spaces on the Schedule pages correctly filled in.

5. During the period before award, the submitted documentation will be evaluated. Furthermore, the bidder agrees to give upon request, earnest and prompt cooperation to the Manager, DBE Program/Contract Compliance in:

   a. Submitting to interviews that may be necessary;
   b. Allowing entry to places of business;
   c. Providing further documentation; or
   d. Soliciting the cooperation of a proposed DBE in providing such assistance.

6. A bid may be treated as non-responsible by reason of the determination that:

   a. A bidder's proposal contains an insufficient level of DBE participation;
   b. The bidder was found to be unresponsive or uncooperative when asked for further information relative to the proposal; or
   c. False statements were made in the Schedules.
   d. The DBE submitted is not certified by the CTA or has not submitted a Schedule A to the DBE Department prior to bid opening.

## VIII. REPORTING REQUIREMENTS DURING THE TERM OF THE CONTRACT

A. The bidder/proposer shall, within five (5) business days of receiving the awarded contract or prior to any work being performed, execute formal subcontracts or purchase orders with the DBE firms included in their proposed Schedules. These written agreements shall be made available to the Manager, DBE Program/Contract Compliance Department upon request.

B. During the term of annual contracts, the bidder/proposer shall submit regular "Status Reports of DBE Subcontract Payments." The frequency with which these reports are to be submitted will be determined by the Manager, DBE Program/Contract Compliance Department, but in no case will reports be required less often than on a quarterly basis. **In the absence of written notice from the Manager, DBE Program/Contract Compliance, the bidder/proposer's first Status Report of DBE Subcontract Payments will be due ninety (90) days after the date of contract award, and reports will be due quarterly thereafter.**

C. In the case of one-time procurements with either single or multiple deliveries, a "Status Report of DBE Subcontract Payments,.. indicating final DBE payments shall be submitted directly to the Manager, DBE Program/Contract Compliance Department, so as to assure receipt either at the same time, or before the using department receives contractor's final invoice. (NOTICE: Do not submit original invoices with "Status Report of DBE Subcontract Payments.")

D. Status Report of DBE Subcontract Payments are to be submitted directly to: Manager, DBE Program/Contract Compliance Department, P.O. Box 7562, Chicago, IL 60680-7562.

08 CV 1828        JH
JUDGE GOTTSCHALL
MAGISTRATE JUDGE ASHMAN

# EXHIBIT D - PART 2

**IX. DBE SUBSTITUTION**

A. Arbitrary changes by the Contractor of the commitments earlier certified in the **Schedule D** are prohibited. Further, after once entering into each approved DBE subagreement, the contractor shall, thereafter, neither terminate the subagreement, nor reduce the scope of the work to be performed by the DBE, nor decrease the price to the DBE, without in each instance receiving prior written approval of the Manager, DBE Program/Contract Compliance Department.

B. In some cases, however, it may become necessary to substitute a new DBE in order to actually fulfill the DBE requirements. In such cases, the Manager, DBE Program/Contract Compliance must be given reasons justifying the release by CTA of prior specific DBE commitments established in the contractor's bid proposal. The substitution procedure will be as follows:

   1. The Contractor must notify the Manager, DBE Program/Contract Compliance immediately in writing of an apparent necessity to reduce or terminate a DBE subcontract and to propose a substitute firm for some phase of work, in order to sustain the fulfillment of the DBE contract goals.

   2. The Contractor's notification to CTA should include the specific reasons for the proposed substitution. Stated reasons which would be acceptable include any of the following examples: A previously committed DBE was found not to be able to perform, or not to be able to perform on time; a committed DBE was found not to be able to produce acceptable work; a DBE previously committed to a given price later demands an unreasonable escalation of price.

      The Contractor's position in these cases must be fully explained and supported with adequate documentation. Stated reasons which will not be acceptable include: A replacement firm has been recruited to perform the same work under terms more advantageous to the prime contractor; issues about performance by the committed DBE were disputed (unless every reasonable effort has already been taken to have the issues resolved or mediated satisfactorily); a DBE has requested reasonable price escalation which may be justified due to unforeseen circumstances (i.e., a change in scope of DBE's work).

   3. The Contractor's notification should include the name, address, and principal official of any proposed substitute DBE and the dollar value and scope of work of the proposed subcontract. The same DBE affidavits and documents, which are required of contractors, as enumerated above in Section VII, "Procedure to Determine Bid Compliance" shall be attached.

   4. CTA will evaluate the submitted documentation and respond within fifteen (15) working days to the request for approval of a substitution. The response may be in the form of requesting more information, or requesting an interview to clarify or mediate the problem. The response may also be in the form of a rejection of the proposed DBE substitution with the reasons therefor included in CTA's response. In the case of an expressed emergency need to receive the necessary decision for the sake of job progress, CTA will instead respond as soon as practicable.

   5. Actual substitution of a DBE to fulfill contract requirements should not be made prior to CTA approval. Once notified of CTA approval, the substitute DBE subcontract must be executed within five (5) working days, and a copy of the DBE subcontract, with signatures of both parties to the agreement, should be submitted to CTA.

C. CTA will not approve extra payment for escalated costs incurred by the Contractor when a substitution of subcontractors becomes necessary in order to comply with DBE contract requirements.

D. After award of contract, no relief of the DBE requirements will be granted by CTA except in exceptional circumstances. Requests for complete or partial waiver of the DBE requirements of the contract must be made in writing, stating all details of the request, the circumstances, and all relevant information. The request must be accompanied by a record of all efforts taken by the Contractor to locate specific firms, solicit DBE bids, seek assistance from technical assistance agencies, etc., as outlined above in Section VI. "Grant of Relief for Bidders: Waiver of DBE Goals."

E. In a case where an enterprise under contract was previously considered to be a DBE but is later found not to be, or whose work is found not to be creditable toward the DBE goal fully as planned, CTA will consider the following special criteria in evaluating a waiver request:

   1. Whether the prime contractor was reasonable in believing the enterprise was a DBE or that eligibility or "counting" standards were not being violated.

   2. The adequacy of unsuccessful efforts taken to obtain a substitute DBE as outlined in Section VI above, "Grant of Relief for Bidders: Waiver of DBE Goal."

F. The Manager, DBE Program/Contract Compliance has sole authority regarding all matters of DBE compliance, including the granting of waivers or other relief to Contractors.

**X. NON-COMPLIANCE**

A. The Manager, DBE Program/Contract Compliance shall have the discretion to apply suitable sanction(s) to the Contractor if the Contractor is found to be in non-compliance with the DBE requirements. Failure to comply with the DBE terms of this contract or failure to use DBEs as stated in the Contractor's submitted schedules constitutes a material breach of this contract, and may lead to the suspension and/or termination of this contract in whole or in part; furthermore, continued eligibility to enter into future contracting arrangements with CTA may be jeopardized as a result of non-compliance. In some cases, payments may be withheld until corrective action is taken.

B. When work is completed the event that CTA has determined that the Con    or    s not compliant in the fulfillment of the required DBE goal, and a    nt of    f of the requirement was not obtained, CTA will    by be damaged in the failure to provide the benefit of participation to Dis    vantaged Business Enterprises to the degree set forth in this SPECIAL CONDITION.

C. Therefore, if CTA has determined, before the contract has been completed, the contractor is in non-compliance with the DBE goal, CTA will deduct part of the total contract amount, in cumulative amounts computed as follows:

**For each one (1) percent (or fraction thereof) of shortfall towards the DBE goal, one (1) percent of the total contract amount shall be withheld from the Contractor as a means of satisfying the DBE goal shortfall.**

## XI.   RECORD KEEPING

The Contractor shall maintain records of all relevant data with respect to the utilization of DBEs, retaining these records for a period of at least three (3) years after final acceptance of the work. Full access to these records shall be granted to the Chicago Transit Authority, Federal or State authorities in this project, the U.S. Department of Justice, the U.S. Department of Transportation, or any duly authorized representatives thereof.

## XII.   ASSISTANCE AGENCIES

The following agencies are available to the prospective bidders for assistance:

A. Management and technical assistance to minority and women contractors; linkage between major firms and DBEs:

U.S. Department of Transportation
Minority Business Resource Center
400 7th Street SW, Room 9410
Washington, DC 20590
Attn: Joe Capuano
(202) 366-2852

Cosmopolitan Chamber of Commerce
1326 South Michigan Avenue, Suite 100
Chicago, Illinois 60605
Attn: Connie Pope
(312) 786-0212, FAX: 786-9079

Illinois Department of Commerce and Community Affairs
Small Business Office
100 West Randolph, Suite 3-400
Chicago, Illinois 60601
Attn: LaMar Green
(312) 814-3263

National Association of Women Business Owners
Executive Director
414 Plaza Drive, Suite 209
Westmont, Illinois 60559
Attn: Kevin Boyer

Grant Thornton Minority Business Development Center
600 One Prudential Plaza, Suite 700
Chicago, Illinois 60601
Attn: Ken Robinson
(312) 856-0200

Chicago Minority Business Development Center
Burgos & Associates, Inc.
35 East Wacker Drive, Suite 922
Chicago, Illinois 60601
Attn: Clara Rhodes
(312) 977-9190

Chicago Urban League
1346 South Michigan Avenue
Chicago, Illinois 60605
Attn: Suzanne A. Daniel
(312) 663-9216, FAX: 663-9809

Chicagoland Chamber of Commerce and Industry
200 North LaSalle Street
Chicago, Illinois 60601
Attn: Samuel Mitchell
(312) 580-6900, FAX: 580-6957

Minority Economic Resources Corporation (MERC)
2570 East Devon Avenue
Des Plaines, Illinois 60018
Attn: Carlina Rodriguez
   Director, Minority Business Department
(708) 297-4705

Women's Business Development Center
8 South Michigan, Suite 400
Chicago, Illinois 60603
Attn: Hedy M. Ratner
(312) 853-3477, FAX: 853-0145

NAACP
7 East 63rd Street
Chicago, Illinois 60637
Attn: Syd Finley
(312) 853-3477

Latin American Chamber of Commerce
2539 North Kedzie, Suite 11
Chicago, Illinois 60647
Attn: Cristina Hernandez
(312) 252-5211

Gary Minority Business Development Center
567 Broadway
Gary, Indiana 46402
Attn: Jeffery Williams
(219) 883-5802

Association of Asian Construction Enterprises
c/o Sam Chung, President
333 North Ogden Avenue
Chicago, Illinois 60607
(312) 666-3626, FAX: 666-1785

Midwest Contractors of Progress
c/o Tommy Harrington
4647 West Huron
Chicago, Illinois 60644
(312) 921-0463

Black Contractors United (BCU)
c/o Jerome Peters
1641 North Milwaukee Avenue
Chicago, Illinois 60647
(312) 663-0704

Women Construction Owners and Executives
c/o Theresa Kern
6723 South Pulaski Road
Chicago, Illinois 60629
(312) 582-9800, FAX: 582-9850

Hispanic-American Construction Industry Association
(HACIA)
c/o Carlos Ponce, Executive Director
542 South Dearborn
Chicago, Illinois 60605
(312) 786-0101, FAX: 786-0104

C.  Small business guaranteed loans; surety bond guarantees; 8(a) certification:

U.S. Small Business Administration
219 South Dearborn Street, Suite 437
Chicago, Illinois 60604
Attn: Robert Connor
(312) 353-9098

Bond Guarantee Program
Surety Bond
230 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
Attn: Tony Zanetello
(312) 353-7331

Procurement Assistance
230 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
Attn: Robert Murphy
(312) 353-1395

D.  Project information, general DBE information; Directory of local and out-of-state construction and design DBEs:

**Project Information**
Chicago Transit Authority
Purchasing Department
567 W. Lake Street
Chicago, IL 60661-1498
Attn:  General Manager, Purchasing
(312) 681-2420

**DBE Information**
Chicago Transit Authority
DBE/ EEO Program/ Contract Compliance
567 W. Lake Street
Chicago, IL 60661-1498
Attn:  Pamela J. Beavers
(312) 681-2600

E.  Information on DBE availability in            manufacturing, sales or supplies, and related fiel     ,direct assistance from 42 regional affili-
ates located throughout the U.S.):

National Minority Suppliers Development Council, Inc.
1412 Broadway - 11th Floor
New York, NY 10018
Attn: Suzette Eaddy
(212) 944-2430

Chicago Regional Purchasing Council
36 South Wabash, Suite 725
Chicago, IL 60602
Attn: Maye Foster-Thompson
(312) 263-0105

## XIII.  PRIME CONTRACTOR ASSISTANCE

Prime contractors must have themselves assist DBEs in overcoming barriers to program participation. The following instruments of as-
sistance, for example, should be used as applicable:

A.  Developing solicitations of subcontract bids so as to increase potential DBE participation. This can take the form of breaking down
large subcontracts into small ones, and of issuing notice of solicitations in a timely manner;

B.  Providing technical assistance and guidance in the bidding, estimating, and scheduling processes;

C.  Considering purchasing supplies and/or leasing the required equipment for a job, then subcontracting only for the expertise re-
quired to perform the work;

D.  Providing accelerated payments or establishing pro-rated payment and delivery schedules so as to minimize cash flow problems
faced by small firms;

E.  Providing, waiving, or reducing subcontractor bonding requirements; allowing state bonding (bonding carried over from one project
state to the next);

F.  Providing a pre-bid conference for potential subcontractors.

In addition to the employment of DBE construction enterprises and material suppliers, the Contractor should consider the utilization
of DBEs in fields indirectly related to construction contracts; banking, office equipment sales, vehicle sales, mechanical repair, legal
and accounting services, building security, graphics and advertising, etc.

## XIV.  EQUAL EMPLOYMENT OPPORTUNITY

Compliance with DBE requirements will not diminish or supplant Equal Employment Opportunity and Civil Rights provisions as speci-
fied elsewhere in this contract and as they relate to Prime Contractor and Subcontractor obligations.

## XV.  MINORITY FINANCIAL INSTITUTIONS/INSURANCE AGENCIES

The prime contractor is encouraged to use the services of banks and insurance agencies owned and controlled by minorities or women.

**Schedule B**
## AFFIDAVIT OF DBE/NON-DBE JOINT VENTURE

This form need not be submitted if all joint venturers are DBEs. In such a case, however, a written joint venture agreement among the DBE venturers must be submitted. In all proposed joint ventures, each DBE venturer must submit a copy of their current Letter of Certification.

ALL INFORMATION REQUESTED BY THIS SCHEDULE MUST BE ANSWERED IN THE SPACES PROVIDED. DO NOT REFER TO YOUR JOINT VENTURE AGREEMENT EXCEPT TO EXPAND ON ANSWERS PROVIDED ON THIS FORM. IF ADDITIONAL SPACE IS REQUIRED, ADDITIONAL SHEETS MAY BE ATTACHED.

I.    **Name of joint venture:** _____

     Address of joint venture: _____

     _____

     Phone number of joint venture: _____

II.   **Identify each non-DBE venturer(s):**

     Name of Firm: _____

     Address: _____

     Phone: _____

     Contact person for matters concerning DBE compliance: _____

III.  **Identify each DBE venturer(s):**

     Name of Firm: _____

     Address: _____

     Phone: _____

     Contact person for matters concerning DBE compliance: _____

IV.   **Describe the role(s) of the DBE venturer(s) in the joint venture:**

     _____

     _____

     _____

     _____

     _____

V.    **Attach a copy of the joint venture agreement.** In order to demonstrate the DBE venturer's share in the ownership, control management responsibilities, risks and profits of the joint venture, the proposed joint venture agreement must include specific details related to: (1) the contributions of capital and equipment; (2) work items to be performed by the DBE's own forces; (3) work items to be performed under the supervision of the DBE venturer; and (4) the commitment of management, supervisory and operative personnel employed by the DBE to be dedicated to the performance of the project.

VI.   **Ownership of the Joint Venture.**

     A.   What are the percentage(s) of DBE ownership of the joint venture?

          DBE ownership percentage(s) _____

          Non-DBE ownership percentage(s) _____

Schedule B
AFFIDAVIT OF DBE/NON-DBE JOINT VENTURE

**VI.   Ownership of the Joint Venture** *(continued)*:

B.   Specify DBE/non-DBE percentages for each of the following (provide narrative descriptions and other detail as applicable):

1.   Profit and loss sharing: _____

2.   Capital contributions:
(a) Dollar amounts of initial contribution: _____

_____

(b) Dollar amounts of anticipated on-going contributions: _____

_____

3.   Contributions of equipment *(specify types, quality and quantities of equipment to be provided by each venturer)*:

_____

_____

_____

4.   Other applicable ownership interests, including ownership options or other agreements which restrict or limit ownership and/or control:

_____

_____

5.   Provide copies of **all** written agreements between venturers concerning this project.

6.   Identify each current Chicago Transit Authority contract and each contract completed during the past two (2) years by a joint venture of two or more firms participating in this joint venture:

_____

_____

_____

**VII.   Control of and Participation in the Joint Venture.** Identify by name and firm those individuals who are, or will be responsible for, and have the authority to engage in the following management functions and policy decisions. *(Indicate any limitations to their authority such as dollar limits and co-signatory requirements.)*:

A.   Joint venture check signing:

_____

_____

_____

B.   Authority to enter contracts on behalf of the joint venture:

_____

_____

_____

C.  Signing, co-signing and/or collateralizing loans:

_____

_____

_____

D.  Acquisition of lines of credit:

_____

_____

_____

E.  Acquisition and indemnification of payment and performance bonds:

_____

_____

_____

F.  Negotiating and signing labor agreements:

_____

_____

G.  Management of contract performance. *(Identify by name and firm only):*
  1. Supervision of field operations: _____

  2. Major purchases: _____

  3. Estimating: _____

  4. Engineering: _____

**VIII.  Financial Controls of joint venture:**

A.  Which firm and/or individual will be responsible for keeping the books of account?

_____

B.  Identify the "managing partner," if any, and describe the means and measure of their compensation:

_____

_____

_____

C.  What authority does each venturer have to commit or obligate the other to insurance and bonding companies, financing institutions, suppliers, subcontractors, and/or other parties participating in the performance of this contract or the work of this project?

_____

_____

_____

IX.   State the approximate number of operative personnel (by trade) needed to perform the joint venture's work under this contract. Indicate whether they will be employee of the majority firm, DBE firm, or the joint venture.

| Trade | Non-DBE Firm (number) | DBE (number) | Joint Venture (number) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Professional |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Administrative/Clerical |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Unskilled Labor |  |  |  |
|  |  |  |  |
|  |  |  |  |

If **any** personnel proposed for this project will be employees of the joint venture:

A.   Are **any** proposed joint venture employees currently employed by either venturer? _____

Currently employed by non-DBE (number) _____          Employed by DBE _____

B.   Identify by name and firm the individual who will be responsible for hiring joint venture employees: _____
    _____

X.   Please state any material facts of additional information pertinent to the control and structure of this joint venture.
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____

**Schedule B**

## AFFIDAVIT OF DBE/NON-DBE JOINT VENTURE

The undersigned affirms that the foregoing statements are correct and include all material information necessary to identify and explain the terms and operations of our joint venture and the intended participation of each venturer in the undertaking. Further, the undersigned covenant and agree to provide to CTA current, complete and accurate information regarding actual joint venture work and the payment therefore, and any proposed changes in any provision of the joint venture, or those of each venturer relevant to the joint venture by authorized representatives of CTA or the Federal funding agency.

Any material misrepresentation will be grounds for terminating any contract which may be awarded and for initiating action under federal or state laws concerning false statements.

**NOTE:** *If, after filing this Schedule B and before the completion on the joint venture's work on the project, there is any change in the information submitted, the joint venture must inform the Chicago Transit Authority directly or through the prime contractor if the joint venture is a subcontractor.*

_____          _____
Name of DBE Partner Firm                       Name of Non-DBE Partner Firm

_____          _____
Signature of Affiant                              Signature of Affiant

_____          _____
Name and Title of Affiant                        Name and Title of Affiant

_____          _____
Date                                           Date

On this _____ day of _____, 19 _____, the above-signed officers

_____
(Names of Affiants)

personally and, known to me be the persons described in the foregoing Affidavit, acknowledged that they executed the same in the capacity therein stated and for the purpose therein contained.

**IN WITNESS OF, I hereunto set my hand and offical seal.**

_____
Signature of Notary Public

My Commission Expires: _____

**SEAL**

**Schedule C:**
## LETTER OF INTENT FROM DBE TO PERFORM AS SUBCONTRACTOR, SUPPLIER AND/OR CONSULTANT

*Bidder's or Proposer's failure to submit this form with their bid*
*will result in their bid being rejected in its entirety*

Name of Project/Contract: __B040P00219    CTA 820-04__

Requisition No.: ____B040P00219____

Job Order No.: _____

From: __Professional Elevator Services__
    (Name of DBE Firm)

To: __Anderson Elevator/South West Inustries, Inc.__ and the Chicago Transit Authority
    (Name of Prime Contractor)

The DBE status of the undersigned is confirmed by the attached Letter of Certification from the Chicago Transit Authority dated _____ . (If proposing to perform as a DBE/non-DBE Joint Venture, then Letter of Certification from DBE venturer is attached along with completed Schedule B and joint venture agreement)

The undersigned is prepared to provide the following described services or supply the following described goods in connection with the above named project/contract:

| Pay Item No./Description | Quantity/Unit Price | Total |
|---|---|---|
| 30% of Contract Award | | |
| Labor and materials | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | Sub (or Grand) Total: $ | 30% of Contract |

**Partial Pay Items.** (For any of the above items that are partial pay items, specifically describe the work and subcontract dollar amount):

_____

_____

_____

_____

_____

_____

Grand Total: $_____

If more space is needed to fully describe the DBE firm's (or DBE/non-DBE joint venture's) proposed scope of work and/or payment schedule, attach additional sheets.

cta 715.04 (rev. 11/89) DBE Program and Contract Compliance                                        (front)

Schedule C:
**LETTER OF INTENT FROM DBE**

**Sub-Contracting Levels**

_____0_____% of the dollar value of the DBE's subcontract will be sublet to non-DBE contractors.

_____% of the dollar value of the DBE's subcontract will be sublet to DBE contractors.

**NOTICE: IF DBE WILL NOT BE SUB-SUBCONTRACTING ANY OF THE WORK DESCRIBED IN THIS SCHEDULE, A ZERO (0) MUST BE SHOWN IN EACH BLANK ABOVE.**

**NOTICE: IF MORE THAN TEN PERCENT (10%) OF THE VALUE OF THE DBE's SCOPE OF WORK WILL BE SUBLET, A BRIEF EXPLANATION AND DESCRIPTION OF THE WORK TO BE SUBLET MUST BE ATTACHED TO THIS SCHEDULE.**

The undersigned will enter into a formal written agreement for the above work with you as a Prime Contractor, conditioned upon your execution of a contract with the Chicago Transit Authority, and will do so within (5) five working days of your receipt of a signed contract from the Chicago Transit Authority.

**NOTICE: THIS SCHEDULE (AND ACCOMPANYING ATTACHMENTS TO BE SUBMITTED IN TRIPLICATE. ORIGINAL SIGNATURES REQUIRED ON ALL THREE (3) COPIES.**

_Kenneth W. Mason_
(Signature of Owner, President or Authorized Agent of DBE)

_Kenneth W. Mason / President_
Name/Title (Print)

_11/29/04_
Date

_312-431-0055_
Phone

**If proposing to perform as a DBE/non-DBE Joint Venture:**



(Signature of Owner, President or Authorized Agent of non-DBE)

Name/Title (Print)

Date

Phone

cta  715.04 (rev. 11/89) DBE Program and Contract Compliance                              (back)

**Schedule D:**
**DBE UTILIZATION PLAN**

*Bidder's or Proposer's failure to submit this form with their bid*
*will result in their bid being rejected in its entirety.*

Project Name: _____ B040P00219  CTA 820-04 _____

Requisition No.: _____ B040P00219 _____

Job Order No.: _____

State of _____ Illinois _____

County (City) of _____ Cook _____

In connection with the above captioned contract, I HEREBY DECLARE AND AFFIRM that I am the

_____ President _____ and duly authorized representative of
(Title of Affiant)

_____ Anderson Elevator /South West Industries, Inc. _____
(Name of Prime Contractor)

and that I have personally reviewed the material and facts set forth in and submitted with the attached Schedules of Disadvantaged Business Enterprises (DBE), Schedule Cs and Schedule Bs (if applicable), being such information.

| Names of DBE Firm(s) | Type of Work to be Performed (in accordance with Schedule Cs) | Contract Amount |
|---|---|---|
| Professional Elevator | | $   30% |
| | | $ |
| | | $ |

Total DBE Credit: $_____ 30% _____

## AFFIDAVIT OF PRIME CONTRACTOR

To the best of my knowledge, information and belief the facts and representations contained in the afformentioned attached Schedules are true, and no material facts have been omitted.

The undersigned will enter into formal agreements with all listed DBE firms for work as indicated by this Schedule D and accompanying Schedules, and will enter into such agreements within five (5) business days after receipt of the contract executed by the Chicago Transit Authority.

The Prime contractor designated the following person as their DBE Liaison Officer:

_____ Tom Krygowski, Vice President _____          708/345-9710
<span></span>(Name - Please Print or Type)                                (Phone)

I do solemnly declare and affirm under penalties of perjury that the contents of the foregoing document are true and correct, and that I am authorized on behalf of the Prime Contractor to make this affidavit.

_____ Anderson Elevator/South West Industries Inc. _____
<span></span>(Name of Prime Contractor - Print or Type)

_____
<span></span>(Signature)

_____ Gregory V. Gibbs _____
<span></span>(Name of Affiant)

_____ December 1, 2004 _____
<span></span>(Date)

**cta** 715.03 (rev. 11/89) DBE Program and Contract Compliance




August 26, 2003

Kenneth W. Mason
Professional Elevator Services
1705 S. State St.
Chicago, IL 60616

**City of Chicago**
Richard M. Daley, Mayor

Department of
Procurement Services

David E. Malone
Chief Procurement Officer

City Hall, Room 403
121 North LaSalle Street
Chicago, Illinois 60602
(312) 744-4900
(312) 744-2949 (TTY)

http://www.cityofchicago.org

RE:       ILLINOIS UNIFIED CERTIFICATION PROGRAM (IL UCP)

Dear Kenneth W. Mason :

It is with great pleasure the City of Chicago welcomes you as a member of the Illinois Unified Certification Program (IL UCP). Effective September 1, 2003, the IL UCP will be implemented. The participating agencies are IDOT, City of Chicago, CTA, Metra and Pace. The IL UCP will provide a "one-stop" certification process for firms seeking certification in the State of Illinois and includes a reciprocating agreement for firms that are currently certified as a Disadvantaged Business Enterprises (DBE).

As a firm currently certified as a Disadvantaged Business Enterprise (DBE) with the City of Chicago, your firm was "grandfathered" into the IL UCP. **The City of Chicago will now serve as your host/certifying agency.** As of September 1, 2003, all of your annual DBE renewals, (No Change Affidavits and Certification Renewals) will be submitted to and processed by The City of Chicago.

Your firm's name will appear in the IL UCP DBE Directory. The Directory can be accessed via the internet at http://www.dot.state.il.us/ucp/ucp.html or by contacting your host agency.

- *Your "City of Chicago" Certification will be accepted by each of the four IL UCP certifying participants.*

Your participation on US DOT assisted contracts let by the participating agencies will only be credited toward DBE goals in your firm's specific area of certification/ specialty.

If at any time there is a change in the ownership or control of your firm, you must notify the City of Chicago, in writing, within 30 days of such occurrence. Failure to report any changes may result in the revocation of your certification as set forth in 49 CFR Part 26.109 © .

On behalf of each of the participating agencies, The City of Chicago welcomes you to the IL UCP. Please direct all inquiries to (312) 744-1896.

Sincerely,

Lillie Cooper
Director of Certification





NOV 30, 2004 13:43



**Chicago Transit Authority**

Merchandise Mart Plaza, P.O. Box 3555
Chicago, Illinois 60654
(312) 664-7200

February 24, 2003

Mr. Kenneth W. Mason
Professional Elevator Services (1597)
1705 S. State Street
Chicago, IL 60605

Dear Mr. Mason:

The Chicago Transit Authority's DBE/EEO Programs/Contract Compliance Department has received your annual *No Change Affidavit* as a Disadvantaged Business Enterprise (DBE). This affidavit was processed in accordance with Department of Transportation Regulation 49 CFR, Part 26.

The result of our review of your submission is that your company continues to be recognized as a DBE. In addition, your firm remains eligible to participate in Chicago Transit Authority contracts financed by the U. S. Department of Transportation and other CTA contracts and it will be listed in our directory as follows:

> **ESCALATOR/ELEVATOR SERVICES; PROJECT MANAGEMENT; TRAFFIC STUDIES; LAYOUT; CUSTOM CAB INTERIORS; RENOVATIONS & REPAIRS**
> **(CREDIT: 100%)**
> **(312) 431-0055**

The DBE certification of your firm will be reviewed on an annual basis to determine if any changes have occurred in the firm's circumstances impacting continued eligibility. It is the obligation of your firm to submit a *No Change Affidavit* prior to your next anniversary date of certification on **NOVEMBER 14, 2003.** Additionally, it is your obligation to promptly notify CTA's DBE/EEO Programs/Contract Compliance Department when any changes occur in the firm's circumstances affecting its ability to meet size, disadvantaged status, ownership, and/or control requirements for eligibility.

Should you have any questions, please don't hesitate to contact me or any member of my staff. We look forward to a mutually successful relationship with your company.

Sincerely,

Pamela J. Beavers
General Manager
DBE/EEO Programs/Contract
Compliance Department

xc: wes

*Currently under
City of Chgo
IL UCP*

Page 3

NOV 30, 2004 13:43

# STANDARD GOVERNMENT REQUIREMENTS FOR CONSTRUCTION CONTRACTS

This contract is subject to a financial assistance contracts between the U.S. Department of Transportation (DOT), Urban Mass Transportation Administration (UMTA); the State of Illinois Department of Transportation (IDOT), Division of Public Transportation (DPT); and the Chicago Transit Authority (CTA).

## STANDARD CLAUSES

The following standard clauses are a part of this construction contract and shall be included in each of the Contractor's subcontracts:

**A. CONTRACT CHANGES.** Any proposed change in this construction contract shall be submitted to CTA for its prior written approval.

**B. GOVERNMENT INSPECTIONS.** Representatives of UMTA and DPT shall have access to the site of construction and shall have the right to inspect all project works and inspect and audit all data and records of the Contractor relating to his performance under this contract.

**C. INTEREST OF MEMBERS OF CONGRESS.** No member of, or delegate to, the Illinois General Assembly or the Congress of the United States shall be admitted to any share or part of this contract or to any benefit arising therefrom.

**D. PROHIBITED INTEREST.** "No member, or officer, or employee of Chicago Transit Authority or a local public body with financial interest or control in this contract during his tenure or for one year thereafter shall have any interest, direct or indirect, in this contract or the proceeds thereof."

**E. INELIGIBLE CONTRACTORS.** Contractors are required to certify that they ARE NOT included on the U.S. Comptroller General's Consolidated List of persons or firms currently debarred for violations of various Public Contracts incorporating labor standards provisions.

**F. NONDISCRIMINATION.** During the performance of the contract, the contractor agrees as follows:

1. The contractor will not discriminate against any employee or applicant for employment because of race, religion, color, sex, national origin, ancestry or handicap. The Contractor will examine all job classifications to determine if minority persons or women are underutilized and will take appropriate affirmative action to rectify any such underutilization. If the contractor hires additional employees in order to perform this contract, or any portion hereof, the contractor will determine the availability (in accordance with the Human Rights Commission's Rules and Regulations for Public Contracts) of minorities and women in the area(s) from which it may reasonably recruit and it will hire for each job classification for which employees are hired in such a way that minorities and women are not underutilized. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, religion, color, sex, national origin, ancestry or handicap. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided setting forth the provisions of this nondiscrimination clause.
2. The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment, without regard to race, religion, color, sex, national origin, ancestry or handicap.
3. The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, advising the said labor union or workers' representatives of the contractor's commitments under this section, 202 of Executive Order 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.
4. The contractor will comply with all provisions of Executive Order 11246 entitled "Equal Employment Opportunity" of September 24, 1965 as amended by Executive Order 11375 and as supplemented in Department of Labor regulations (41CFR Part 60).
5. The contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the Urban Mass Transportation Administration and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.
6. In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of the said rules, regulations or orders, this contract may be cancelled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts or federally-assisted construction contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, as amended, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.
7. The contractor will include a citation to 41 C.F.R. § 60-1.4(b)(1) and (c) and the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions shall be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the Urban Mass Transportation Administration may direct as a means of enforcing such provision, including sanctions for noncompliance; provided, however, that in the event a contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the Urban Mass Transportation Administration, the contractor may request the United States to enter into such litigation to protect the interests of the United States.
8. The prime contractor shall on behalf of itself and its subcontractors, submit monthly Manpower Utilization Reports as prescribed by the Department of Labor (OFCCP). This completed report is to be submitted to the Department of Labor (OFCCP) Regional Office by the fifth of the following month. Should the fifth be on a weekend, submission of the report must be received by the Friday prior to the fifth.

**G. ILLINOIS HUMAN RIGHTS ACT - Equal Employment Opportunity.** During the performance of this contract, the contractor agrees as follows:

1. That it will not discriminate against any employee or applicant for employment because of race, color, religion, sex, marital status, national origin or ancestry, age, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service; and further that it will examine all job classifications to determine if minority persons or women are underutilized and will take appropriate affirmative action to rectify any such underutilization.
2. That, if it hires additional employees in order to perform this contract, or any portion hereof, it will determine the availability (in accordance with the Department's Rules and Regulations) of minorities and women in the area(s) from which it may reasonably recruit and it will hire for each job classification for which employees are hired in such a way that minorities and women are not underutilized.
3. That, in all solicitations or advertisements for employees placed by it or on its behalf, it will state that all applicants will be afforded equal opportunity without discrimination because of race, color, religion, sex, marital status, national origin or ancestry, age, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service.
4. That it will send to each labor organization or representative of workers with which it has or is bound by a collective bargaining or other agreement or understanding, a notice advising such labor organization or representative of the contractor's obligations under the Illinois Human Rights Act and the Department's Rules and Regulations. If any such labor organization or representative fails or refuses to cooperate with the contractor in its efforts to comply with such Act and Rules and Regulations, the contractor will promptly so notify the department and the contracting agency and will recruit employees from other resources when necessary to fulfill its obligations thereunder.

5. That it will submit reports as required by the Department's Rules and Regulations, furnish all relevant information as may from time to time be requested by the Department or the contracting agency, and in all respects comply with the Illinois Human Rights Act and the Department's Rules and Regulations.

6. That it will permit access to all relevant books, records, accounts and work sites by personnel of the contracting agency and the Department for purposes of investigation to ascertain compliance with the Illinois Human Rights Act and the Department's Rules and Regulations.

7. That it will include verbatim or by reference the provisions of this clause in every subcontract it awards under which any portion of the contract obligations are undertaken or assumed, so that such provisions will be binding upon such subcontractor. In the same manner as with other provisions of this contract, the contractor will be liable for compliance with applicable provisions of this clause by such subcontractors; and further it will promptly notify the contracting agency and the Department in the event of any subcontractor fails or refuses to comply therewith. In addition, the contractor will not utilize any subcontractor declared by the Illinois Human Rights Commission to be ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations.

## H. STANDARD FEDERAL EQUAL EMPLOYMENT OPPORTUNITY CONSTRUCTION CONTRACT SPECIFICATIONS (EXECUTIVE ORDER 11246):

1. As used in these specifications:
   (a) "Covered Area" means the geographical area described in the solicitation from which this contract resulted;
   (b) "Director" means Director, Office of Federal Contract Compliance Programs, United States Department of Labor, or any person to whom the Director delegates authority;
   (c) "Employer Identification Number" means the Federal Social Security Number used on the Employer's Quarterly Federal Tax Return, U.S. Treasury Department Form 941.
   (d) "Minority" includes:
      (i) BLACK (All persons having origins in any of the Black African racial groups not of Hispanic origin);
      (ii) HISPANIC (All persons of Mexican, Puerto Rican, Cuban, Central or South American or other Spanish culture or origin regardless of race);
      (iii) ASIAN AND PACIFIC ISLANDER (All persons having origins in any of the original people of the Far East, Southeast Asia, the Indian Subcontinent or the Pacific Islands); and
      (iv) AMERICAN INDIAN or ALASKAN NATIVE (All persons having origins in any of the original people of North America and maintaining identifiable tribal affiliations through memberships and participation or community identification).

2. Whenever the contractor, or any subcontractor at any tier, subcontracts a portion of the work involving any construction trade, it shall physically include in each subcontract in excess of $10,000 the provisions of these specifications and the notice which contains the applicable goals for minority and female participation and which is set forth in the solicitations from which this contract resulted.

3. If the contractor is participating (pursuant to 41 C.F.R. 60-4.5) in a hometown plan approved by the U.S. Department of Labor in the covered area, either individually or through an association, its affirmative action obligations on all work in the plan area (including goals and timetables) shall be in accordance with that plan for those trades which have unions participating in the plan. Contractors must be able to demonstrate their participation in and compliance with the provisions of any such hometown plan. Each contractor or subcontractor participating in an approved plan is individually required to comply with its obligations under the EEO Clause, and to make a good faith effort to achieve each goal under the plan in each trade in which it has employees. The overall good faith performance by other contractors or subcontractors toward a goal in an approved plan does not excuse any covered contractor's or subcontractor's failure to take good faith efforts to achieve the plan goals and timetables.

4. The contractor shall implement the specific affirmative action standards provided in Paragraphs (7)(a) through (p) of these specifications. The goals set forth in the solicitation from which this contract resulted are expressed as percentages of the total hours of employment and training of minority and female utilization the contractor should reasonably be able to achieve in each construction trade in which it has employees in the covered area. Covered construction contractors performing construction work in geographical areas where they do not have a Federal or Federally assisted construction contract shall apply the minority and female goals established for the geographical area where the work is being performed. Goals are published periodically in the Federal Register in notice form, and such notices may be obtained from any office of Federal Contract Compliance Program office or from Federal Procurement Contracting Officers. The contractor is expected to make substantially uniform progress toward its goal in each craft during the period specified.

5. Neither the provisions of any collective bargaining agreement, nor the failure by a union with whom the contractor has a collective bargaining agreement, to refer either minorities or women shall excuse the contractor's obligations under these specifications, Executive Order 11246, or the regulations promulgated pursuant thereto.

6. In order for the nonworking training hours of apprentices and trainees to be counted in meeting the goals, such apprentices and trainees must be employed by the contractor during the training period, and the contractor must have made a commitment to employ the apprentices and trainees at the completion of their training, subject to the availability of employment opportunities. Trainees must be trained pursuant to training programs approved by the U.S. Department of Labor.

7. The contractor shall take specific affirmative actions to ensure equal employment opportunity. The evaluation of the contractor's compliance with these specifications shall be based upon its effort to achieve maximum results from its actions. The contractor shall document these efforts fully, and shall implement affirmative action steps at least as extensive as the following:
   (a) Ensure and maintain a working environment free of harassment, intimidation, and coercion at all sites, and in all facilities at which the contractor's employees are assigned to work. The contractor, where possible, will assign two or more women to each construction project. The contractor shall specifically ensure that all foremen, superintendents, and other on-site supervisory personnel are aware of and carry out the contractor's obligation to maintain such a working environment, with specific attention to minority or female individuals working at such sites or in such facilities.
   (b) Establish and maintain a current list of minority and female recruitment sources, provide written notification to minority and female recruitment sources and to community organizations when the contractor or its unions have employment opportunities available, and maintain a record of the organizations' responses.
   (c) Maintain a current file of the names, addresses and telephone numbers of each minority and female off-the-street applicant and minority or female referral from a union, a recruitment source or community organization and of what action was taken with respect to each such individual. If such individual was sent to the union hiring hall for referral and was not referred back to the contractor by the union or, if referred, not employed by the contractor, this shall be documented in the file with the reason therefore, along with whatever additional actions the contractor may have taken.
   (d) Provide immediate written notification to the director when the union or unions with which the contractor has a collective bargaining agreement has not referred to the contractor a minority person or woman sent by the contractor, or when the contractor has other information that the union referral process has impeded the contractor's efforts to meet its obligations.
   (e) Develop on-the-job training opportunities and/or participate in training programs for the area which expressly include minorities and women, including upgrading programs and apprenticeship and trainee programs relevant to the contractor's employment needs, especially those programs funded or approved by the Department of Labor. The contractor shall provide notice of these programs to the sources compiled under (7)(b) above.
   (f) Disseminate the contractor's EEO Policy by providing notice of the policy to unions and training programs and requesting their cooperation in assisting the contractor in meeting its EEO Obligations; by including it in any policy manual and Collective Bargaining Agreement; by publicizing it in the company newspaper, annual report, etc.; by specific review of the policy with all management personnel and with all minority and female employees at least once a year; and by posting the company EEO Policy on bulletin boards accessible to all employees at each location where construction work is performed.
   (g) Review, at least annually, the company's EEO Policy and Affirmative Action Obligations under these specifications with all employees having any responsibility for hiring, assignment, layoff, termination or other employment decisions including specific review of these items with on-site supervisory personnel such as, superintendents, general foremen, etc., prior to the initiation of construction work at any job site. A written record shall be made and maintained identifying the time and place of these meetings, persons attending, subject matter discussed, and disposition of the subject matter.

(h) Disseminate the contractor's EEO Policy externally by including it in any advertising in the news media, including minority and female news media, and providing written notification to and discussing the contractor's EEO Policy with other contractors and subcontractors with whom the contractor does or anticipates doing business.

(i) Direct its recruitment efforts, both oral and written, to minority, female and community organizations, to schools with minority and female students and to minority and female recruitment and training organizations serving the contractor's recruitment area and employment needs. Not later than one month prior to the date for the acceptance of applications for apprenticeship or other training by any recruitment source, the contractor shall send written notification to organizations such as the above, describing the openings, screening procedures, and tests to be used in the selection process.

(j) Encourage present minority and female employees to recruit other minority persons and women and, where reasonable, provide after school, summer and vacation employment to minority and female youth both on the site and in other areas of the contractor's workforce.

(k) Validate all tests and other selection requirements where there is an obligation to do so under 41 C.F.R. Part 60-3.

(l) Conduct, at least annually, an inventory and evaluation at least of all minority and female personnel for promotional opportunities and encourage these employees to seek or to prepare for, through appropriate training, etc., such opportunities.

(m) Ensure that seniority practices, job classifications, work assignments and other personnel practices, do not have a discriminatory effect by continually monitoring all personnel and employment related activities to ensure that the EEO Policy and the contractor's obligations under these specifications are being carried out.

(n) Ensure that all facilities and company activities are non-segregated except that separate or single-user toilet and necessary changing facilities shall be provided to assure privacy between the sexes.

(o) Document and maintain a record of all solicitations of offers for subcontracts from minority and female construction contractors and suppliers, including circulation of solicitations to minority and female contractor associations and other business associations.

(p) Conduct a review, at least annually, of all supervisors' adherence to and performance under the contractor's EEO Policies and Affirmative Action Obligations.

8. Contractors are encouraged to participate in voluntary associations which assist in fulfilling one or more of their affirmative action obligations set forth in Paragraphs (7)(a) through (p). The efforts of a contractor association, joint contractor-union, contractor community, or other similar group of which the contractor is a member and participant, may be asserted as fulfilling any one or more of its obligations under (7)(a) through (p) of these specifications, provided that the contractor actively participates in the group, makes every effort to assure that the group has a positive impact on the employment of minorities and women in the industry, ensure that the concrete benefits of the program are reflected in the contractor's minority and female workforce participation, makes a good faith effort to meet its individual goals and timetable, and can provide access to documentation which demonstrates the effectiveness of actions taken on behalf of the contractor. The obligation to comply, however, is the contractor's and failure of such a group to fulfill an obligation shall not be a defense for the contractor's non-compliance.

9. A single goal for minorities and separate single goal for women have been established. The contractor, however, is required to provide equal employment opportunity and to take affirmative action for all minority groups, both male and female, and all women, both minority and non-minority. Consequently, the contractor may be in violation of the executive order if a particular group is employed in a substantially disparate manner (for example, even though the contractor has achieved its goal for women generally, the contractor may be in violation of the executive order if a specific minority group of women is underutilized).

10. The contractor shall not use the goals and timetables or affirmative action standards to discriminate against any person because of race, color, religion, sex, or national origin.

11. The contractor shall not enter into any subcontract with any person or firm debarred from government contracts pursuant to Executive Order 11246.

12. The contractor shall carry out such sanctions and penalties for violation of these specifications and of the equal opportunity clause, including suspension, termination and cancellation of existing subcontracts as may be imposed or ordered Pursuant to Executive Order 11246, as amended, and its implementing regulations by the Office of Federal Contract Compliance Programs. Any contractor who fails to carry out such sanctions and penalties shall be in violation of these specifications and Executive Order 11246, as amended.

13. The contractor, in fulfilling its obligations under these specifications, shall implement specific affirmative action steps, at least as extensive as those standards prescribed in Paragraph (7) of these specifications, so as to achieve maximum results from its efforts to ensure equal employment opportunity. If the contractor fails to comply with the requirements of the Executive Order, the implementing regulations, or these specifications, the director shall proceed in accordance with 41 C.F.R. 60-4.8.

14. The contractor shall designate a responsible official to monitor all employment related activity to ensure that the company EEO Policy is being carried out, to submit reports relating to the provisions hereof as may be required by the government and to keep records. Records shall at least include for each employee the name, address, telephone numbers, construction trade, union affiliation if any, employee identification number when assigned, social security number, race, sex, status (E.G. mechanic, apprentice, trainee, helper, or laborer), dates of changes in status, hours worked per week in the indicated trade, rate of pay, and locations at which the work was performed. Records shall be maintained in an easily understandable and retrievable form; however, to the degree that existing records satisfy this requirement, contractors shall not be required to maintain separate records.

15. Nothing herein provided shall be construed as a limitation upon the application of other laws which establish different standards of compliance or upon the application of requirements for the hiring of local or other area resident (e.g., those under the Public Works Employment Act of 1977 and the Community Development Block Grant Program.)

## L. NOTICE OF REQUIREMENT FOR AFFIRMATIVE ACTION TO ENSURE EQUAL EMPLOYMENT OPPORTUNITY (EXECUTIVE ORDER 11246)

1. The offerer's or bidder's attention is called to the "Equal Opportunity Clause" and the "Standard Federal Equal Employment Opportunity Construction Contract Specifications" set forth herein.

2. (a) The goals and timetables for minority and female participation, expressed in percentage terms for the contractor's aggregate workforce in each trade on all construction work in the covered area, are as follows:

1/85 Through And Until Further Notice

| | Goals For Minority Participation For Each Trade 19.6% | Goals For Female Participation In Each Trade 6.9% |
|---|---|---|
| Contractor Must Insert Goals For Current Year | Goals 30 | Goals 5 |

These goals are applicable to all contractor's construction work (whether or not it is Federal or Federal Assisted) performed in the covered area. If the contractor performs construction work in a geographical area located outside the covered area, it shall apply the goals established for such geographical area where the work is actually performed. With regard to this second area, the contractor also is subject to the goals for both its Federally involved and non-Federally involved construction.

(b) The contractor's compliance with the Executive Order and the Regulations in 41 C.F.R. Part 60-4 shall be based on its implementation of the equal opportunity clause, specific affirmative action obligations required by the specifications set forth in 41 C.F.R. 60-4.3(a), and its efforts to meet the goals. The hours of minority and female employment and training must be substantially uniform throughout the length of the contract, and in each trade, and the contractor shall make a good faith effort to employ minorities and women evenly on each of its projects. The transfer of minority or female employees or trainees from contractor to contractor or from project to project for the sole purpose of meeting the contractor's goals shall be a violation of the contract, the Executive Order, and the Regulations in 41 C.F.R. Part 60-4. Compliance with the goals will be measured against the total work hours performed.

3. The contractor shall provide not____on to the Director of the Office of Federal Contract Com____e Programs within ten (10) working days of award of any construction subcontract in____ss of $____0,000 at any tier for construction work under th____nt____sulting from this solicitation. The notification shall list the name, address and telephon____mber of the subcontractor; employer identification numb____of the subcontractor; estimated dollar amount of the subcontract; estimated starting and completion dates of the subcontract and the geographical area in which the contract is to be performed.

4. As used in this Notice, and in the contract resulting from this solicitation, the "covered area," is (insert description of the geographical areas where the contract is to be performed, giving the State, County and City, if any).

**J.  PRIME CONTRACTOR PARTICIPATION.** The prime contractor shall perform, on site, with his own staff, work equivalent to at least 25 percent of the total amount of construction work at the site. Only pay items of the construction contract will be used in computing the total amount of construction work at the site. CTA may increase this minimum amount of prime contractor participation, depending upon degree of specialization required to perform this work.

**K.  CONTRACT SECURITY.** The contractor shall furnish a surety bond in a sum equal to the full amount of the contract price to ensure the faithful performance of the contract and for the payment of all persons performing labor and furnishing materials in connection with the contract, and with sureties satisfactory to the Chicago Transit Authority.

**L.  WAGE RATES.** Minimum wages to be paid on this construction project have been established by the U.S. Department of Labor and are shown on sheets attached to this specification. These wage rates must be prominently posted at the construction site.

**M.  LABOR PROVISIONS.** Pursuant to regulations set forth in 29 C.F.R. Part 5, all construction contracts of $2,000 or more shall be subject to the following provisions:

**1.  MINIMUM WAGES.**

(a) All mechanics and laborers employed or working upon the site of work, will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by Regulations issued by the Secretary of Labor under the Copeland Act (29 C.F.R., Part 3), the full amounts due at the time of payment computed at wage rates not less than those contained in the wage determination decision of the Secretary of Labor which wage determination decision is attached hereto and made a part hereof, regardless of any contractual relationship which may be alleged to exist between the contractor and such laborers and mechanics; and the wage determination decision shall be posted by the contractor at the site of the work in a prominent place where it can be easily seen by the workers. For the purpose of this clause, contributions made or costs reasonably anticipated under Section 1(b)(2) of the Davis-Bacon Act, 40 U.S.C. §276a(b)(2), on behalf of laborers of mechanics are considered wages paid to such laborers or mechanics, subject to the Provisions of 29 C.F.R. 5.5(A)(1)(iv). Also for the purpose of this clause, regular contributions made or costs incurred for more than a weekly period under plans, funds, or programs, but covering the particular weekly period, are deemed to be constructively made or incurred during such weekly period.

(b) The contracting officer shall require that any class of laborers or mechanics, including apprentices and trainees, which is not listed in the wage determination and which is to be employed under the contract, shall be classified or reclassified conformably to the wage determination, and a report of the action taken shall be sent by the Department of Transportation (DOT) to the Secretary of Labor. In the event the interested parties cannot agree on the proper classifications or reclassification of a particular class of laborers and mechanics, including apprentices and trainees, to be used, the question, accompanied by the recommendation of the contracting officer, shall be referred to the Secretary of Labor for final determination.

(c) The contracting officer shall require, whenever the minimum wage rate prescribed in the contract for a class of laborers or mechanics includes a fringe benefit which is not expressed as an hourly wage rate and the contractor is obligated to pay a cash equivalent of such a fringe benefit, an hourly cash equivalent thereof to be established. In the event the interested parties cannot agree upon a cash equivalent of the fringe benefit, the question, accompanied by the recommendation of the contracting officer, shall be referred to the Secretary of Labor for determination.

(d) If the contractor does not make payments to a trustee or other third person, he may consider as part of the wages of any laborer or mechanic the amount of any costs reasonably anticipated in providing benefits under a plan or program of a type expressly listed in the Wage Determination Decision of the Secretary of Labor which is a part of this contract. Provided, however, the Secretary of Labor has found, upon the written request of the contractor, that the applicable standards of the Davis-Bacon Act have been met. The Secretary of Labor may require the contractor to set aside in a separate account assets for the meeting of obligations under the plan or program.

**2.  WITHHOLDING.**
UMTA, DPT, or CTA shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld from the contractor under this contract or any other federal contract with the same prime contractor, or any other federally-assisted contract subject to Davis-Bacon prevailing wage requirements, which is held by the same prime contractor, so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics, including apprentices, trainees, and helpers, employed by the contractor or any subcontractor the full amount of wages required by the contract. In the event of failure to pay any laborer or mechanic, including any apprentice, trainee, or helper, employed or working on the site of the work (or under the United States Housing Act of 1937 or under the Housing Act of 1949 in the construction or development of the project), all or part of the wages required by the contract, UMTA, DPT or CTA may, after written notice to the contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds until such violations have ceased.

**3.  PAYROLLS AND BASIC RECORDS.**

(i) Payrolls and basic records relating thereto shall be maintained by the contractor during the course of the work and preserved for a period of three years thereafter for all laborers and mechanics working at the site of the work (or under the United States Housing Act of 1937, or under the Housing Act of 1949, in the construction or development of the project). Such records shall contain the name, address, and social security number of each such worker, his or her correct classification, hourly rates of wages paid (including rates of contributions or costs anticipated for bona fide fringe benefits or cash equivalents thereof of the types described in Section 1(b)(2)(B) of the Davis-Bacon Act), daily and weekly number of hours worked, deductions made and actual wages paid. Whenever the Secretary of Labor has found under 29 CFR §5.5 (a)(1)(iv) that the wages of any laborer or mechanic include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in Section 1(b)(2)(B) of the Davis-Bacon Act, the contractor shall maintain records which show that the commitment to provide such benefits is enforceable, that the plan or program is financially responsible, and that the plan or program has been communicated in writing to the laborers or mechanics affected, and records which show the costs anticipated or the actual cost incurred in providing such benefits. Contractors employing apprentices or trainees under approved programs shall maintain written evidence of the registration of apprenticeship programs and certification of trainee programs, the registration of the apprentices and trainees, and the ratios and wage rates prescribed in the applicable programs.

(ii) A. The contractor shall submit weekly for each week in which any contract work is performed a copy of all payrolls to DOT if DOT is a party to the contract, but if DOT is not such a party, the contractor will submit the payrolls to the CTA for transmission to DOT and DPT. The payrolls submitted shall set out accurately and completely all of the information required to be maintained under §5.5(a)(3)(i) of regulations, 29 CFR part 5. This information may be submitted in any form desired. Optional form WH-347 is available for this purpose and may be purchased from the Superintendent of Documents (federal stock number 029-005-00014-1), U.S Goverment Printing Office, Washington, D.C. 20402. The prime contractor is responsible for the submission of copies of payrolls by all subcontractors

B. Each payroll submitted ( )e a ompanied by a "Statement of Compliance." signec oy t ( )ntractor or subcontractor or his or her agent who pays or supervises the pay ( ) of the persons employed under the contract and shall certify the following:
1. That the payroll for the payroll period contains the information required to be maintained under §5.5(a)(3)(i) of regulations, 29 CFR part 5 and that such information is correct and complete;
2. That each laborer or mechanic (including each helper, apprentice, and trainee) employed on the contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly, and that no deductions have been made either directly or indirectly from the full wages earned, other than permissible deductions as set forth in regulations, 29 CFR part 3;
3. That each laborer or mechanic has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the contract.
C. The weekly submission of a properly executed certification set forth on the reverse side of option form WH-347 shall satisfy the requirement for submission of the "Statement of Compliance" required by paragraph (a)(3)(ii)(B) of 29 CFR §5.5
D. The falsification of any of the above certifications may subject the contractor or subcontractor to civil or criminal prosecution under section 1001 title 18 and section 231 of title 31 of the United States code.

(iii) The contractor or subcontractor shall make the records required under paragraph (a)(3)(i) of 29 CFR §5.5 available for inspection, copying, or transcription by authorized representatives of DOT, DPT or the Department of Labor, and shall permit such representatives to interview employees during working hours on the job. If the contractor or subcontractor fails to submit the required records or to make them available, the federal agency may, after written notice to the contractor, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds. Furthermore, failure to sumbit the required records upon request or to make such records available may be grounds for debarment action pursuant to 29 CFR §5.12.

4. APPRENTICES AND TRAINEES.
(i) Apprentices:  Apprentices will be permitted to work at less than the predetermined rate for the work they performed when they are employed pursuant to and individually registered in a bona fide apprenticeship program registered with the U.S. Department of Labor, Employment and Training Administration, Bureau of Apprenticeship and Training, or with a State Apprenticeship Agency recognized by the Bureau, or if a person is employed in his or her first 90 days of probationary employment as an apprentice in such an apprenticeship program, who is not individually registered in the program, but who has been certified by the Bureau of Apprenticeship and Training or a State Apprenticeship Agency (where appropriate) to be eligible for probationary employment as an apprentice. The allowable ratio of apprentices to journeymen on the job site in any craft classification shall not be greater than the ratio permitted to the contractor as to the entire work force under the registered program. Any worker listed on a payroll at an apprentice wage rate, who is not registered or otherwise employed as stated above, shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any apprentice performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. Where a contractor is performing construction on a project in a locality other than that in which its program is registered, the ratios and wage rates (expressed in percentages of the journeyman's hourly rate) specified in the contractor's or subcontractor's registered program shall be observed. Every apprentice must be paid at not less than the rate specified in the registered program for the apprentice's level of progress, expressed as a percentage of the journeyman's hourly rate specified in the applicable wage determination. Apprentices shall be paid fringe benefits in accordance with the provisions of the apprenticeship program. If the apprenticeship program does not specify fringe benefits, apprentices must be paid the full amount of fringe benefits listed on the wage determination for the applicable classification. If the administrator determines that a different practice prevails for the applicable apprentice classification, fringe benefits shall be paid in accordance with that determination. In the event the Bureau of Apprenticeship and Training or a State Apprenticeship Agency recognized by the bureau withdraws approval of an apprenticeship program, the contractor will no longer be permitted to utilize apprentices at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

(ii) Trainees: Except as provided in 29 CFR° 5.16, trainees will not be permitted to work at less than the predetermined rate for the work performed unless they are employed pursuant to and individually registered in a program which has received prior approval, evidenced by formal certification, by the U.S. Department of Labor, Employment and Training Administration. The ratio of trainees to journeymen on the job site shall not be greater than permitted under the plan approved by the Employment and Training Administration. Every trainee must be paid at not less than the rate specified in the approved program for the trainee's level of progress, expressed as a percentage of the journeyman's hourly rate specified in the applicable wage determination. Trainees shall be paid fringe benefits in accordance with the provisions of the trainee program. If the trainee program does not mention fringe benefits, trainees shall be paid the full amount of fringe benefits listed on the wage determination unless the Administrator of the Wage and Hour Division determines that there is an apprenticeship program associated with the corresponding journeyman's wage rate on the wage determination which provides for less than full fringe benefits for apprentices. Any employee listed on the payroll at a trainee rate who is not registered and participating in a training plan approved by the Employment and Training Administration shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any trainee performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. In the event the Employment and Training Administration withdraws approval of a training program, the contractor will no longer be permitted to utilize trainees at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

(iii) Equal Employment Opportunity: The utilization of apprentices, trainees and journeymen under this part shall be in conformity with the equal employment opportunity requirements of Executive Order 11246, as amended, and 29 CFR Part 30.

5. COMPLIANCE WITH COPELAND ACT REQUIREMENTS.
The contractor shall comply with the requirements of 29 CFR Part 3, which are incorporated by reference.

6. CONTRACT TERMINATION: DEBARMENT.
A breach of contract clauses in 29 CFR §5.5 may be grounds for termination of the contract, and for debarment as a contractor and a subcontractor as provided in 29 CFR §5.12.

7. COMPLIANCE WITH DAVIS-BACON AND RELATED ACT REQUIREMENTS.
All rulings and interpretations of the Davis-Bacon and related acts contained in 29 CFR parts 1, 3, and 5 are herein incorporated by reference.

8. DISPUTES CONCERNING LABOR STANDARDS.
Disputes arising out of the labor standards provisions of this contract shall not be subject to the general disputes clause of this contract. Such disputes shall be resolved in accordance with the procedures of the Department of Labor set forth in 29 CFR parts 5, 6, and 7. Disputes within the meaning of this clause include disputes between the contractor (or any of its subcontractors) and the contracting agency, the U.S. Department of Labor, or the employees or their representatives.

9. CERTIFICATION OF ELIGIBILITY.
(i) By entering into this contract, the contractor certifies that neither it (nor he or she) nor any person or firm who has an interest in the contractor's firm is a person or firm ineligible to be awarded government contracts by virtue of Section 3(a) of the Davis-Bacon Act or 29 CFR §5.12(a)(1)
(ii) No part of this contract shall be subcontracted to any person or firm ineligible for award of a government contract by virtue of Section 3(a) of the Davis-Bacon Act or 29 CFR §5.12(a)(1).
(iii) The penalty for making false statements is prescribed in the U.S. Criminal Code, 18 U.S.C. §1001.

cta
6515 (rev 01/89)

**10. OVERTIME REQUIREMENTS.** ( ) ( ) ny part of the contract work which may require or inv the employment of laborers or mechanics shall require or permit any laborer or mechanic in any workweek in which he or she is employed on such work to work in excess of forty hours in such workweek unless such laborer or mechanic receives compensation at a rate not less than one and one-half times his basic rate of pay for all hours worked in excess of forty hours in such workweek.

**11. VIOLATION, LIABILITY FOR UNPAID WAGES: LIQUIDATION DAMAGES.**
In the event of any violation of the clause set forth in subparagraph (b)(1) 29 CFR §5.5. , the contractor and any subcontractor responsible therefor shall be liable for the unpaid wages. In addition, such contractor and subcontractor shall be liable to the United States (in the case of work done under contract for the District of Columbia or a territory, to such District or to such territory), for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic, including watchmen and guards, employed in violation of the clause set forth in subparagraph (b)(1) of 29 CFR §5.5 in the sum of $10 for each calendar day on which such individual was required or permitted to work in excess of eight hours or in excess of the standard workweek of forty hours without payment of the overtime wages required by the clause set forth in subparagraph (b)(1) of 29 CFR §5.5.

**12. WITHHOLDING FOR UNPAID WAGES AND LIQUIDATED DAMAGES.**
DOT, DPT or the CTA shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld, from any moneys payable on account of work performed by the contractor or subcontractor under any such contract or any other federal contract with the same prime contractor, or any other federally-assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same prime contractor, such sums as may be determined to be necessary to satisfy any liabilities of such contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth in subparagraph (b)(2) of 29 CFR §5.5

**13. NONCONSTRUCTION CONTRACTS.**
In addition to the clauses contained in 29 CFR §5.5(b) or paragraphs (10) through (14) herein. In any contract subject only to the Contract Work Hours and Safety Standards Act and not to any of the other statutes cited in 29 CFR §5.1. the recipient shall insert a clause requiring that the contractor or subcontractor shall maintain payrolls and basic payroll records during the course of the work and shall preserve them for a period of three years from the completion of the contract for all laborers and mechanics, including guards and watchmen, working on the contract. Such records shall contain the name and address of each such employee, social security number, correct classifications, hourly rates of wages paid, daily and weekly number of hours worked, deductions made, and actual wages paid. Further, the recipient shall require the contracting officer to insert in any such contract a clause providing that the records to be maintained under this paragraph shall be made available by the contractor or subcontractor for inspection, copying, or transcription by authorized representatives of DOT and the Department of Labor, and the contractor or subcontractor will permit such representatives to interview employees during working hours on the job.

**14. SUBCONTRACTS.**
The contractor or subcontractor shall insert in any subcontracts the clauses set forth in subparagraph (1) through (14) of this paragraph and also a clause requiring the subcontractors to include these clauses in any lower tier subcontracts. The prime contractor shall be responsible for compliance by any subcontractor or lower tier subcontractor with the clauses set forth in subparagraphs (1) through (14) of this paragraph.

**15. FINAL LABOR SUMMARY.**
The contractor and each subcontractor shall furnish to CTA, upon the completion of the contract, a summary of all employment, indicating for the completed project, the total hours worked and the total amount earned.

**16. FINAL CERTIFICATION.**
Upon completion of the contract, the contractor shall submit to CTA with the voucher for final payment for any work performed under the contract a certificate concerning wages and classifications for laborers and mechanics, including apprentices and trainees employed on the project, in the following form:

THE UNDERSIGNED, CONTRACTOR ON

B040P00219

(CONTRACT NO.)

HEREBY CERTIFIES THAT ALL LABORERS, MECHANICS, APPRENTICES, AND TRAINEES EMPLOYED BY HIM OR BY A SUBCONTRACTOR PERFORMING WORK UNDER THIS CONTRACT ON THE PROJECT HAVE BEEN PAID WAGES AT RATES NOT LESS THAN THOSE REQUIRED BY THE CONTRACT PROVISIONS, AND THAT THE WORK PERFORMED BY EACH SUCH LABORER, MECHANIC, APPRENTICE OR TRINEE CONFORMED TO THE CLASSIFICATIONS SET FORTH IN THE CONTRACT OR TRAINING PROGRAM PROVISIONS APPLICABLE TO THE WAGE RATE PAID.

SIGNATURE AND TITLE: _Gregory V. Gibbs, President_

**N. CERTIFIED PAYROLLS—CONSTRUCTION PROJECTS.** The CTA shall obtain from each contractor and subcontractor a certified copy of each weekly payroll within seven days after the regular payroll date, following a review by CTA for compliance with State and Federal labor laws. the payroll copy shall be retained at the project site for later review by UMTA/DRT.

A contractor may use the Department of Labor Form WH-347. "Optional Payroll Form". which provides for all the necessary payroll information certifications. This Department of Labor form may be purchased at nominal cost from the Superintendent of Documents. U.S. Government Printing Office. Washington. D.C. 20402. However. the contractor may use his own payroll form provided it includes the same information and certifications as the Department of Labor Form WH-348. "Statement of Compliance".

**O. TERMINATION FOR CONVENIENCE OF THE AUTHORITY.** The Authority may at any time terminate the contract by notice in writing to the contractor. On the receipt of such notice. the contractor shall immediately discontinue the work but shall do such extra work as is ordered therein to safeguard the work then completed and the materials and equipment then delivered and do such other extra work as may be ordered by the Authority for the purpose of leaving the work in a safe and useful condition.

Forthwith upon the Authority giving such notices of termination. the Authority shall estimate all the work done up to the time of the receipt of such notice and the contractor shall be entitled to and shall receive payment therefor in the manner provided in the contract. In addition thereto. the Authority will pay to

the contractor, in full and complete [illegible] ction and settlement for the contractor's inconvenience, [illegible] of [illegible] pated profits, cost of removing his equipment from the site and all other expenses [illegible] soev[illegible] percent of the difference between the contract price and the sum of the payments made to the contractor for work done to the date of receipt of the no[illegible] of termination. On completion, to the satisfaction of the Authority, of any extra work, the contract shall be deemed to be at an end and of no further force or effect and, except as hereinbefore provided, the Contractor shall have no claim against the Authority for any reason whatsoever by reason of the termination of the contract.

For the purpose of this article, "all of the work done" includes all materials ordered for this contract by the Contractor prior to the date of receipt of such notice of termination, whether or not they have been delivered to the fabrication site. The amount of payment for all such materials under this article shall be their actual necessary cost to the contractor up to the date of receipt of such notice of termination. all the contractor's right, title and interest in and to the materials mentioned in this article shall be vested in the Authority and the contractor shall upon demand of the Authority execute and deliver to the Authority all requisite bills of sale, assignments and other documents of transfer that may be necessary to give effect to the intention of this article.

P. **SINGLE BID REQUIREMENTS.** In the event a single bid is received, the CTA will conduct a price and/or cost analysis of the bid. A price analysis is the process of examining the bid and evaluating a prospective price without evaluating the separate cost elements. It should be recognized that a price analysis through comparison to other similar procurements must be based on an established or competitive price of the elements used in the comparison. The comparison must be made to a purchase of similar quantity and involving similar specifications. Where a difference exists, a detailed analysis must be made of this difference and costs attached thereto.

Where it is impossible to obtain a valid price analysis, it may be necessary for the CTA to conduct a costs analysis of the bid price. The price and/or cost analysis shall be made by competent and experienced auditors or price analysts, an engineer's estimate or comparison of the prices involved is insufficient. If the CTA does not have the capabilities to perform the needed analyses, UMTA will lend support in obtaining the services of the Defense Contract Audit Agency.

The CTA shall submit to UMTA all data and analyses of the determination prior to award of the contract.

Q. **WARRANTY OF CONSTRUCTION.** Refer to the Contract Documents for Warranty requirements.

R. **LIQUIDATED DAMAGES.** Refer to the Contract Documents for Liquidated Damages requirements.

S. **ENVIRONMENTAL AND ENERGY PROTECTION AND CONSERVATION REQUIREMENTS.** The facilities and equipment will meet the criteria for air and water pollution control and energy conservation as follows:

"All facilities and equipment acquired, constructed, reconstructed, or improved using UMTA and DPT grant funds, shall be designed and equipped to prevent or control air and water pollution in accordance with criteria issued by the Department of Health, Education and Welfare. However, in those locations where State or local air and water pollution regulations are in force, the more restrictive criteria shall govern."

"All contractors and suppliers must submit evidence to the CTA that the governing air and water pollution criteria will be met. This evidence and related documents will be retained by the sponsor for on-site examination by UMTA or DPT representatives."

"All contractors and suppliers shall recognize mandatory standards and policies relating to energy efficiency which are contained in the State energy conservation plan issued in compliance with the Energy Policy and Conservation Act (42 U.S.C. § 6321 et seq.).

T. **PROJECT SIGN.** The contractor shall erect and maintain signs, satisfactory to UMTA and DPT identifying the project and indicating Federal and State participation.

Form 715.46 replaces Section "U".
See Table of Contents to locate Form 715.46.

Form 715.46 replaces Section "U".
See Table of Contents to locate Form 715.46.

V. **CONTRACT WORK HOURS AND SAFETY STANDARDS ACT.** "It is a condition of this contract, and shall be made a condition of each subcontract entered into pursuant to this contract, that the contractor and any subcontractor shall comply with sections 103 and 107 of the Contract Work Hours and Safety Standards Act (40 USC 327-330) as supplemented by Department of Labor regulations (29 CFR Part 5), which are herein incorporated by reference.

W. **CARGO PREFERENCE—USE OF UNITED STATES—FLAG VESSELS.** The contractor agrees:
1. To utilize privately owned United States-flag commercial vessels to ship at least 50 percent of the gross tonnage (computed separately for dry bulk carriers, dry cargo liners, and tankers) involved, whenever shipping any equipment, materials or commodities pursuant to this contract, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels.
2. To furnish within 20 days following the date of loading for shipments originating within the United States, or within 30 working days following the date of loading for shipments originating outside the United States, a legible copy of a rated, "on-board" commercial ocean bill-of-lading in English for each shipment of cargo described in paragraph (1) above to the CTA (through the prime contractor in the case of subcontractor bills-of-lading) and to the Division of National Cargo, Office of Market Development, Maritime Administration, 400 Seventh Street, S.W., Washington, D.C. 20590, marked with appropriate identification of the Project.

X. **PATENT RIGHTS.**
1. In all third party contracts at any tier with any small business firm, non-profit organization, or university, the patent rights clause of Office of Management and Budget (OMB) Circular A-124, Attachment A, dated February 10, 1982, (implementing the Patent and Trademark Amendments of 1980, 35 U.S.C. §200 et seq.) will be applicable, when the purpose of its participation is to perform experimental, development, or research work.
2. In third party contracts at any tier with any other party (except a small business firm, non-profit organization, or university), the Recipient shall acquire for the Government those rights that would be due to the Government as set forth in the Patent Rights clause - Acquisition by the Government, at 41 C.F.R. 1-9.107-5(a).
3. Any deviations from the requirement of this section V must be approved in writing by the Secretary or, if appropriate, by his designee.

**The Contractor is also required to comply with the following clauses required by the U.S. Department of Transportation Federal Transit Administration as applicable:**

1. <u>Seismic Safety Requirements</u> - The Contractor agrees that any new building or addition to an existing building will be designed and constructed in accordance with the standards for Seismic Safety required in Department of Transportation Seismic Safety Regulations 49 CFR Part 41 and will certify to compliance to the extent required by regulation. The Contractor also agrees to ensure that all work performed under this contract including work performed by a subcontractor is in compliance with the standards required by the Seismic Safety Regulations and the certification of compliance issued on the project.

2. <u>Recycled Products</u> - The Contractor agrees to comply with all the requirements of Section 6002 of the Resource Conservation and Recovery Act (RCRA), as amended (42 U.S.C. 6962), including but not limited to the regulatory provisions of 40 CFR Part 247, and Executive Order 12873, as they apply to the procurement of the items designated in Subpart B of 40 CFR Part 247.

3. <u>No Obligation by the Federal Government</u> - The Contractor acknowledges and agrees that, notwithstanding any concurrence by the Federal Government in or approval of the solicitation or award of the underlying contract, absent the express written consent by the Federal Government, the Federal Government is not a party to this contract and shall not be subject to any obligations or liabilities to the Contractor, or any other party pertaining to any matter resulting from the underlying contract.

4. <u>Privacy Act</u> - The following requirements apply to a Contractor and its employees that administer any system of records on behalf of the Federal Government under any contract.

> A) The Contractor agrees to comply with, and assure the compliance of its employees with, the information restrictions and other applicable requirements of the Privacy Act of 1974, 5 USC subsection 552a. The Contractor agrees to obtain the express consent of the Federal Government before the Contractor or its employees operate a system of records on behalf of the Federal Government. The Contractor understands that the requirements of the Privacy Act, including the civil and criminal penalties for violation of that Act, apply to those individuals involved, and that failure to comply with the terms of the Privacy Act may result in termination of the underlying contract.

> B) The Contractor also agrees to include these requirements in each subcontract to administer any system of records on behalf of the Federal Government financed in whole or in part with FTA funding.

5. <u>Access to Records and Reports</u> - The following access to records requirement apply to this Contract.

> A) The Contractor agrees to provide the Authority, the FTA Administrator, the Comptroller General of the United States or any other authorized representatives access to any books, documents, papers and records of the Contractor which are directly pertinent to this Contract for the purposes of making audits, examination, excerpts and transcriptions. Contractor also agrees, pursuant to 49C.F.R. 633.17 to provide the FTA Administrator or his authorized representatives access to Contractor's records and construction sites pertaining to a major capital project, defined at 49U.S.C. 5302(a)1, which is receiving federal financial assistance through the programs described at 49U.S.C. 5307, 5309 or 5311. By definition, a major capital project excludes contracts of less than the simplified acquisition threshold currently set at $100,000.

> B) For any contract for a capital project or improvement entered into which was not the result of competitive bidding, the Contractor shall make available records related to the Contract to the Authority, the FTA and the Comptroller General or any authorized officer or employee of any of them for the purposes of conducting an audit and inspection.

<div align="center">GR-10a</div>

C) The Contractor agrees to permit the authorized representatives to reproduce by any means whatsoever or to copy excerpts and transcriptions as reasonable needed.

D) The Contractor agrees to maintain all books, records, accounts and reports required under this contract, except in the event of litigation or settlement of claims arising from the performance of this contract, in which case Contractor agrees to maintain same under the Authority, the FTA Administrator, the Comptroller General, or any of their dully authorized representatives, have disposed of all such litigation, appeals, claims or exceptions related thereto.

6.   Fraud and False or Fraudulent Statements or Related Acts - The Contractor acknowledges that the provisions of the Program Fraud Civil Remedies Act of 1986, as amended, 31 U.S.C. subsection 3801 et seq and U.S. Department of Transportation and FTA regulations, "Program Fraud Civil Remedies", 49 C.F.R. Part 31, apply to its actions pertaining to this Contract.

By submitting a proposal and execution of the Contract, the Contractor certifies or affirms the truthfulness and accuracy of any statement it has made, it makes, it may make, or causes to be made, pertaining to the Contract Documents.   In addition to other penalties that may be applicable the Contractor further acknowledges that if it makes, or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification, the Federal Government reserves the right to impose the penalties of the Program Fraud Civil Remedies Act of 1986 on the Contractor.  The Contractor also acknowledges that it makes, or causes to be made, a false, fictitious, or fraudulent claim, statement, submission, or certification to the Federal Government under a contract connected with a project that is financed in whole or in part with Federal assistance originally awarded by FTA under the authority of 49 U.S.C. subsection 5307, the Government reserves the right to impose the penalties of 18 U.S.C. subsection 5307, the Government reserves the right to impose the penalties of 18 U.S.C. subsection 1001 and 49 U.S.C. subsection 5307(n)(1) on the Contractor, to the extent the Federal Government deems appropriate.  The Contractor agrees to include the above language in each subcontract without modification, except to identify the subcontractor who will be subject to the provisions.

7. Incorporation of Federal Transit Administration (FTA) Terms - The provisions in this "Standard Government Requirements for Construction Contract" exhibit include, in part, certain Standard Terms and Conditions required by FTA, whether or not expressly set forth in the preceding contract provisions.  All contractual provisions required by FTA, as set forth in FTA Circular 4220.1D, dated April 15, 1996, are hereby incorporated by reference.  The Contractor shall not perform any act, fail to perform any act, or refuse to comply with any Authority requests which would cause the Authority to be in violation of FTA terms and conditions.

8. Clean Air - (1) The Contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. (7401et seq.).  The Contractor agrees to report each violation to the Purchaser and understands and agrees that the Purchaser will, in turn, report each violation as required to assure notification to FTA and the appropriate EPA Regional Office.  (2) The Contractor also agrees to include these requirements in each subcontract exceeding $100,000 financed in whole or in part with Federal assistance provided by FTA.

9.      Federal Changes - Contractor shall at all times comply with all applicable FTA regulations, policies, procedures and directives, including without limitation those listed directly or by reference in the Agreement (Form FTA MA (4) dated October 1, 1997) between Purchaser and FTA, as they may be amended or promulgated from time to time during the term of this contract.  Contractor's failure to so comply shall constitute a material breach of this contract.

PAGES GR-11, 12, & 13 ARE OMITTED

Form 415.62 replaces Section "Z".
See Table of Contents for location of 415.62.

```
------------------------------------------------------------
  BRIL0021-004 06/01/2003
------------------------------------------------------------
```

|                                              | Rates    | Fringes |
|----------------------------------------------|----------|---------|
| Marble mason.............................    | $ 31.75  | 9.63    |

```
* BRIL0052-001 06/01/2004
------------------------------------------------------------
```

|                                              | Rates    | Fringes |
|----------------------------------------------|----------|---------|
| Pointer, cleaner and caulker...              | $ 33.50  | 10.45   |

```
 CARP0555-001 06/01/2002
------------------------------------------------------------
```

|                                              | Rates    | Fringes |
|----------------------------------------------|----------|---------|
| Carpenter                                    |          |         |
| CARPENTERS, LATHERS, MLLWRIGHTS, · PILEDRIVER, & SOFT FLOOR LAYERS..........| $ 31.97 | 8.70    |

```
 CARP0555-002 10/01/2002
------------------------------------------------------------
```

RESIDENTIAL:

|                                              | Rates    | Fringes |
|----------------------------------------------|----------|---------|
| Carpenter (Excluding structures with elevators and structures over 3 1/2 stories).| $ 31.97 | 8.70    |

```
 ELEC0009-003 05/28/2002
------------------------------------------------------------
```

|                                              | Rates    | Fringes |
|----------------------------------------------|----------|---------|
| Line Construction                            |          |         |
| Equipment Operator.........                  | $ 32.45  | 38.72%  |
| Groundman..................                  | $ 25.31  | 38.72%  |
| Lineman....................                  | $ 32.45  | 38.72%  |

```
 ELEC0134-001 06/05/2000
------------------------------------------------------------
```

|                                              | Rates    | Fringes  |
|----------------------------------------------|----------|----------|
| BUILDING CONSTRUCTION                        |          |          |
| Electricians................                 | $ 30.50  | 12.59+3% |

```
 ELEC0134-002 04/01/1998
------------------------------------------------------------
```

|  | Rates | Fringes |
|---|---|---|

Electrician ((CLASS B)
(Install magnetic or
electronic replacement
ballasts either singly or in
groups including necessary
wiring within fixture;
Install replacement lamp
holders and/or sockets
including necessary wiring
within fixture including
relocating sockets within
fixture; Install replacement
lighting circuit breakers
where necessary; Install
replacement lighting switches
where necessary; Repair
lighting fixtures other than
ballast or socket
replacements; Rewire
chandeliers or incandescent
fixtures only within fixtures
themselves.)................$ 20.71          2.975+a+b

FOOTNOTES:

a-Paid Vacation- Employees who have been employed for one
year but less than three years receive 1 week of paid
vacation; employees who have been employed three years but
less than ten years receive 2 weeks of paid vacation;
Employees who have been employed ten years but less than
twenty years receive 3 weeks of paid vacation; and
employees who have worked twenty or more years receive 4
weeks of paid vacation.

b-Funeral Leave-In the instance of the death of a mother,
other-in-law-; father, father-in-law, sister, brother,
husband, wife, or a child of an employee shall receive up
to three days of paid funeral leave.
-----------------------------------------------------------
ELEC0134-003 01/01/1997


|  | Rates | Fringes |
|---|---|---|

Electrician
    ELECTRICAL TECHNICIAN.......$ 22.55          5.28+13%

The work shall consist of the installation, operation,
inspection, maintenance, repair and service of radio,

television, recording, voice sound vision production and reproduction, telephone and telephone interconnect, facsimile, data appatatus, coaxial, fibre optic and wireless equipment, appliances and systems used for the transmission and reception of signals of any nature, business, domestic, commercial, education, entertainment and residential purposes, including but not limited to communication and telephone, electronic and sound equipment, fibre optic and data communication systems, and the performance of any task directly related to such installation or service whether at new or existing sites, such tasks to include the placing of wire and cable and electrical power conduit or other raceway work within the equipment room and pulling wire and/or cable through conduit and the installation of any incidential conduit.

-----------------------------------------------
ELEV0002-003 07/03/2002
-----------------------------------------------

|  | Rates | Fringes |
|---|---|---|
| Elevator Mechanic..............$ 34.475 | | 7.455+A+B |

FOOTNOTES:

A. Seven paid holidays: New Year's Day; Memorial Day; Independence Day; Labor Day; Thanksgiving Day; Day after Thanksgiving; and Christmas Day.

B. Employer contributes 8% of regular basic hourly rate as vacation pay credit for employees with more than 5 years of service; and 6% for 6 months to 5 years of service.

-----------------------------------------------
ENGI0150-006 06/01/2004
-----------------------------------------------

BUILDING & RESIDENTIAL

|  | Rates | Fringes |
|---|---|---|
| Power equipment operators: | | |
| GROUP  1...................$ 37.60 | | |
| GROUP  2...................$ 36.30 | | 13.30 |
| GROUP  3...................$ 33.75 | | 13.30 |
| GROUP  4...................$ 32.00 | | 13.30 |
|  | | 13.30 |

POWER EQUIPMENT OPERATORS CLASSIFICATIONS

GROUP 1:  Mechanic; Asphalt Plant*; Asphalt Spreader; Autograde*; Backhoes with Caisson attachment*:Batch Plant*; Benoto(Requires two Engineers); Boiler and Throttle Valve; Caisson Rigs*; Central Redi-Mix Plant*; Combination Backhoe

Front Endloader Machine; Compressor and Throttle Valve; Concrete Breaker (Truck Mounted)*; Concrete Conveyor, Truck Mounted; Concrete Paver over 27E cu. ft.*; Concrete Paver 27E cu ft and Under*; Concrete Placer*; Concrete Placing Boom; Concrete Pump (Truck Mounted); Concrete Tower; Cranes*; Cranes, Hammerhead*; Cranes, (GCI and similar type Requires two operators only); Creter Crane; Crusher, Stone, etc; Derricks; Derricks, Traveling*; Formless Curb and Gutter Machine*; Grader, Elevating; Grouting Machines; Highlift Shovels or Front Endloader 2 1/4 yd. and over; Hoists, Elevators, Outside Type Rack and pinion and similar Machines; Hoists, One, Two, and Three Drum; Hoists, Two Tugger One Floor; Hydraulic Backhoes*; Hydraulic Boom Trucks; Hydraulic Vac Drivers amd Skid Rig*; Post Hole Digger; Pre- Stress Machine; Pump Cretes Dual Ram(Requiring frequent Lubrication and Water); Pump Cretes; Squeeze Cretes-Screw Type Pumps Gypsum Bulker and Pump; Raised and Blind Hole Drill*; Roto Mill Grinder (36" and Over)*; Roto Mill Grinder (Less Than 36")*; Scoops-Tractor Drawn; Slip-Form Paver*; Straddle Buggies; Tournapull; Tractor with Boom, and Side Boom; and Trenching Machines*.

GROUP 2:   Bobcat (over 3/4 cu yd); Boilers; Broom, Power Propelled; Bulldozers; Concrete Mixer (Two Bag and over); Conveyor, Portable; Forklift Trucks; Greaser Engineer; Highlift Shovels or Front End loaders under 2 1/4 cu yd; Aotomatic Hoists, Hoists, Inside Elevators; Hoists, Sewer Dragging Machine; Hoists, Tugger Single Drum; Laser Screed; Rock Drill (Self-Propelled); Rock Drill (Truck Mounted)*; Rollers; Steam Generators; Tractors; Tractor Drawn Vibratory Roller (Receives an additional $.50 per hour); Winch Trucks with "A" Frame.

GROUP 3:   Air Compressor-Small 250 and Under (1 to 5 not to exceed a total of 300 ft); Air Compressor-Large over 250; Combination-Small Equipment Operator; Generator- Small .50 kw and under; Generator-Large over 50 kw; Heaters, Mechanical; Hoists, Inside Elevators (Remodeling or Renovatin work); Hydrualic Power Units (Pile Driving, Extracting, and Drilling); Low Boys; Pumps Over 3" (1 To 3 not to exceed a total of 300 ft); Pumps, Well Points; Welding Machines (2 through 5); Winches, 4 Small Electric Drill Winches; Bobcat (up to and including 3/4 cu yd)

GROUP  4 - Bobcats and/or other Skid Steer Loaders; Brick Forklifts; Oilers

*-Requires Oiler

---

ENGI0150-025 06/01/2004

|  | Rates | Fringes |
|---|---|---|
| Power equipment operators: | | |
| GROUP 1 | $ 35.80 | |
| GROUP 2 | $ 35.25 | 13.30 |
| GROUP 3 | $ 33.20 | 13.30 |
| GROUP 4 | $ 31.80 | 13.30 |
| GROUP 5 | $ 30.60 | 13.30 |
|  |  | 13.30 |

POWER EQUIPMENT OPERATORS CLASSIFICATIONS

GROUP 1: Asphalt Plant*; Asphalt Heater and Planer combination; Asphalt Heater Scarfire*,Asphalt Spreader; Autograder/ GOMACO or similar; ABG Paver*, Backhoes with Caisson attachment*, Ballast Regulator,Belt Loader*;Caisson Rigs*Car Dumper, Central Redi-Mix Plant*;Combination Backhoe; Front End Loader Machine (1 cu yd or over Backhoe bucket or with attachments); Concrete Breaker (truck mounted);Concrete Conveyor; Concrete Paver over 27E cu ft*; Concrete Placer*; Concrete Tube Float; Cranes, all attachments*; Cranes, Hammerhead, Linden, Peco and machines of a like nature*; Creter Crane; Crusher, stone; All Derricks; Derrick Boats; Derricks, traveling*; Dowell Machine with Air Compressor ($1.00 above Class 1); Dredges*; Field Mechanic Welder; Formless Curb and Gutter Machine*; Gradall and machines of a like nature*; Grader, Elevating; Grader, Motor Grader, Motor Patrol, Auto Patrol, Form Grader, Pull Grader, Subgrader*; Guard Rail Post Driver mounted*; Hoists, one, two, and three Drum; Hydraulic Backhoes*; Backhoes with Shear attachments*; Mucking Machine; Pile Drivers and Skid Rig*; Pre-Stress Machine; Pump Cretes Dual Ram (requires frequent lubrication and water)*; Rock Drill- Crawler or Skid Rig*; Rock Drill truck mounted*; Rock/ Track Tamper; Roto Mill Grinder, (36" and over)*; Slip-Form Paver*; Soil Test Drill Rig, truck mounted*; Straddle Buggies; Hydraulic Telescoping Form (tunnel); Tractor Drawn Belt Loader*; Tractor Drawn Belt Loader with attached Pusher(two engineers); Tractor with boom; Tractaire with attachment; Traffic Barrier Transfer Machine*; Trenching Machine; Truck Mounted Concrete Pump with boom*; Underground Boring and/or Mining Machines 5 ft in diameter and over tunnel, etc.*; Wheel Excavator* & Widener (Apsco); Raised or Blind Hoe Drill, Tunnel & Shaft*

GROUP 2: Batch Plant*; Bituminous Mixer; Boiler and Throttle Valve; Bulldozer; Car Loader Trailing Conveyors; Combination Backkhoe Front End Loader Machine, (less than 1

cu yd Backhoe Bucket with attachments); Compressor and Throttle Valve; Compressor, common receiver (3); Concrete Breaker or Hydro Hammer; Concrete Grinding Machine; Concrete Mixer or Paver 7S series to and including 27 cu ft; Concrete Spreader; Concrete Curing Machine; Burlap Machine; Belting Machine and Sealing Machine; Concrete Wheel Saw; Conveyor Muck Cars (Haglund or similar type); Drills (all); Finishing Machine-Concrete; Greaser Engineer; Highlift Shovels or Front End Loader; Hoist- Sewer Dragging Machine; Hydraulic Boom Trucks, all attachments; Hydro-Blaster (requires two operators); Laser Screed*; Locomotives, Dinky; Off-Road Hauling Units (including articulating); Pump Cretes; Squeeze Cretes-Screw Type pumps, Gypsum Bulker and Pump; Roller Asphalt; Rotary Snow Plows; Rototiller, Seaman, self-Propelled; Scoops-Tractor Drawn; Self- propelled Compactor; Spreader-Chip-Stone; Scraper; Scraper-Prime Mover in Tandem regardless of size (add $1.00 to Group 2 hourly rate for each hour and for each machine attached thereto add $1.00 to Group 2 hourly rate for each hour); Tank Car Heater; Tractors, Push, pulling Sheeps Foot, Disc, or Compactor, etc; Tug Boats

GROUP 3: Boilers; Brooms, all power propelled; Cement Supply Tender; Compressor, Common Receiver (2); Concrete Mixer, two bag and over; Conveyor, Portable; Farm type Tractors used for mowing, seeding, etc; Fireman on Boilers; Forklift Trucks; Grouting Machines; Hoists; Automatic; Hoists, all Elevators; Hoists, Tugger single Drum; Jeep Diggers; Low Boys; Pipe Jacking Machines; Post-hole Digger; Power Saw, Concrete, Power Driven; Pug Mills; Rollers, other than asphalt; Seed and Straw Blower; Steam Generators; Stump Machine; Winch Trucks with A-Frame; Work Boats; Tamper-Form motor driven

GROUP 4: Air compressor - Small 250 and under (1 to 5 not to exceed a total of 300 ft); Air Compressor - Large over 250; Combination - Small Equipment Operator; Directional Boring Machine; Generators - Small 50 kw and under; Generators - Large , over 50 kw; Heaters, Mechanical; Hydraulic power unit (Pile Driving, Extracting or Drilling); Light Plants (1 to 5); Pumps, over 3" (1 to 3, not to exceed a total of 300 ft); Pumps, Well Points; Tractaire; Welding Machines (2 through 5); Winches, 4 small electric drill winches;

GROUP 5: Bobcats (All); Brick Forklifts; Oilers; Directional Boring

*-Requires Oiler

--------------------------------------------------------------

IRON0001-002 06/01/2002

|                                                              | Rates    | Fringes |
|--------------------------------------------------------------|----------|---------|
| Ironworker (Structural and Reinforcing)......................| $ 32.58  | 16.01   |

IRON0063-001 06/01/2002

|                                           | Rates   | Fringes |
|-------------------------------------------|---------|---------|
| Ironworker, Ornamental.....................| $ 29.85 | 15.19   |

IRON0063-002 01/01/2003

|                                            | Rates   | Fringes |
|--------------------------------------------|---------|---------|
| Ironworker                                 |         |         |
| FENCE ERECTORS.....................| $ 29.83 | 14.89   |
| METAL FENCE ERECTORS...............| $ 22.54 | 12.04   |

IRON0136-001 07/01/2002

|                                                | Rates   | Fringes |
|------------------------------------------------|---------|---------|
| Ironworker                                     |         |         |
| Machinery Movers & Riggers..| $ 23.65 | 17.42   |
| Master Riggers.....................| $ 25.40 | 17.42   |

* LABO0002-006 06/01/2004

|                                  | Rates    | Fringes |
|----------------------------------|----------|---------|
| Laborers:                        |          |         |
| LABORERS (BUILDING & RESIDENTIAL): |        |         |
| GROUP  1......................| $ 29.00  |         |
| GROUP  2......................| $ 28.90  | 9.97    |
| GROUP  3......................| $ 29.075 | 9.97    |
| GROUP  4......................| $ 29.10  | 9.97    |
| GROUP  5......................| $ 29.15  | 9.97    |
| GROUP  6......................| $ 29.20  | 9.97    |
| GROUP  7......................| $ 29.225 | 9.97    |
| GROUP  8......................| $ 29.325 | 9.97    |
| GROUP  9......................| $ 29.35  | 9.97    |
| GROUP 10......................| $ 29.45  | 9.97    |
| GROUP 11......................| $ 29.575 | 9.97    |
| GROUP 12......................| $ 29.65  | 9.97    |
|                                  |          | 9.97    |

LABORERS CLASSIFICATIONS (BUILDING & RESIDENTIAL)

GROUP 1:   Building Laborers; Plasterer Tenders; Pumps for Dewatering; and other unclassified laborers.

GROUP 2:   Fireproofing and Fire Shop laborers.

GROUP 3:   Cement Gun.

GROUP 4:   Chimney over 40 ft.; Scaffold Laborers.

GROUP 5:   Cement Gun Nozzle Laborers (Gunite); Windlass and capstan person.

GROUP 6:   Stone Derrickmen & Handlers.

GROUP 7:   Jackhammermen; Power driven concrete saws; and other power tools.

GROUP 8:   Firebrick & Boiler Laborers.

GROUP 9:   Chimney on fire brick; Caisson diggers; & Well Point System men.

GROUP 10:  Boiler Setter Plastic Laborers.

GROUP 11:  Jackhammermen on fire brick work only.

GROUP 12:  Dosimeter use (any device) monitoring nuclear exposure); Asbestos Abatement Laborer; Toxic and Hazardous Waste Removal Laborers.
----------------------------------------------------------------

* LABO0002-007 06/01/2004

|  | Rates | Fringes |
|---|---|---|
| Laborers: | | |
| LABORERS (HEAVY AND HIGHWAY): | | |
| GROUP 1 | | |
| GROUP 2 | $ 29.00 | 9.97 |
| GROUP 3 | $ 29.075 | 9.97 |
| GROUP 4 | $ 29.15 | 9.97 |
| GROUP 5 | $ 29.275 | 9.97 |
|  | $ 29.655 | 9.97 |

LABORERS CLASSIFICATIONS

GROUP 1:  Common laborer; Tenders; Material expeditor (asphalt plant); Street paving, Grade separation, sidewalk, curb & gutter, strippers & All laborers not otherwise mentioned

GROUP 2: Ashpalt tampers & smoothers; Cement gun laborers

GROUP 3: Cement Gun Nozzle (laborers)
Gunite

GROUP 4: Rakers, Lutemen; Machine-Screwmen; Kettlemen;
Mixermen; Drun-men; Jackhammermen (asphalt); Paintmen;
Mitre box spreaders; Laborers on birch, overman and similar
spreader equipment; Laborers on APSCO; Laborers on air
compressor; Paving Form Setter; Jackhammermen (concrete);
Power drive concrete saws; other power tools.

GROUP 5: Asbestos Abatement Laborers; Toxic and Hazardous
Waste Removal Laborers, Dosimeter (any device) monitoring
nuclear exposure
----------------------------------------------------------------
LABO0002-008 06/01/2002

| | Rates | Fringes |
|---|---|---|
| Laborers: (COMPRESSED AIR) | | |
| 0 - 15 POUNDS...............$ 29.00 | | |
| 16 - 20 POUNDS...............$ 30.50 | | 6.67 |
| 21 - 26 POUNDS...............$ 31.00 | | 6.67 |
| 27 - 33 POUNDS...............$ 32.00 | | 6.67 |
| 34 - AND OVER...............$ 33.00 | | 6.67 |
| | | 6.67 |

----------------------------------------------------------------
LABO0225-001 06/01/2002

| | Rates | Fringes |
|---|---|---|
| Laborers: (DEMOLITION/WRECKING) | | |
| TOTAL DEMOLITION or | | |
| dismatling of buildings | | |
| and all structures in their | | |
| entirety | | |
| Burners, Wallmen, Power | | |
| Tool and Equipment Operator$ 22.70 | | 6.67 |
| Total Demolition Laborer...$ 22.20 | | 6.67 |

----------------------------------------------------------------
MARB0025-001 06/01/2003

| | Rates | Fringes |
|---|---|---|
| Tile Finisher................$ 26.45 | | 6.20 |

----------------------------------------------------------------
MARB0067-001 06/01/2001

| | Rates | Fringes |
|---|---|---|

```
       Tile Setter.....................$ 28.42
       -----------------------------------------------        8.02
       MARB0067-002 06/01/2001
```

|  | Rates | Fringes |
|---|---|---|
| Terrazzo Worker.................$ 27.37 |  | 9.35 |

```
       MARB0087-001 06/01/1999
```

|  | Rates | Fringes |
|---|---|---|
| Marble Finisher................$ 20.78 |  | 7.40 |

```
       PAIN0014-001 06/01/2004
```

|  | Rates | Fringes |
|---|---|---|

Painter
```
       Drywall Taper...............$ 32.10                     10.92
       Painter, Brush; Decorator;
       and    Paperhanger..........$ 32.10                     10.92
       PAIN0014-004 06/01/2004
```

|  | Rates | Fringes |
|---|---|---|
| Painter, Brush.................$ 32.10 |  | 10.92 |

```
       PAIN0027-001 06/01/2003
```

|  | Rates | Fringes |
|---|---|---|
| Glazier........................$ 29.00 |  | 13.67 |

```
       PLAS0005-002 06/01/2001
```

|  | Rates | Fringes |
|---|---|---|
| Plasterer......................$ 28.44 |  | 8.41 |

```
       PLAS0502-001 06/01/2002
```

|  | Rates | Fringes |
|---|---|---|
| Cement Mason...................$ 32.00 |  | 8.79 |

```
       PLUM0130-001 06/01/2002
```

|  | Rates | Fringes |
|---|---|---|

Plumber..........................$ 35.00

                                                        8.32

PLUM0597-002 06/01/2002

                              Rates                Fringes

Pipefitter.......................$ 33.48

                                                      10.06

ROOF0011-001 12/01/2003

                              Rates                Fringes

Roofer...........................$ 31.45

                                                       7.75

SFIL0281-001 06/01/2001

                              Rates                Fringes

Sprinkler Fitter.................$ 33.82

                                                       7.85

SHEE0073-001 06/01/1999

                              Rates                Fringes

Sheet Metal Worker...............$ 28.56

                                                      10.34

SHEE0073-002 06/01/1999

RESIDENTIAL:

                              Rates                Fringes

Sheet Metal Worker
   ALUMINUM GUTTER WORK........$ 15.63

                                                      10.34

TEAM0731-001 06/01/2002

HEAVY & HIGHWAY

                              Rates                Fringes

Truck Driver
   2 & 3 Axles..................$ 25.90
   4 Axles......................$ 26.15              7.00 +A+B
   5 Axles......................$ 26.35              7.00 +A+B
   6 Axles......................$ 26.55              7.00 +A+B
                                                     7.00 +A+B

FOOTNOTES FOR TRUCK DRIVERS (HEAVY & HIGHWAY):

A.  Paid Holidays:  New Year's Day, Memorial Day,
Independence Day, Labor Day, Thanksgiving Day, and
Christmas Day.

B.  900 straight time hours or more in 1 calendar year for
the same employer shall receive 1 week paid vacation; 3
years - 2 weeks paid vacation; 10 years - 3 weeks paid
vacation; 20 years - 4 weeks paid vacation.
-------------------------------------------------------------
TEAM0731-002 06/01/2002

|  | Rates | Fringes |
|---|---|---|
| Truck Driver (DEMOLITION) | | |
| 2 OR 3 Axles...............$ 25.90 | | 7.00 |
| 4 Axles....................$ 26.15 | | 7.00 |
| 5 Axles....................$ 26.35 | | 7.00 |
| 6 Axles....................$ 26.55 | | 7.00 |

-------------------------------------------------------------
TEAM0731-003 05/01/1997

|  | Rates | Fringes |
|---|---|---|
| Traffic Control Device Monitor TRAFFIC SAFETY WORKERS: Traffic Safety Worker primary duties include but are not limited to the delivery, maintenance and pick-up of traffic control devices, the set-up and installation of traffic signs, pavement markings, barricades, crash barrels and glare screens,  and traffic control surveillance, the repair and  maintenance of the company's trucks, cars, arrow  boards, message signs, barricade and sign fabrication  equipment.....$ 16.15 | | 108.75/wk+a |

FOOTNOTE a:

1. The following paid holidays: New Year's Day; Memorial Day;
Independence Day; Labor Day; Thanksgiving Day; and
Christmas Day  provided the employee has earned a vacation
the previous year or have worked thirty-one days in the
current year before the holiday, or have seniority as

stated herein; work the scheduled work day before and the scheduled day after the holiday; work one day in the holiday week; and work one scheduled work day after the holiday.

2. Paid vacation is earned the first year of employment, but may not be taken until after their first anniversary date. One and two years of employment receive 40 hours of paid vacation; Three thru nine years of employment receive 80 hours of paid vacation; Ten thru nineteen years of employment receive 120 hours of paid vacation; and Twenty years and over receive 160 hours of paid vacation.

3. Personal time (floating holidays) will be earned on a per hour worked basis. New employees will earn personal time during the first year of employment, but may not be take personal time until after their first anniversary date. Personal time is earned in the following way: One and two years receive 8 hours of personal time; Three thru nine years receive sixteen hours of personal time; and ten years and over receive twenty-four hours of personal time.
----------------------------------------------------------------
TEAM0786-001 06/01/2002

BUILDING & RESIDENTIAL

|  | Rates | Fringes |
|---|---|---|
| Truck Driver |  |  |
| 2 & 3 Axles.................$ 25.95 |  |  |
| 4 Axles.....................$ 26.20 |  | d,e,f |
| 5 Axles.....................$ 26.40 |  | d,e,f |
| 6 Axles.....................$ 26.60 |  | d,e,f |
|  |  | d,e,f |

FOOTNOTES FOR TRUCK DRIVERS (BUILDING & RESIDENTIAL):

d.  $276.00 per week.

e.  Paid Holidays:  New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

f.  900 straight time hours or more in 1 calendar year for the same employer shall receive 1 week paid vacation; 3 years - 2 weeks paid vacation; 10 years - 3 weeks paid vacation; 20 years - 4 weeks paid vacation.

----------------------------------------------------------------

WELDERS - Receive rate prescribed for craft performing

operation to which welding is incidental.
=============================================================

Unlisted classifications needed for work not included within
the scope of the classifications listed may be added after
award only as provided in the labor standards contract clauses
(29CFR 5.5 (a) (1) (ii)).

-----------------------------------------------------------------

In the listing above, the "SU" designation means that rates
listed under the identifier do not reflect collectively
bargained wage and fringe benefit rates. Other designations
indicate unions whose rates have been determined to be
prevailing.

-----------------------------------------------------------------

WAGE DETERMINATION APPEALS PROCESS

1.) Has there been an initial decision in the matter? This can
be:

*  an existing published wage determination
*  a survey underlying a wage determination
*  a Wage and Hour Division letter setting forth a position on
   a wage determination matter
*  a conformance (additional classification and rate) ruling

On survey related matters, initial contact, including requests
for summaries of surveys, should be with the Wage and Hour
Regional Office for the area in which the survey was conducted
because those Regional Offices have responsibility for the
Davis-Bacon survey program. If the response from this initial
contact is not satisfactory, then the process described in 2.)
and 3.) should be followed.

With regard to any other matter not yet ripe for the formal
process described here, initial contact should be with the
Branch of Construction Wage Determinations. Write to:

        Branch of Construction Wage Determinations
        Wage and Hour Division
        U.S. Department of Labor
        200 Constitution Avenue, N.W.
        Washington, DC 20210

2.) If the answer to the question in 1.) is yes, then an
interested party (those affected by the action) can request
review and reconsideration from the Wage and Hour Administrator

(See 29 CFR Part 1.8 and 29 CFR Part 7). Write to:

> Wage and Hour Administrator
> U.S. Department of Labor
> 200 Constitution Avenue, N.W.
> Washington, DC 20210

The request should be accompanied by a full statement of the interested party's position and by any information (wage payment data, project description, area practice material, etc.) that the requestor considers relevant to the issue.

3.) If the decision of the Administrator is not favorable, an interested party may appeal directly to the Administrative Review Board (formerly the Wage Appeals Board). Write to:

> Administrative Review Board
> U.S. Department of Labor
> 200 Constitution Avenue, N.W.
> Washington, DC 20210

4.) All decisions by the Administrative Review Board are final.

================================================================

END OF GENERAL DECISION

## BID PROTEST PROCEDURES

### SECTION I - AUTHORITY BID PROTEST PROCEDURE

A. The Chicago Transit Authority (CTA/ Authority) will hear and consider a bona fide bid protest regarding its procurement actions. It is anticipated that the majority of protests will be evaluated and finally decided by the Authority. Accordingly, the Authority intends to provide a thorough review of all bona fide bid protests. The Authority's primary concern, however, is the timely procurement of needed capital equipment, supplies or services. It does not intend to allow the filing of bid protests to unnecessarily delay the procurement process, especially if the protest involved is vexatious or frivolous in nature.

Notwithstanding the availability of these protest procedures, any interested party is encouraged to exhaust all methods described in the Contract Documents of resolving a procurement issue before filing a formal protest with the Authority. In its consideration of a bid protest, the Authority reserves the right to give due consideration to the good faith efforts of the protestor to resolve the issue involved through informal methods.

*Note. The Federal Transit Administration (FTA) will be notified by the Authority of all formal, written protests, when FTA funds are involved.*

B. **Definitions** For purposes of this section -
    1. The term "days" refers to working days of the Authority
    2. The term "interested party" means any person (a) who is an actual bidder or prospective bidder in the procurement involved, and (b) whose direct economic interest would be affected by the award of the contract or by a failure to award the contract.

C. **Submission of Protests**
Any interested party may file a bid protest with the Authority on the basis that the Authority has failed to comply with applicable Federal or State law or with the Authority's Procurement Regulations. The protest must be filed in accordance with the timing requirements set forth in Subsection D of this section, and must include:

    1. The name and address of the protestor,
    2. The number of the contract solicitation;
    3. A statement of the grounds for the protest, and in particular the Federal or State law or Authority Regulation alleged to have been violated. This statement should be accompanied by any supporting documentation the protesting party desires the Authority to consider in making its decision.

Protests should be submitted to:    General Manager, Purchasing
        Chicago Transit Authority
        P.O. Box 7560
        Chicago, IL 60680-7560

D. **Types of Protests and Timing**
The requirement for timely filing of a bid protest with the Authority will depend upon the type of protests involved. The Authority will consider the following three types of protests by interested parties:

    1. **Protests regarding solicitation**
    Any bid protest regarding the solicitation by the Authority must be filed **no later than five (5) days before the opening of bids.** Any protest filed after that date which raises issues regarding the solicitation will not be considered by the Authority.

This type of protest would include any claim that the bid solicitation contained exclusionary or discriminatory specifications, any challenge to the basis of award, or any claim that the solicitation documents or the solicitation process violated applicable Federal or State law, or Did the Authority failed to follow its Procurement Regulations in the solicitation of bids.

## 2. Protests regarding bid evaluation

Any bid protest regarding the evaluation of bids by the Authority must be filed with the Authority <u>no later than twenty (20) days after the opening of bids</u>. Any protest filed after such date which raises issues regarding the bid evaluation will not be considered by the Authority.

This type of protest would include any challenge to determinations by the Authority of the responsiveness of a bid or the responsibility of a bidder, or any claim that the evaluation of bids violated Federal or State law or the Authority's Procurement Regulations.

## 3. Protests Regarding Award of Contract

Any protest regarding the award of the contract must be filed <u>no later than ten (10) days after the date of award.</u> Any protest regarding the award of the contract filed after that date will not be considered by the Authority.

This type of protest will only be entertained by the Authority if the protestor is able to demonstrate that the party awarded the contract fraudulently represented itself as a responsible bidder or that the Authority violated Federal or State law or its Procurement Regulations in the award of the contract.

## E. Authority Response

### 1. Types of Protests

The Authority will notify the protestor upon timely receipt of a bid protest and may, where appropriate, request additional information from the protestor. The Authority may, at its discretion, meet with the protestor to review the matters raised by the protest. The Authority's consideration of the particular types of protests will, except as otherwise provided in Paragraph 2 of this subsection, be in accordance with the following provisions:

#### a. Protests regarding solicitation

Upon receipt of a timely filed protest regarding the solicitation, the Authority will postpone the opening of bids until resolution of the protest. No additional bids will be accepted during the period of postponement.

If the protest regarding the solicitation involves a claim of unduly restrictive or exclusionary specifications, the Authority will, in evaluating the protest, consider both the specific need of the Authority for the feature or item challenged and any effects on competition of including the specification regarding that feature or item. If the Authority determines that such feature or item was included in the specification in order to meet justified and valid transit needs of the Authority, and was not unduly restrictive of competition or designed to exclude a particular competitor, then the Authority will have grounds to deny the protest.

#### b. Protests regarding bid evaluation

Upon receipt of a timely filed protest regarding the evaluation of bids, the Authority will suspend its evaluation of all bids submitted until resolution of the protest if the Authority determines that the protestor has established that there are reasonable doubts regarding the responsiveness of a bid or the responsibility of a bidder or regarding the Authority's compliance with Federal or State law or its Procurement Regulations.

#### c. Protests after award

Upon receipt of a timely filed protest regarding the award of a contract, the Authority will issue a stop work order, if necessary, until the resolution of the protest if the Authority determines that the protestor has established a **Prima facie** case that the contract was awarded fraudulently or in violation of that Federal or State law or the Authority's Procurement Regulations.

## 2. Decisions by Authority

As indicated above, in most instances the Authority will suspend the procurement process upon receipt of a bona fide bid protest. However, the Authority reserves the right, notwithstanding the pendency of a protest, to proceed with the appropriate action in the procurement process or under the contract in the following cases:

    a. where the item to be procured is urgently required;

    b. where the Authority determines that the protest was vexatious or frivolous; and

    c. where delivery or performance will be unduly delayed, or other undue harm will occur, by failure to make the award promptly.

After review of a bid protest submitted under this section, the Authority will issue a written decision on the basis of the information provided by the protestor, the results of any meetings with the protestor, and the Authority's own investigation. If the protest is upheld, the Authority will take appropriate action to correct the procurement process and protect the rights of the protestor, including resolicitation of bids, revised evaluation of bids or Authority determinations, or termination of the contract. If the protest is denied, the Authority will lift any suspension imposed and proceed with the procurement process or the contract, as the case may be.

The availability of review of bid protests by FTA is described in Section II. As noted in that section, under FTA's revised procurement guidelines the role of the Federal government in bid protest review is quite limited.

## SECTION II - FTA BID PROTEST PROCEDURE

Under FTA Circular 4220.1D, *reviews of protests by FTA will be limited to claims that the CTA failed to have or follow protest procedures, or claims that CTA failed to review a complaint or protest. A protester must exhaust all administrative remedies with the CTA before pursuing a protest with FTA. An appeal to FTA must be received by the cognizant FTA regional or Headquarters Office within five (5) working days of the date the protester knew or should have known of the violation. Violations of Federal law or regulation will be handled by the complaint process stated within that law or regulation. Violations of State or local law or regulations will be under the jurisdiction of State or local authorities.*

**CHICAGO TRANSIT AUTHORITY**
**INSURANCE AND BOND REQUIREMENTS**
[Short Form rev. 12/04/02]

REQUISITION NUMBER: B04OP00219
SPECIFICATION NUMBER CTA: _____

# PART I.    GENERAL INSTRUCTIONS AND REQUIREMENTS

A.    **WAYS TO COMPLY WITH CTA INSURANCE REQUIREMENTS.**

1.    HOW TO COMPLY IF CGL, OWNERS PROTECTIVE LIABILITY, BUILDER'S RISK INSURANCE AND/OR PROFESSIONAL LIABILITY ARE REQUIRED BY PART III OF THIS DOCUMENT.

There are three ways to satisfy the CTA's insurance requirements for Comprehensive General Liability, Owners Protective Liability, Builder's Risk and Professional Liability. For Comprehensive General Liability, Owners Protective Liability, Builder's Risk and Professional Liability the Contractor must provide the CTA with one of the following insurance documents:

a)    certified copy of the insurance policy,
b)    an insurance binder, *or*
c)    the CTA Certificate of Coverage on the CTA approved form.  The CTA Certificate of Coverage may be completed only by an authorized representative of the insurance company, an agent, broker, or underwriter.

2.    HOW TO COMPLY IF *RAILROAD PROTECTIVE INSURANCE* IS REQUIRED BY PART III OF THIS DOCUMENT.

There are two ways to satisfy the CTA's insurance requirements for Railroad Protective. The Contractor must provide the CTA with one of the following insurance documents:

a)    certified copy of the insurance policy *or*
b)    an insurance binder

Method b is a temporary method that is valid only for 90 days.  A certified copy of the railroad protective insurance policy must be furnished prior to the expiration of this 90 day period.

3.    HOW TO COMPLY FOR ALL OTHER TYPES OF REQUIRED INSURANCE.

For all other insurance required by Part III of this document, an ACORD™ certificate is acceptable.

B.    **DEADLINE FOR INITIAL SUBMITTAL OF CONTRACTOR'S INSURANCE AND BOND DOCUMENTS.**

The Contractor must furnish all required insurance and performance and payment bond documents within fourteen days of the date that the Contractor receives a letter (the "Insurance Submittal Letter") from the CTA's General Manager of Purchasing requesting the Contractor to submit the documents required by these Insurance and Bond Requirements. CTA will not execute the Contract until the required insurance and bond documents are delivered to CTA and approved by CTA.  Failure to deliver the required documents within

Special Conditions – Insurance And Bond Requirements  1

fourteen days of receipt of the Insurance Submittal Letter is a material failure to comply with the specifications and may result in any or all of the following at the CTA's sole discretion:

1. debarment or suspension, and
2. determination of Contractor non-responsibility.

## C.    CTA ADDRESS.

All notices and documents must be mailed to the CTA at:

> Chicago Transit Authority
> P.O. Box 7554
> 567 W. Lake
> Chicago, IL 60661

## D.    OBLIGATION TO MAINTAIN CONTINUOUS COMPLIANCE

1. The Contractor expressly agrees that failure to comply and maintain compliance with all insurance and bond requirements shall constitute a material breach of the Contract which may result in default and, if uncured, termination for default under the contract. In addition, such failure, if uncured, may result in debarment and suspension.

2. The Contractor is prohibited from performing any work if Contractor has allowed any of the required insurance policies to expire.

# PART II.    INSURANCE REQUIREMENTS

A.    The CTA must be named as an Additional Insured and Certificate Holder. When the CTA is an additional insured, the coverage shall be primary.

B.    The CTA must be the Named Insured on the Owners Protective Liability, Railroad Protective Liability, or Builders Risk Insurance policies.

C.    The Commercial General Liability and Owners Protective Liability, General Aggregate Limit of Liability, if any, must apply on a per location, per project basis by endorsement to the policy.

D.    All insurance carriers must be acceptable to the CTA. All insurance companies shall have at least a B+ VII POLICY HOLDER RATING, or better, by the A.M. Best Co., Inc. Insurance companies with lower ratings will not be accepted. Carriers licensed to do business in the State of Illinois must issue all insurance, with the exception of Railroad Protective.

E.    To the extent permitted by the Contractor's insurance policies required by the CTA, the Contractor and its insurers waive all rights of subrogation against the CTA.

F.    The insurance to be carried shall in no way be subject to limitations, if any, expressed in the indemnity section of the General Conditions (or any statutory, judicial or common law limitations).

# PART III.  INSURANCE COVERAGES

### A.    WORKERS COMPENSATION

Coverage A:        In form and in accordance with the laws of the State of Illinois.

Coverage B:        Employers Liability:

STATUTORY        Bodily Injury by Accident

STATUTORY        Bodily Injury by Disease, Policy Limit

### B.    COMPREHENSIVE OR COMMERCIAL GENERAL LIABILITY:

| | |
|---|---|
| $2,000,000 | General Aggregate (Per Location) |
| $2,000,000 | Products/Completed Operations Aggregate |
| $1,000,000 | Personal Injury and Advertising Injury |
| $1,000,000 | Per Occurrence |

The Commercial General Liability policy shall include, without limitation:  (i) Broad Form Contractual Liability, (ii) Products/Completed Operations to be maintained in full force and effect for a period of two (2) years following final completion of the work under the Contract, (iii) Independent Contractors' Protective Liability, (iv) Premises/Operations, including deletion of explosion, collapse and underground (XCU) exclusions, (v) Broad Form Property Damage, including Products/Completed Operations, (vi) Personal Injury Liability, with employee  and contractual exclusions deleted, (vii) Severability of Interest and Cross Liability endorsement and (viii) Contractor expressly agrees to waive, and will require its insurer to waive, its rights, benefits and entitlement under the "Other Insurance" clause of its Commercial General Liability policy, with respect to the CTA.

If any work is to be performed within fifty (50) feet of rail right-of-way and the Contractor is not required to provide Railroad Protective Insurance by the other provisions of these  Insurance and Bond Requirements, then an additional requirement applies which can be satisfied in either of the two following ways:  1) the CGL policy exclusion for coverage of work within fifty (50) feet of rail right-of-way must be deleted by endorsement to the CGL policy, or 2) in the alternative, railroad protective insurance may be provided.

### C.    AUTOMOBILE LIABILITY

| | |
|---|---|
| $1,000,000 | Combined Single Limit (Bodily Injury and Property Damage) |
| ———————— | Uninsured/Underinsured Motorist Including Owned, Non-Owned, Hired and Borrowed Vehicles and Equipment |

Special Conditions – Insurance And Bond Requirements  3

D.    UMBRELLA LIABILITY

_____ Each occurrence and in the aggregate, excess of the underlying policies.

The Umbrella Liability Policy shall specifically identify each of the policies described in A, B, and C above on the Schedule of Underlying Coverages, and shall provide coverage at least as broad as each of the underlying policies.

E.    OWNERS PROTECTIVE LIABILITY

$2,000,000    General Aggregate (Per Location)

$1,000,000    Per Occurrence

_____    Combined Single Limit (Bodily Injury and Property Damage Per Location)

The definition of designated contractor must be amended to include contractors of every tier.

F.    RAILROAD PROTECTIVE LIABILITY

_____    Bodily Injury per Occurrence

_____    Bodily Injury Aggregate

_____    Property Damage per Occurrence

_____    Property Damage Aggregate

The definition of designated contractor must be amended to include contractors of every tier.

G.    VALUABLE PAPERS INSURANCE

_____

H.    PROFESSIONAL LIABILITY

_____ Each Claim _____ Annual Aggregate _____ Deductible (Maximum Permissible Deductible)

I    OTHER INSURANCE: CTA MUST BE NAMED ADDITIONAL INSD ON CGL.

_____

# PART IV    BOND REQUIREMENTS

The Contractor shall furnish the following bond(s) for this contract:

Type of bond required: _____    Amount _____

Issue Date _____

## INSURANCE CERTIFICATE OF COVERAGE

Named
Insured: _____

Specification #: _____

Address: _____

RFP #: _____

(NUMBER & STREET)

_____

Project #: _____

(CITY)    (STATE)    (ZIP)

Contract #: _____

| Description of Operation/Location | |
|---|---|

The insurance policies and endorsements indicated below have been issued to the designated named insured with the policy limits as set forth herein covering the operation described within the contract involving the named insured and the Chicago Transit Authority. The Certificate issuer agrees that in the event of cancellation, non-renewal or material change involving the indicated policies, the issuer will provide at least sixty (60) days prior written notice of such change to the Chicago Transit Authority at the address shown on this Certificate. This certificate is issued to the Chicago Transit Authority in consideration of the contract entered into with the named insured, and it is mutually understood that the Chicago Transit Authority relies on this certificate as a basis for continuing such agreement with the named insured.

| Type of insurance | Insurer Name | Policy Number | Expiration Date | Limits of Liability All Limits in Thousands |
|---|---|---|---|---|
| Commercial General Liability<br>~ Occurrence    ~ Claims made<br>~ Premise-Operations<br>~ Explosion/Collapse Underground<br>~ Products/Completed Operations<br>~ Blanket Contractual<br>~ Broad Form Property Damage<br>~ Independent Contractors<br>~ Personal Injury<br>~ Pollution | | | | Each Occurrence $_____<br><br>General Aggregate $_____<br><br>Products/Completed Operations Aggregate $_____ |
| Automobile Liability (Any Auto) | | | | |
| Excess Liability<br>~ Umbrella Liability | | | | Each Occurrence $_____ |
| Workers' Compensation and Employer's Liability | | | | Each Occurrence $_____<br>Statutory/Illinois Employers Liability $_____ |
| Builders' Risk/Course of Construction | | | | |
| Professional Liability | | | | Amount of Contract |
| Owner Contractors Protective | | | | $_____ |
| Other | | | | $_____ |

a) Each insurance policy required by this agreement, except policies for workers' compensation and professional liability, will read: "The Chicago Transit Authority is an additional insured as respects to operations and activities of, or on behalf of the named insured, performed under contract with or permit from the Chicago Transit Authority".

b) The General, Automobile and Excess/Umbrella Liability Policies described provide for separation of insureds applicable to the named insured and the CTA.

c) Workers Compensation and Property insurer shall waive all rights of subrogation against the Chicago Transit Authority.

d) The receipt of this certificate by the CTA does not constitute agreement by the CTA that the insurance requirements in the contract have been fully met, or that the insurance companies indicated by this certificate are in compliance with all contract requirements.

| Name and Address of Certificate Holder and Receipt of Notice | Signature of Authorized Rep. |
|---|---|
| Certificate Holder/Additional Insured | |
| **Chicago Transit Authority**<br>**Dept. of Purchasing**<br>**P.O. Box 3555**<br>**Chicago, IL 60654** | Agency/Company |
| | Address |
| | Telephone |